FILED
2012 Sep-13  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SAN FRANCISCO RESIDENCE CLUB, INC., *et al.,* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-09-S-0421-NE |
| | ) | |
| CHERYL BASWELL-GUTHRIE, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### TABLE OF CONTENTS

| TOPIC | PAGE NO. |
|---|---|
| I. INTRODUCTION.. | 1 |
| II. THE BASIC REQUIREMENTS FOR A DEFERRED, LIKE-KIND EXCHANGE UNDER SECTION 1031 | 4 |
| III. THE PLAINTIFFS, DEFENDANTS, AND OTHER, NON-PARTY PLAYERS | 23 |
| A. Plaintiffs | 23 |
| B. The Wilmer & Lee Defendants | 26 |
| C. The Baswell-Guthrie Defendants | 26 |
| D. The McDermott Defendants | 27 |
| 1. The resolution and dismissal of plaintiffs' claims against the McDermott Defendants | 28 |
| E. Non-Parties Involved in Some Transactions | 29 |
| IV. THE REPLACEMENT PROPERTY ACQUISITIONS | 32 |
| A. The Moquin and Fountain Acquisitions | 32 |
| 1. The Moquin transaction | 36 |
| 2. The Fountain transaction | 40 |

| | | | |
|---|---|---|---|
| | B. | The Corporate Drive Acquisition.............................. | 40 |
| | C. | The Old Madison Pike Acquisition............................. | 43 |
| | D. | The Quality Circle Acquisition................................. | 45 |
| V. | | ACQUISITIONS CLOSED BY THE WILMER & LEE DEFENDANTS............. | 47 |
| | A. | Acquisition of the "Moquin Drive" and "Fountain" Properties..... | 47 |
| | | 1. Samuel Givhan's involvement.............................. | 51 |
| | | 2. The "Ireland conference call"............................. | 52 |
| | | 3. WaMu forwards funds and forms to Givhan.................. | 54 |
| | B. | Acquisition of the "Corporate Drive" Property................... | 61 |
| | C. | The Role of California Attorney Jeffrey Weiss.................. | 65 |
| | D. | Reformation of Titles to the Properties Closed by Givhan......... | 67 |
| | E. | The Issue of the $50,000 Check.............................. | 69 |
| VI. | | ACQUISITIONS CLOSED BY THE BASWELL-GUTHRIE DEFENDANTS.......... | 70 |
| | A. | Lead-Up to Old Madison Pike and Quality Circle Acquisitions..... | 70 |
| | B. | Old Madison Pike (a/k/a "Tech Point")......................... | 72 |
| | C. | Quality Circle................................................ | 79 |
| | D. | Possible Conflict of Interest................................. | 86 |
| | E. | Dispute With McDermott...................................... | 88 |
| VII. | | CHOICE OF GOVERNING LAW........................................ | 90 |
| | A. | The Public Policy Exception to the Rule of *Lex Loci Delicti*........ | 93 |
| | | 1. The Alabama Legal Services Liability Act.................. | 94 |
| | | 2. Plaintiffs' argument that non-clients can assert common-law claims against Alabama attorneys......................... | 98 |
| | | a. *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800 (Ala. 1999)........................ | 98 |

   b. *Fogarty v. Parker, Poe, Adams & Bernstein, L.L.P.*,
    961 So. 2d 784 (Ala. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

   c. *Smith v. Math*, 984 So. 2d 1179 (Ala. Civ. App. 2007).. . . . . . . 101

   d. *Line v. Ventura*, 38 So. 3d 1 (Ala. 2009).. . . . . . . . . . . . . . . . . 104

  3. **Analysis of the cases relied upon by plaintiffs, and their
   application to public policy**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

**VIII.** **INCONSISTENCIES AMONG THE ALLEGATIONS OF THE COMPLAINT, THE
  UNCONTESTED FACTS, AND ARGUMENTS IN BRIEFS.** . . . . . . . . . . . . . . . . . . 113

  A. **Claims Against the Wilmer & Lee Defendants**. . . . . . . . . . . . . . . . . 113

   1. **Variance between the factual allegations and Count 3 of the
    complaint, on the one hand, and uncontested facts on the other**. 114

  B. **Claims Against the Baswell-Guthrie Defendants**. . . . . . . . . . . . . . . . 116

  C. **The Omissions of Counsel**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

**IX.** **ANALYSIS OF THE CLAIMS BROUGHT AGAINST THE WILMER & LEE
  DEFENDANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

  A. **Alabama Securities Violation (Count 2)**. . . . . . . . . . . . . . . . . . . . . . . 119

   1. **Beyond *Foster***. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

    a. *CFT Seaside Investment Limited Partnership
     v. Hammet*, 868 F. Supp. 836 (D. S.C. 1994). . . . . . . . . . . . . . 124

    b. *Ward v. Bullis*, 748 N.W. 2d 397 (N.D. 2008).. . . . . . . . . . . . . 126

    c. *San Francisco Residence Club, Inc., et al. v. Park
     Tower, LLC, et al.*, Civil Action No. 08-1423-NE-AKK
     (N.D. Ala. Jan. 12, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

   2. **Application of the *ratio decidendi* of the preceding decisions
    to the issues raised in the present action**. . . . . . . . . . . . . . . . . . . . 130

  B. **Claims Asserted Against the Wilmer & Lee Defendants Under
   the Alabama Legal Services Liability Act (Count 3)**. . . . . . . . . . . . . 135

   1. **Plaintiffs' proposed expert witness**. . . . . . . . . . . . . . . . . . . . . . . . 137

    a. **Crockett's qualifications**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

        **b.   Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   139

  **C.**      **The Claim for Thomas O'Shea's $50,000 Check (Count 3)**. . . . . . .   146

**X.**   **ANALYSIS OF THE CLAIMS BROUGHT AGAINST THE BASWELL-GUTHRIE DEFENDANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   148

  **A.**      **Existence of an Attorney-Client Relationship Between Plaintiffs and Baswell-Guthrie**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   149

  **B.**      **The Old Madison Pike Acquisition**. . . . . . . . . . . . . . . . . . . . . . . .   151

        **1.**   **Expert testimony on the standard of care, and the "common knowledge and experience" exception**. . . . . . . . . . . . . . . . . .   151

        **2.**   **Damages**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   156

  **C.**      **The Quality Circle Acquisition**. . . . . . . . . . . . . . . . . . . . . . . . . . .   159

        **1.**   ***Gilmour v. Gates, McDonald & Co.,*** 382 F.3d 1312 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   160

        **2.**   ***Davis v. Coca-Cola Bottling Co. Consol.,*** 516 F.3d 955 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   162

        **3.**   **Application**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   164

  **D.**      **Escrow Liability of One Source Title & Escrow L.L.C. (Count 11)**. .   169

**XI.**  **ANALYSIS OF COUNTERCLAIMS ASSERTED BY THE BASWELL-GUTHRIE DEFENDANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   170

  **A.**      **Motion for Partial Summary Judgment: Fraud Counterclaim**. . . . .   171

  **B.**      **Motion for Partial Summary Judgment: Breach of Contract Counterclaim**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   178

  **C.**      **Motion to Dismiss the Counterclaim**. . . . . . . . . . . . . . . . . . . . . . .   182

        **1.**   **Standard of review**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   182

        **2.**   **Discussion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   184

**XII.**  **MISCELLANEOUS MOTIONS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   189

  **A.**      **Plaintiffs' Motion to Compel**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   190

iv

B. The Baswell-Guthrie Defendants' Motion to Quash Subpoena. . . . .  195

C. Defendants' Joint Motion to Compel. . . . . . . . . . . . . . . . . . . . . . . . .  196

    1. Attorney communications. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  197

        a. Factual background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  198

        b. Waiver of the attorney-client privilege. . . . . . . . . . . . . . . .  200

        c. Application of the privilege in this case. . . . . . . . . . . . . . . .  202

    2. Attorneys' fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  209

D. The Baswell-Guthrie Defendants' Motion to Strike. . . . . . . . . . . . .  211

XIII. CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  215

A. Choice of Law and Counts 4, 11, and 10. . . . . . . . . . . . . . . . . . . . . .  215

    1. Count 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  216

    2. Count 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  216

    3. Count 10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  217

B. Remaining Counts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  217

    1. Count 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  217

    2. Count 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  218

        a. ALSLA and the Wilmer & Lee defendants. . . . . . . . . . . . .  218

        b. ALSLA and the Baswell-Guthrie defendants. . . . . . . . . . . .  219

C. The Baswell-Guthrie Defendants' Counterclaims. . . . . . . . . . . . . . .  222

    1. Counterclaim count 1: Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . .  222

    2. Counterclaim count 2: Breach of contract . . . . . . . . . . . . . . . . .  223

D. The Miscellaneous Discovery Motions. . . . . . . . . . . . . . . . . . . . . .  225

# I.  INTRODUCTION

This action grew out of a series of real-estate acquisitions that occurred in Huntsville, Alabama during 2007.  Section 1031 of the Internal Revenue Code — a provision that allows a property owner to defer taxation of profits generated from the exchange of property held for productive use in a trade or business or for investment in property of a "like kind" — lies at the heart of the controversy.  *See* 26 U.S.C. § 1031(a)(1).[1]  The plaintiffs intended to effect transactions under that provision by selling income-producing properties located in California and Mississippi, and then utilize the profits derived from those transactions to purchase replacement commercial properties in Huntsville, Alabama.

This action — as well as three similar cases assigned to other judges on this same court,[2] and a spate of state-court suits spawned by the plaintiffs' investments in

---

[1] For an explication of the history of, and policy rationales for, the statute quoted in text, from its origins as section 202(c)(1) of the Revenue Act of 1921 through the late 1980s, see, *e.g.*, Marjorie E. Kornhauser, *Section 1031:  We Don't Need Another Hero*, 60 So. Cal. L. Rev. 397 (1987).

[2] The first action filed, *San Francisco Residence Club, Inc., et al. v. Park Tower, L.L.C., et al.*, CV-08-AKK-1423-NE (N.D. Ala. Aug. 8, 2008), is assigned to Judge Abdul Kallon.  That action grew from the plaintiffs' investment in the "Park Tower" building located at 200 West Side Square in Huntsville, Alabama (*i.e.*, the structure originally known as "the Central Bank building": a multi-story office complex for professionals).  Samuel Givhan acted as the closing attorney for that acquisition which, like the transactions at issue in the present case, allegedly failed to comply with Section 1031.  The plaintiffs instituted suit against the parties identified in Part III(B) of this opinion, *infra*, as the "Wilmer & Lee Defendants," alleging the same causes of action asserted in this action.  The defendants' motion for summary judgment was granted in part and denied in part.

The second case filed, *Triad Properties Corp. v. San Francisco Residence Club, Inc.*, CV-08-J-1574-NE (N.D. Ala. Aug. 29, 2008), was assigned to Judge Inge Pritz Johnson.  The case was brought against the parties identified in Part III(B), *infra*, as the "McDermott Defendants."  It was

Huntsville real estate[3] — arose when the plaintiffs' acquisitions of Huntsville real estate allegedly were not structured in a manner that made the investments eligible for favorable tax treatment under Section 1031.  The failure to do so exposed plaintiffs to potentially significant, and negative, tax consequences — an outcome that they, nevertheless, avoided by falsely stating on their respective 2007 income tax returns that each of the acquisitions qualified for Section 1031 treatment.  Plaintiffs compounded their misrepresentations to the Internal Revenue Service by commencing this action, in which even their *Second* Amended Complaint — that is, *their third*

---

referred to arbitration shortly after it was filed.  The arbitrator's award in favor of plaintiff for $383,429.74, interest, costs, and attorneys' fees was entered on Nov. 25, 2008, and the case was closed.

The fourth case to be filed in this District, *San Francisco Residence Club, Inc., et al. v. Cheryl Baswell-Guthrie, et al.*, CV-11-SLB-2420-NE (N.D. Ala. July 1, 2011), was assigned to Chief Judge Sharon Lovelace Blackburn.  Its claims are based upon the allegedly tortious actions taken by the parties identified in Part III(C), *infra*, as the "Baswell-Guthrie Defendants" in the course of providing title insurance for the "Old Madison Pike" and "Quality Circle" property acquisitions discussed in Parts IV(C) and (D) of the present opinion, *infra*.  A motion to dismiss the claims in that case is pending.

[3] *See*, *e.g.*, *Scott J. McDermott v. Quality Circle, L.L.C., et al.*, CV 08-90134 (Cir. Ct. of Madison Co., Ala., Aug. 20, 2009); *Estelle Phillips v. Claytor-Phillips Holdings, L.L.C., et al*. CV-09-900425 (Cir. Ct. of Madison Co., Ala. Apr. 16, 2009); *LAG, L.L.C. v. Colinwood Dev. Gr., Inc., et al.*, CV-09-900924 (Cir. Ct. of Madison Co., Ala. Oct. 28, 2008); *One Source Title & Escrow, L.L.C., et al. v. Scott McDermott, et al.*, CV-09-900925 (Cir. Ct. of Madison Co., Ala. Aug. 20, 2009); *Jeri Holden, et al. v. Cheryl Baswell-Guthrie, et al*., CV-09-900926 (Cir. Ct. of Madison Co., Ala., Aug. 20, 2009); *LAG, L.L.C. v. Claytor Phillips Holdings, L.L.C., d/b/a Coldwell Banker*, CV-10-770 (Cir. Ct. of Madison Co., Ala. May 20, 2010); *LAG, L.L.C. v. Colinwood Dev. Gr. Inc*., CV-10-900152 (Cir. Ct. of Madison Co., Ala., Feb. 4, 2010); *Todd Adcock, et al. v. Cheryl Baswell-Guthrie*, CV-11-173 (Cir. Ct. of Madison Co., Ala., Feb. 23, 2011); *Vern E. Gohanna, et al. v. Madison Cnty., Ala., et al*., CV-11-188 (Cir. Ct. of Madison Co., Ala., Feb. 18, 2011); *Vern E. Gohanna, et al. v. Cheryl Baswell-Guthrie, et al*., CV-11-901405 (Cir. Ct. of Madison Co., Ala., Oct. 20, 2011).

*attempt to plead claims upon which relief arguably might be granted* — continues to perpetuate a confusing muddle of facts, claims, and remedies that, at times, can only be described as bewildering.  Regrettably, plaintiffs' attorneys have provided scant assistance to this court's comprehension of difficult issues by way of briefs or oral argument.  Perhaps that was intentional:  a tactical decision that scattering claims, contentions, and defenses might be more efficacious than targeted shots.  If so, that "does great disservice to the administration of civil justice."[4]

For such reasons, the following opinion represents this court's best effort at hacking a path through the tangled allegations, arguments, and evidentiary materials presented in connection with the disposition of ten pending motions,[5] and an attempt to determine whether some harmonizing themes may be discerned among the

---

[4] *Johnson Enter. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998).  The Eleventh Circuit long ago condemned so-called "shotgun pleadings" that disregard either the "short and plain statement of the claim" requirement of Rule 8, or the requirement of Rule 10(b) that discrete claims should be pled in separate counts.  *See, e.g., BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1326-27 n.6 (11th Cir. 1998); *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1368 (11th Cir. 1998); *Pelletier v. Zweifel*, 921 F.2d 1465, 1518-19 (11th Cir. 1991).

[5] *See* doc. no. 84 (plaintiffs' motion to dismiss the Baswell-Guthrie Defendants' counterclaim); doc. no. 122 (plaintiffs' motion to compel discovery by the Baswell-Guthrie Defendants); doc. no. 126 (Baswell-Guthrie Defendants' motion to quash subpoena issued to a non-party by plaintiff San Francisco Residence Club, Inc.); doc. no. 128 (Baswell-Guthrie Defendants' motion to compel plaintiffs to respond to discovery); doc. no. 136 (Wilmer & Lee Defendants' motion for summary judgment); doc. no. 137 (Baswell-Guthrie Defendants' motion for summary judgment); doc. no. 140 (Baswell-Guthrie Defendants' motion for partial summary judgment on their counterclaims); doc. no. 164 (Baswell-Guthrie Defendants' motion to strike portions of evidentiary materials submitted by plaintiffs); doc. no. 184 (Baswell-Guthrie Defendants' motion strike plaintiffs' "second supplemental filing of evidence"); and doc. no. 186 (Wilmer & Lee Defendants' motion to strike the report of, and preclude testimony by, plaintiffs' expert witness).

3

admitted and undisputed facts.  The discussion will begin, however, as it must, with a summary of the basic requirements for structuring a deferred, like-kind exchange under Section 1031.

## II.  THE BASIC REQUIREMENTS FOR A DEFERRED, LIKE-KIND EXCHANGE UNDER SECTION 1031

Normally, when real property is sold, the owner must recognize either a gain or loss.[6]  If it is a gain, the amount is subject to taxation.[7]  If the property has a low basis,[8] and the gain from the sale will be high,[9] the taxpayer often will attempt to structure the transaction in a manner that will minimize his tax liability.  Internal Revenue Code Section 1031 is the primary means of accomplishing that objective. The primary clause of that statute provides that:

> No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

---

[6] *Recognition* is a term that, in tax law, refers to the act of accounting for a taxpayer's realized gain or loss for the purpose of income-tax reporting.  *See* 26 U.S.C. § 1001(c) ("[T]he entire amount of the gain or loss . . . on the sale or exchange of property shall be recognized.").

[7] *See* 26 U.S.C. § 1001(a) ("The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain . . . .").  Typically, the property-owner faces the payment of 15-25% in federal capital gain taxes, and the potential of state income taxes, as well as the recapture of depreciation deductions from prior tax returns.

[8] *See, e.g.*, 26 U.S.C.  § 1012 ("The basis of property shall be the cost of such property, except as otherwise provided in this subchapter . . . .").

[9] *See* 26 U.S.C. §§ 1001(a), (b) (defining the computation of the amount of gain).

4

26 U.S.C. § 1031(a)(1).  Because Section 1031 provides an exception to the general rule found in I.R.C. § 1001(c), requiring "recognition" (*i.e.*, taxation) of the entire amount of the gain on the sale of property, the statutory and regulatory requirements for such transactions are complex, nuanced, and strict.  Some of those requirements are fundamental to an understanding of the transactions at issue in this case, and they, along with relevant terms, are discussed below.

**Exchanger** (*sometimes referred to as an* "Exchangor"):[10]  An individual or entity performing an exchange under Section 1031.[11]

**Relinquished property**:  The property an exchanger transfers in a Section 1031 exchange.

**Replacement property**:  The property an exchanger identifies and ultimately receives in a Section 1031 exchange.

**Exchange requirement**:  Treasury Regulations provide that, "[o]rdinarily, to constitute *an exchange*, the transaction must be *a reciprocal transfer of property*, as

---

[10] *See*, *e.g.*, doc. no. 193-1 (Plaintiffs' Response to Court's Aug. 9, 2012 Order), "Ex. A (Part 1 of 2)" at 3 (Exchange Agreement and Supplemental Closing Instructions) (referring to Thomas O'Shay as the "Exchangor").

[11] There is no requirement that an exchanger (or "exchangor") be an individual.  Rather, a corporation, limited liability company, or other entity can participate in a like-kind exchange as an exchanger.  *See, e.g.*, I.R.S. Priv. Ltr. Rul. 06-31-012 (Aug. 4, 2006) (stating that a property exchange proposed by a corporation and a partnership would qualify for tax deferral under Section 1031).

distinguished from *a transfer for a money consideration only*."[12]  In other words, to satisfy the "exchange" requirement of Section 1031, the transaction must involve a transfer of property by the exchanger and the receipt of property by the exchanger. The transactions cannot be transfers of property for the receipt of money.[13]

"**Like-kind**" **property requirements**:  The relinquished and replacement properties must be of a "like-kind."  The term "like-kind" is not specifically defined in the Internal Revenue Code.  Section 1031 provides only that the property subject to "exchange" must be "property held for productive use in a trade or business or for investment."[14]  Treasury Regulations provide some, but not a great deal of, guidance when stating that the term refers to "the nature or character of the property and not to its grade or quality."[15]  For example, *unimproved* real estate is deemed to be of a "like-kind" with *improved* real property since the existence of the improvements

---

[12] 26 C.F.R. § 1.1002 – 1(d) (emphasis supplied).

[13] Courts have strictly construed this element of the exchange requirement.  For example, even if an exchanger can show an intent to do an exchange, courts will ignore the intent if the exchanger receives money or other non-like-kind exchange property.  This rule applies even if the exchanger holds the cash or non-like-kind property for a very short period of time. *See*, *e.g.*, *Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967). *See also*, *e.g.*, *Halpern v. United States*, 286 F. Supp. 255 (N.D. Ga. 1968) (holding that a transaction in which the exchanger constructively received money for relinquished property also failed to satisfy the property-for-property element of the exchange requirement).

[14] 26 U.S.C. § 1031(a)(1).

[15] 26 C.F.R. § 1.1031(a) – 1(b) ("As used in section 1031(a), the words *like kind* have reference to *the nature or character of the property* and not to its grade or quality. . . .").

relates only to the grade or quality of the property, and not to its nature or character.[16]

*Like-kind ownership interests*— The nature of the exchanger's *ownership interests* in the exchanged properties also are subject to the "like-kind" requirement. In other words, title to the replacement property must be vested in *the same persons or entities*, and with *the same forms of ownership interests* — *e.g.*, "tenants in common," "joint tenants with right of survivorship"[17] — as was the case with the relinquished property.  Even so, the relative percentage of a taxpayer-exchanger's ownership interest in a replacement property does not have to be equal to the exchanger's ownership percentage in the relinquished property; instead, it can be either greater or less, *but the nature of the ownership interest must be the same*.[18]  For example, if an exchanger owned a 25% interest in a relinquished property as a tenant

---

[16] *Id.* (providing that:  "One kind or class of property may not, under that section [1031], be exchanged for property of a different kind or class.  The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class.  Unproductive real estate held by one other than a dealer for future use or future realization of the increment in value is held for investment and not primarily for sale.  . . .") (alteration supplied).

[17] Generally speaking, the term "joint tenants" describes a form of title in which two or more co-owners take identical interests simultaneously by the same instrument (*e.g.*, a deed or will), the same kinds of estates in the land (*e.g.*, fee-simple, for life, etc.), with identical rights of possession to the property, and with a right of survivorship to the other co-tenants' shares.  In contrast, the term "tenants in common" describes a form of title in which two or more persons acquire equal (or unequal) undivided shares, each person having an equal right to possess the whole property, *but no right of survivorship*.  *See*, *e.g.*, *Black's Law Dictionary* 1603, 1604 (9th ed. 2009).

[18] *See* Revenue Ruling 73-476, 1973-2 C.B. 41 (allowing Section 1031 tax deferral where three exchangers, each holding one-third interests as tenants-in-common in three properties, agreed to take full title to one property each).

in common with two other persons or entities, the exchanger could use the proceeds from the sale of the relinquished property to acquire any other fractional proportion of a tenancy in common interest in the replacement property.  The key factors in this example are that the exchanger owned an *undivided* interest as a tenant in common in both the relinquished property and the replacement property.

*The exchanger also must be* "on the title" *of both the relinquished and replacement properties*.  That is, the taxpayer owning an interest in real  property that is to be exchanged under Section 1031 — and regardless of whether the taxpayer is an individual, a corporation, limited liability company, or some other entity — must be "on the title" to both the relinquished and replacement properties.  For example, if a husband and wife held fee-simple title to a relinquished property as tenants in common, then title to the replacement property must vest in both spouses in the same form of ownership as was the case with the relinquished property.  Similarly, a corporation, partnership, limited liability company, trust, or any other entity holding an ownership interest in the relinquished property must be "on the title" of the replacement property.

It follows, therefore, that an exchanger who sold his, her, or its share in a relinquished property in which the nature of the exchanger's title was as *a tenant in common*, and then purchased a membership in a *multi-member, limited liability*

*company* ("L.L.C.") that acquired title to a replacement property, would not be entitled to defer recognition of the taxable gain from the sale of the relinquished property — *even if* the exchanger's share in the L.L.C. was equal to the share of the title the exchanger had possessed in the relinquished property under a tenancy in common arrangement.[19]  The key factor in this example is that the exchanger would not be "on the title" of the replacement property owned by the L.L.C.; instead, title would be vested in the L.L.C., as opposed to the individual members of the L.L.C.. For that reason, the taxpayer-exchanger could not claim that *he, she, or it* had received "like-kind" property in the exchange.

The requirement for an exchanger to be "on the title" of the replacement property lies at the center of all the claims asserted in the present action.  The plaintiffs contend that defendants failed to structure the replacement property acquisitions at issue in compliance with the requirements for deferred tax treatment

---

[19] Note well that the Internal Revenue Service has privately ruled that the acquisition of a single-owner ("single-member") limited liability company that owns real property may be treated as the acquisition of real property for purposes of the "like-kind exchange" rules.  The basis for that ruling is that a non-corporate business entity (L.L.C.) with a single-owner (*i.e.*, "single member" L.L.C.) may be disregarded as an entity separate from its owner ("member") under Treasury Regulation 301.7701-2(c)(2), which provides that:  "For federal tax purposes . . . a business entity that has a single owner and is not a corporation . . . is disregarded as an entity separate from its owner."  In other words, the receipt of the sole ownership interest in the L.L.C. that owns real property is treated as the direct receipt of real property by the taxpayer-owner.  I.R.S. Priv. Ltr. Rul. 200118023 (May 4, 2001), 2001 WL 470569.  Even so, the real property owned by the L.L.C. must be of a like-kind to the real property transferred by the taxpayer, and it must be held for use in the taxpayer's trade or business, or for investment.

under Section 1031.  The intended replacement properties were purchased by limited

liability companies, rather than by the plaintiff-exchangers.  Plaintiffs allege that the

remaining defendants — *i.e.*, *the Wilmer & Lee Defendants* and *the Baswell-Guthrie*

*Defendants* — committed tortious acts in the process of structuring the transactions.

"**Safe harbors**":  As a practical matter, a taxpayer rarely engages in a

transaction in which he and another party literally exchange the titles to relinquished

and replacement properties on the same day, back-to-back.[20]  Instead, almost all

Section 1031 exchanges are non-simultaneous:  *that is*, in tax parlance, "deferred"

exchanges.[21]  Treasury Regulations define a *deferred exchange* as one

> in which, pursuant to an agreement, the taxpayer transfers property held
> for productive use in a trade or business or for investment (the
> "relinquished property") and subsequently receives property to be held
> either for productive use in a trade or business or for investment (the
> "replacement property").

26 C.F.R. § 1.1031(k) – 1(a).  That is what occurred in each transaction at issue in the

present controversy:  the plaintiffs' acquisition of replacement, income-producing

properties occurred several months after the dates on which they had closed on the

---

[20] In a "simultaneous exchange," there is not an appreciable interval of time between the closing of the sale of the "relinquished property" and the closing on the acquisition of the "replacement property."

[21] There are basically four kinds of Section 1031 exchanges:  *i.e.*, a simultaneous exchange; a deferred exchange; a reverse exchange; and, an improvement exchange.  Of those, only the second is at issue in the present case.  As the terminology suggests, title to a *replacement property* in a "deferred exchange" is acquired by the exchanger on a later date than the date on which the exchanger closed on the sale of his *relinquished property*.

sales of their relinquished properties.

Significantly, however, Treasury Regulations stipulate that, "[i]n order to constitute a deferred exchange, *the transaction must be an exchange* (i.e., *a transfer of property for property*, *as distinguished from a transfer of property for money*)." *Id*. (emphasis supplied). Placing that regulatory requirement next to the observation that taxpayers almost never engage in transactions in which they and another party exchange properties with each other on the same day begs a question: *How can a taxpayer structure a deferred exchange that still qualifies for favorable tax treatment under Section 1031?*  The answer lies in a legal fiction:  the use of one of the four, so-called "safe harbors" sanctioned by Treasury Regulations.[22]  By doing so, the taxpayer-exchanger will not be deemed to be in actual or constructive receipt of money or other property derived from his or her disposition of a relinquished property.[23]  One such "safe harbor," the kind at issue in this case, is discussed below.

---

[22] *See* 26 C.F.R. § 1.1031(k) – 1(g)(1) ("Paragraphs (g)(2) through (g)(5) of [26 C.F.R. § 1.1031(k) – 1(g)] set forth four safe harbors the use of which will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for purposes of section 1031 and this section.  More than one safe harbor can be used in the same deferred exchange, but the terms and conditions of each must be separately satisfied.  For purposes of the safe harbor rules, the term "taxpayer" does not include a person or entity utilized in a safe harbor (*e.g.*, a qualified intermediary). . . .").

[23] *See* 26 C.F.R. § 1.1031(k) – 1(g), providing that:

   **(g) Safe harbors** – **(1) In general**.  Paragraphs (g)(2) through (g)(5) of this section set forth four safe harbors the use of which will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for purposes of section 1031 and this section.  More than one safe harbor can be used in

**Qualified intermediary**:  A qualified intermediary is a person or entity who (or which) "[e]nters into a written agreement with the taxpayer (the 'exchange agreement') and, *as required by the exchange agreement*, [*i.*] acquires the relinquished property from the taxpayer, [*ii.*] transfers the relinquished property, [*iii.*] acquires the replacement property, and [*iv.*] transfers the replacement property to the taxpayer."   26 C.F.R. § 1.1031(k) – 1(g)(4)(iii)(B) (emphasis and alterations supplied).  In other words, both the relinquished and replacement properties must pass through the qualified intermediary.

This safe harbor provides that a qualified intermediary is not treated as the agent of the taxpayer-exchanger for the purposes of determining whether the taxpayer has actually or constructively received money from disposition of the "relinquished property" when that compensation is paid to and held by the qualified intermediary.

> In the case of a taxpayer's transfer of relinquished property involving a qualified intermediary, the qualified intermediary is not considered the agent of the taxpayer for purposes of section 1031(a). In such a case, the taxpayer's transfer of relinquished property and subsequent receipt of like-kind replacement property is treated as an exchange, and the determination of whether the taxpayer is in actual or constructive receipt of money or other property before the taxpayer

---

the same deferred exchange, but the terms and conditions of each must be separately satisfied.  For purposes of the safe harbor rules, the term "taxpayer" does not include a person or entity utilized in a safe harbor (*e.g.*, a qualified intermediary). See paragraph (g)(8), Example 3(v), of this section.

*Id*. § 1.1031(k) – 1(g)(1) (emphasis in original).

> actually receives like-kind replacement property is made as if the qualified intermediary is not the agent of the taxpayer.

26 C.F.R. § 1.1031(k) – 1(g)(4)(i).  Stated differently, in order to preserve the legal fiction of an "exchange," the exchanger cannot directly receive money when transferring the relinquished property to the qualified intermediary for sale.[24]  Instead, the qualified intermediary holds the funds derived from the sale of the relinquished property until the closing on the acquisition of the replacement property.  At that time, the qualified intermediary delivers to the seller of the replacement property the funds used to purchase that property, and then transfers to the taxpayer-exchanger title to the replacement property.  Such transactions have been approved as a valid means of effecting an "exchange" of property for the purposes of favorable tax treatment under Section 1031.  *See, e.g.*, *Alderson v. Comm'r of Internal Revenue*, 317 F.2d 790 (9th Cir. 1963).

**Requirements for "qualified intermediaries"**:  The following requirements must be satisfied in order for the "qualified intermediary safe harbor" to apply.

*The inclusion of the "(g)(6) restrictions"*—

The agreement between the taxpayer-exchanger and qualified intermediary

---

[24] *See* 26 C.F.R. § 1.1031(k) – 1(a) ("If the taxpayer actually or constructively receives money . . . in the full amount of the consideration for the relinquished property, the transaction will constitute a sale, and not a deferred exchange, even though the taxpayer may ultimately receive like-kind replacement property.").

13

must contain the restrictions specified in Treasury Regulation § 1.1031(k) − 1(g)(6).[25]

> **(6) Additional restrictions on safe harbors under paragraphs (g)(3) through (g)(5).** **(i)** An agreement limits a taxpayer's rights as provided in this paragraph (g)(6) only if the agreement provides that the taxpayer has no rights, except as provided in paragraph (g)(6)(*ii*) and (g)(6)(*iii*) of this section, to receive, pledge, borrow, or otherwise obtain the benefits of money or other property before the end of the exchange period.
>
> **(ii)** The agreement may provide that if the taxpayer has not identified replacement property by the end of the identification period, the taxpayer may have rights to receive, pledge, borrow, or otherwise obtain the benefits of money or other property at any time after the end of the identification period.
>
> **(iii)** The agreement may provide that if the taxpayer has identified replacement property, the taxpayer may have rights to receive, pledge, borrow, or otherwise obtain the benefits of money or other property upon or after—
>
>> (A) The receipt by the taxpayer of all of the replacement property to which the taxpayer is entitled under the exchange agreement, or
>>
>> (B) The occurrence after the end of the identification period of a material and substantial contingency that—
>>
>>> (1) Relates to the deferred exchange,
>>>
>>> (2) Is provided for in writing, and

---

[25] *See* 26 C.F.R. § 1.1031(K) – 1(g)(4)(ii), providing that:

> **(ii)** Paragraph (g)(4)(i) of this section applies only if the agreement between the taxpayer and the qualified intermediary expressly limits the taxpayer's rights to receive, pledge, borrow, or otherwise obtain the benefits of money or other property held by the qualified intermediary as provided in paragraph (g)(6) of this section.

14

(3) Is beyond the control of the taxpayer and of any disqualified person (as defined in paragraph (k) of this section), other than the person obligated to transfer the replacement property to the taxpayer.

26 C.F.R. § 1.1031(k) – 1(g)(6) (emphasis in original).

*The qualification requirement—*

Second, the qualified intermediary must be a person or entity who (or which) is not *either* the taxpayer-exchanger *or* a "disqualified person" as defined in Treasury Regulation § 1.1031(k) – 1(k).[26]  *See* 26 C.F.R. § 1.1031(k) – 1(g)(4)(iii)(A).

---

[26] 26 C.F.R. § 1.1031(k) – 1(k) reads, in part, as follows:

(**k**) **Definition of disqualified person**.  (**1**) For purposes of this section, a disqualified person is a person described in paragraph (k)(2), (k)(3), or (k)(4) of this section.

(**2**) The person is the agent of the taxpayer at the time of the transaction.  For this purpose, a person who has acted as the taxpayer's employee, attorney, accountant, investment banker or broker, or real estate agent or broker within the 2–year period ending on the date of the transfer of the first of the relinquished properties is treated as an agent of the taxpayer at the time of the transaction.  Solely for purposes of this paragraph (k)(2), performance of the following services will not be taken into account—

(**i**) Services for the taxpayer with respect to exchanges of property intended to qualify for nonrecognition of gain or loss under section 1031; and

(**ii**) Routine financial, title insurance, escrow, or trust services for the taxpayer by a financial institution, title insurance company, or escrow company.

(**3**) The person and the taxpayer bear a relationship described in either section 267(b) or section 707(b) (determined by substituting in each section "10 percent" for "50 percent" each place it appears).

(**4**)(**i**) Except as provided in paragraph (k)(4)(ii) of this section, the person and

15

*Requirement that both transfers pass through the qualified intermediary—*

The exchange agreement must require the qualified intermediary to:   (1) acquire the relinquished property from the taxpayer-exchanger; (2) transfer the title to the relinquished property to the purchaser; (3) acquire the replacement property from the seller; and (4) transfer title to the replacement property to the taxpayer-exchanger.[27]  In other words, both the relinquished property and replacement property must pass through the qualified intermediary.

*The definition of "transfer"—*

---

a person described in paragraph (k)(2) of this section bear a relationship described in either section 267(b) or 707(b) (determined by substituting in each section "10 percent" for "50 percent" each place it appears).

> (**ii**) In the case of a transfer of relinquished property made by a taxpayer on or after January 17, 2001, paragraph (k)(4)(i) of this section does not apply to a bank (as defined in section 581) or a bank affiliate if, but for this paragraph (k)(4)(ii), the bank or bank affiliate would be a disqualified person under paragraph (k)(4)(i) of this section solely because it is a member of the same controlled group (as determined under section 267(f)(1), substituting "10 percent" for "50 percent" where it appears) as a person that has provided investment banking or brokerage services to the taxpayer within the 2–year period described in paragraph (k)(2) of this section.  For purposes of this paragraph (k)(4)(ii), a bank affiliate is a corporation whose principal activity is rendering services to facilitate exchanges of property intended to qualify for nonrecognition of gain under section 1031 and all of whose stock is owned by either a bank or a bank holding company (within the meaning of section 2(a) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(a)).

[27] *See* 26 C.F.R. § 1.1031(k) – 1(g)(4)(iii)(B), providing that: "A qualified intermediary is a person who— . . . (B) Enters into a written agreement with the taxpayer (the 'exchange agreement') and, *as required by the exchange agreement*, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." (emphasis supplied).

When determining whether property has been "transferred through" the qualified intermediary, a modified version of the usual Internal Revenue Service definition of the term "transfer" is employed: *that is*, property is deemed to have been "transferred through" a qualified intermediary if the qualified intermediary acquires or transfers title to the property. *See* 26 C.F.R. § 1.1031(k) – 1(g)(4)(iv).[28]

*The terms of the exchange agreement—*

The qualified intermediary is treated as having entered into an exchange agreement if the rights of a party to the agreement are assigned to the intermediary,

---

[28] The full text of the regulation cited in text reads as follows:

(**iv**) Regardless of whether an intermediary acquires and transfers property under general tax principles, solely for purposes of paragraph (g)(4)(iii)(B) of this section—

(A) An intermediary is treated as acquiring and transferring property if the intermediary acquires and transfers legal title to that property,

(B) An intermediary is treated as acquiring and transferring the relinquished property if the intermediary (either on its own behalf or as the agent of any party to the transaction) enters into an agreement with a person other than the taxpayer for the transfer of the relinquished property to that person and, pursuant to that agreement, the relinquished property is transferred to that person, and

(C) An intermediary is treated as acquiring and transferring replacement property if the intermediary (either on its own behalf or as the agent of any party to the transaction) enters into an agreement with the owner of the replacement property for the transfer of that property and, pursuant to that agreement, the replacement property is transferred to the taxpayer.

26 C.F.R. § 1.1031(k) – 1(g)(4)(iv).

and, all parties to the agreement are notified in writing of the assignment on or before the relevant transfer of property.  *See* 26 C.F.R. § 1.1031(k) – 1(g)(4)(v).[29]  Thus, the taxpayer-exchanger may enter into an agreement with the purchaser of the relinquished property and satisfy this requirement by assigning his rights in the contract to the qualified intermediary.  In like manner, the taxpayer-exchanger may enter into an agreement to purchase a replacement property (or properties) and satisfy this requirement by assigning his rights under that contract to the qualified intermediary.

**Timing requirements for deferred exchanges**:  Internal Revenue Code Section 1031(a)(3) imposes three strict time requirements for completion of a deferred exchange.  The time period for each requirement begins on the day after the exchanger transfers the relinquished property,[30] and ends at midnight on the last day

---

[29] The Treasury Regulation cited in text provides that:

(**v**) Solely for purposes of paragraphs (g)(4)(iii) and (g)(4)(iv) of this section, an intermediary is treated as entering into an agreement if the rights of a party to the agreement are assigned to the intermediary and all parties to that agreement are notified in writing of the assignment on or before the date of the relevant transfer of property.  For example, if a taxpayer enters into an agreement for the transfer of relinquished property and thereafter assigns its rights in that agreement to an intermediary and all parties to that agreement are notified in writing of the assignment on or before the date of the transfer of the relinquished property, the intermediary is treated as entering into that agreement.  If the relinquished property is transferred pursuant to that agreement, the intermediary is treated as having acquired and transferred the relinquished property.

[30] The day on which the exchanger transfers the relinquished property is not counted for purposes of the timing requirements.  *See* 26 C.F.R. § 1.1031(k) – 1(b)(3).  The date on which the

18

of the applicable time period.[31]

Moreover, if — as part of the same deferred exchange — the exchanger sells more than one relinquished property, and the relinquished properties are transferred on different dates, the times periods discussed below begin running on the earliest date on which any of the properties is sold.[32]

*The 45-day identification period—*

The first time restriction for a deferred exchange is the requirement that a taxpayer *either close on* the acquisition of a replacement property, *or identify* the potential replacement property, within 45 days from the date of the sale, transfer, or other disposition of the relinquished property.[33]  *The 45 day rule is hard and fast, with no forgiveness for weekends or holidays.*

This requirement is satisfied if the replacement property is acquired before 45 days have expired; otherwise, the identification of the replacement property must be incorporated into a written document ("the identification notice"), signed by the taxpayer-exchanger, and delivered to the qualified intermediary.[34] The "identification

---

property is deemed to have been "transferred" is the date on which the property is disposed of within the meaning of Internal Revenue Code § 1001(a).  *See* 26 C.F.R. § 1.1031(k) – 1(b)(2)(*iv*).

[31] *See id.* §§ 1.1031(k) – 1(b)(2)(*i*)-(*ii*).

[32] *See id.* § 1.1031(k) – 1(b)(2)(*iii*).

[33] *See* 26 C.F.R. § 1.1031(k) – 1(b)(2)(*i*) ("The identification period begins on the date the taxpayer transfers the relinquished property and ends at midnight on the 45th day thereafter.").

[34] The technical requirements of "identification" are set out in 26 C.F.R. § 1.1031(k) –

notice" must contain an unambiguous description of the replacement property, including, in the case of real property, the legal description and street address (or a distinguishable name).[35]   More than one potential replacement property can be identified.   These requirements are encapsulated in the following Treasury Regulations:

> Replacement property is identified only if it is designated as replacement property in a written document signed by the taxpayer and hand delivered, mailed, telecopied, or otherwise sent before the end of the identification period to either—
>
> > (i)   The person obligated to transfer the replacement property to the taxpayer . . . ; or
> >
> > (ii)  Any other person involved in the exchange other than the taxpayer or a disqualified person (as defined in paragraph (k) of this section).
>
> Examples of persons involved in the exchange include any of the parties to the exchange, an intermediary, an escrow agent, and a title company. An identification of replacement property made in a written agreement for the exchange of properties signed by all parties thereto before the end of the identification period will be treated as satisfying the requirements of this paragraph (c)(2).
>
> **(3)   Description of replacement property**.   Replacement property is identified only if it is unambiguously described in the written document or agreement.   Real property generally is unambiguously described if it is described by a legal description, street address, or

---

1(c)(2).

[35] The description of the identified property must be sufficiently specific to be unambiguous. *See id*. § 1.1031(k) – 1(c)(3).

distinguishable name (e.g., the Mayfair Apartment Building). Personal property generally is unambiguously described if it is described by a specific description of the particular type of property.  For example, a truck generally is unambiguously described if it is described by a specific make, model, and year.

(**4**)  **Alternative and multiple properties**.  (**i**) The taxpayer may identify more than one replacement property. Regardless of the number of relinquished properties transferred by the taxpayer as part of the same deferred exchange, the maximum number of replacement properties that the taxpayer may identify is—

(A)  Three properties without regard to the fair market values of the properties (the "3–property rule"), or

(B)  Any number of properties as long as their aggregate fair market value as of the end of the identification period does not exceed 200 percent of the aggregate fair market value of all the relinquished properties as of the date the relinquished properties were transferred by the taxpayer (the "200–percent rule").

26 C.F.R. § 1.1031(k) – 1(c)(2) – (4)(I) (emphasis in original).

*The 180-day, or due-date of income-tax return, exchange period—*

Once a replacement property has been identified, it must be acquired and the exchange completed *no later than the date of the occurrence of the first of the following events*:  (a) 180 days after the sale or transfer of the relinquished property; *or* (b) the due date of the taxpayer's income tax return, including extensions, for the tax year in which the relinquished property was sold or transferred — *whichever*

21

*event first occurs*.[36]   The 180 day requirement is also strict:[37]  it does not mean six

months, but 180 *consecutive days*, *with no forgiveness for weekends or holidays*.

   **1031 Tax Savings Example**:  The following hypothetical demonstrates how

a taxpayer might evaluate whether to exchange a rental property for a replacement

investment property by estimating the potential Federal capital gain tax liability (15-

25%).

**Facts related to the Relinquished Property**

| | |
|---|---|
| ○ Original Purchase Price | $   500,000 |
| ○ Capital Improvements Made | 25,000 |
| ○ Depreciation Deducted | 100,000 |
| ○ Anticipated Sale Price | 1,000,000 |
| ○ Sale Related Expenses | 80,000 |

**Determining the Basis**

| | |
|---|---|
| Original Purchase Price | $   500,000 |
| *Plus* Capital Improvements | + 25,000 |
| ○ *Subtotal* | 525,000 |
| *Less* Depreciation | − 100,000 |
| ○ *Adjusted Basis* | $   425,000 |

**Determining the Gain**

| | |
|---|---|
| Sale Price | $ 1,000,000 |
| *Less* Sale Related Expenses (closing costs) | − 80,000 |
| Net Sale Price | $   920,000 |
| *Less* Adjusted Basis | − 425,000 |
| Realized Gain | $   495,000 |

---

   [36] *See* 26 C.F.R. § 1.1031(k) − 1(b)(2)(*ii*) ("The exchange period begins on the date the taxpayer transfers the relinquished property and ends at midnight on the earlier of the 180th day thereafter or the due date (including extensions) for the taxpayer's return of the tax imposed by chapter 1 of subtitle A of the Code for the taxable year in which the transfer of the relinquished property occurs.").

   [37] *Note well that*, with the sole exception of an extension that may be allowed in the event of a Presidentially-declared "National Disaster," *there is no provision for an extension of the 180-day time limit for any circumstance or hardship*.

22

**Determining the Estimated Tax**

| | | |
|---|---|---|
| Depreciation Recapture | | |
| ($100,000 x 25%) | | 25,000 |
| Capital Gain | | |
| (15% x $395,000)[38] | | 59,250 |
| Estimated Federal Taxes Due | $ | 84,250 |

In this example, if the taxpayer should decide not to pursue a Section 1031 exchange, the taxable gain would be $495,000, and the Federal capital gain tax liability would be $84,250, *plus* any state tax liability. By acquiring "like-kind" replacement property equal to or greater than the net sales price of $920,000, however, and reinvesting all of the proceeds of sale, the entire gain can be deferred and no taxes will be due for the tax year in which the relinquished property was sold.

## III.  THE PLAINTIFFS, DEFENDANTS, AND OTHER, NON-PARTY PLAYERS

### A.  Plaintiffs

***Thomas O'Shea*** is a California citizen, over the age of 65 years, and the husband of Anne Donahue O'Shea. He has extensive experience in real estate investments, including the management of a real estate portfolio that stretches across nine states and is valued at more than $14,000,000. He has participated in more than thirty like-kind exchanges,[39] and he identified his occupation as "real estate" on his

---

[38] Realized Gain ($495,000) less Depreciation ($100,000).

[39] *See* doc. no. 138 (Brief in Support of Summary Judgment, filed by Baswell-Guthrie Defendants), at "Statement of Undisputed Facts" ¶ 1 (hereafter "Baswell-Guthrie Facts"). *See also* doc. no. 139-11 (O'Shea Plaintiffs' 1031 Exchanges).

For the sake of simplicity, the court will cite to the parties' fact statements, to the extent that

23

2007 joint income tax return.[40]

*Anne Donahue O'Shea* is the wife of Thomas O'Shea and an attorney licensed to practice law in the State of California, where she was a state prosecutor for some thirteen years.[41]  She has been involved in more than twenty like-kind exchanges.[42]  She is the sister of Kate and Kevin Donahue.  Like her husband, Anne O'Shea's occupation was identified on the couple's 2007 joint income tax return as "real estate."[43]

*The Trust of Thomas and Anne O'Shea*, sometimes referred to as "*the O'Shea Trust*," is a California revocable living trust.  The sole trustees are Thomas and Anne Donahue O'Shea.[44]

*Kate Donahue* is a California citizen, and the sister of Anne Donahue O'Shea and Kevin Donahue.[45]  She relies on real estate investments as her primary source of

---

those statements are undisputed.

[40] Baswell-Guthrie Facts ¶ 5.

[41] *Id.* ¶ 3.

[42] *Id.* ¶ 4.

[43] *Id.* ¶ 5.

[44] Doc. no. 139 (Brief in Support of Summary Judgment, filed by Wilmer & Lee Defendants), at "Statement of Undisputed Facts" ¶ 8 (hereafter "Wilmer & Lee Facts").

[45] Ms. Donahue's full name is Kate Larkin Donahue.  *See* doc. no. 193-3 (Plaintiffs' Response to Court's Aug. 9, 2012 Order), "Ex. B (Part 1 of 4)" at 2 ("Stewart Title Guaranty Company Closing Statement," stating Ms. Donahue's name at various places as "Kate Larkin Donahue"); *id.* at 7 ("Exchange Agreement and Supplemental Closing Instructions") (same).

24

income,[46] and has been involved in at least ten like-kind exchanges.[47]

*San Francisco Residence Club, Inc*. is a closely-held California corporation. There are four shareholders and Directors:  Anne Donahue O'Shea; Kate Donahue; Kevin Donahue; and Gwen Donahue.[48]  Gwen Donahue is the mother of Anne, Kate, Kevin, and Kim Donahue.[49]  Kim Donahue Welch formerly was a shareholder, but relinquished her stock at the time of her divorce (presumably, to keep the shares out of the hands of her former husband).[50]  She is no longer involved in the corporation or this case.  Kevin Donahue is the President of the corporation, and Kate Donahue is the Secretary.[51]

*KKA CAS, L.L.C.* is an Alabama limited liability company, the members of which are Kate Donahue, Kevin Donahue, and Anne O'Shea.[52]  The acronym "KKA" is formed from the first letter of each member's given name.  "CAS" refers to the main tenant in one of the Huntsville commercial properties involved in this action.[53]

---

[46] Baswell-Guthrie Facts ¶ 7.

[47] *Id.*

[48] Doc. no. 139-4 (Anne O'Shea Dep., Feb. 10, 2010), at 22; *see also* Wilmer-Lee Facts ¶ 7 (mentioning the "Donahue family"); Baswell-Guthrie Facts ¶ 11 (omitting mention of Gwen Donahue).

[49] Doc. no. 139-13 (John Kevin Donahue Dep., Feb. 2, 2011), at 38.

[50] *Id.* at 186-90.

[51] Doc. no. 139-4 (Anne O'Shea Dep., Feb. 10, 2010), at 22.

[52] Baswell-Guthrie Facts ¶ 13.

[53] "The CAS Group" is a subsidiary of Wyle Laboratories of El Segundo, California, and it provides services to the United States Department of Defense in weapon system support and

***TAK Tech Point, L.L.C.*** is another Alabama limited liability company, the members of which are Thomas O'Shea, Anne O'Shea, and Kate Donahue.[54]  Again, the acronym "TAK" is formed from the first letter of each member's given name. "Tech Point" references the seller of the property located at 7027 Old Madison Pike in Huntsville's Cummings Research Park West.[55]

## B.    Wilmer & Lee Defendants

***Samuel Givhan*** is an attorney licensed to practice law in the State of Alabama.[56]  He is a shareholder in the Huntsville law firm known as "***Wilmer & Lee, P.A.***"[57]  Givhan and his firm are sometimes referred to by the parties, and also this court, as "the Wilmer & Lee Defendants."

## C.    Baswell-Guthrie Defendants

***Cheryl Baswell-Guthrie*** is an attorney who, at the time of the events on which this action is based, was licensed to practice law in Alabama.  She also then was the sole member of both ***Baswell-Guthrie, P.C.***,[58] and ***One Source Title & Escrow,***

---

analysis.  *See* www.wyle.com/CAS/Pages/default/.aspx (last visited Aug. 15, 2012).  CAS is headquartered at 100 Quality Circle in Huntsville: a property discussed in Part IV(D) of this opinion, *infra*.

[54] Baswell-Guthrie Facts ¶ 14.

[55] *See* doc. no. 141-22 (Old Madison Pike Closing Affidavit); doc. no. 141-23 (Old Madison Pike Tenancy-in-Common Agreement).

[56] Wilmer & Lee Facts ¶ 1.

[57] *Id.*

[58] Baswell-Guthrie Facts ¶ 46.

*L.L.C.*, an Alabama limited liability company.[59]  Over the course of her legal career,

Ms. Baswell-Guthrie was involved in over fifty like-kind exchanges.[60]  Her license

to practice law was suspended by the Alabama State Bar on September 16, 2011,

following her arrest on a warrant obtained by the Securities and Exchange

Commission and charging her with the offense of Theft of Property in the First

Degree.  She subsequently was placed on "disability inactive" status and, at least as

late as July 23, 2012, remained in that status.[61]  Her present whereabouts are unknown

to this court.  Her only contact with the attorneys defending the claims asserted

against her apparently is by means of infrequent email transmissions.

## D.    McDermott Defendants

*Scott McDermott*, *Roy Claytor*, and *William Chapman* are Alabama citizens,

real estate professionals, and, on the dates leading up to the commencement of this

action, were associates of one another.  *Highlands Management, L.L.C.* is an

Alabama limited liability company, the members of which were the three individuals

just named.  *Claytor-Phillips, L.L.C.* was an Alabama limited liability company, the

---

[59] Doc. no. 157 (Response in Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs), at "Additional Undisputed Facts" ¶ 4 (hereafter 2 Plaintiffs' Facts).

[60] 2 Plaintiffs' Facts ¶ 4.

[61] July 23, 2012 email to this court from J. Anthony McLain, General Counsel of the Alabama State Bar Association.

members of which were Scott McDermott, Roy Claytor, and Estell Phillips. *Huntsville Commercial Brokerage, L.L.C.* is an Alabama limited liability company, of which William Chapman is the sole member. The individual defendants named above, together with the limited liability companies controlled by them, will be collectively referred to in this opinion as "the McDermott Defendants."

### 1.   The resolution and dismissal of plaintiffs' claims against the McDermott Defendants

In their initial investigation into Huntsville real estate, plaintiffs contacted Scott McDermott, Roy Claytor, and William Chapman — all of whom represented to plaintiffs that they were qualified real estate professionals with experience in arranging Section 1031 like-kind exchanges. Plaintiffs alleged that those representations were false, and that McDermott, Claytor, and Chapman conspired to defraud them.

The McDermott Defendants were named in eight of the twelve counts of the plaintiffs' Second Amended Complaint.[62] Those defendants are not the focus of the motions addressed in this opinion, however. Rather, this court previously granted a motion to compel arbitration that had been filed by some of the McDermott

---

[62] *See* doc. no. 65 (Second Amended Complaint) ¶¶ 139-146 (Count 1), ¶¶ 155-65 (Count 2), ¶¶ 203-23 (Count 5), ¶¶ 224-38 (Count 6), ¶¶ 239-52 (Count 7), ¶¶ 253-62 (Count 8), ¶¶ 263-71 (Count 9), ¶¶ 272-78 (Count 10).

Defendants, and ordered plaintiffs and those defendants to proceed to arbitration.[63]
William Chapman was dismissed from the case on October 22, 2010.[64]  The parties
filed a notice with the court on May 17, 2011, stating that the claims against the
remaining McDermott Defendants had settled.[65]  Accordingly, plaintiffs' claims
against those defendants were dismissed.[66]

Thus — and even though the McDermott Defendants, especially Scott
McDermott himself, are at the center of the web of events forming the basis of the
plaintiffs' remaining claims against all other defendants — the McDermott
Defendants are no longer parties to the action.  Plaintiffs' remaining claims, asserted
against the Wilmer & Lee and Baswell-Guthrie Defendants, grew out of the property
acquisitions closed by those defendants.

E.    **Non-Parties Involved in Some Transactions**

***Kevin Donahue*** is a California citizen who, as previously noted, is the brother
of Anne Donahue O'Shea, Kate Donahue, and Kim Donahue Welch.

***Michael Shiffman*** is a California attorney who has represented plaintiffs and
other members of their family in the past, and who has been involved in fifteen to

---

[63] Doc. no. 64 (Order), at 2.

[64] Doc. no. 96 (Order of Dismissal as to Fewer Than All Defendants).

[65] Doc. no. 130 (Notice of Conclusion of Arbitration).

[66] Doc. no. 183 (Order Dismissing Fewer Than All Defendants).

29

thirty like-kind exchanges under Section 1031.[67]

**Jeffrey Weiss** is another California attorney.  His practice is concentrated on estate planning and tax law, including like-kind exchanges.  Weiss represented plaintiffs in some of the real estate transactions forming the basis of this action.[68]

**Erica O'Leary** was employed by the qualified intermediaries discussed below in the capacity of either an "Exchange Specialist," or "Senior Exchange Specialist."

**The Qualified Intermediaries**— As noted in Part II, *supra*, both the relinquished and replacement properties must pass through the same qualified intermediary;[69] otherwise, the taxpayer will be denied deferred taxation under Section 1031.  However, upon initial review of the documents prepared by Senior Exchange Specialist Erica O'Leary in connection with Thomas O'Shea's 2007 relinquishment of his interest in a 392-unit multi-family apartment complex known as "The Plaza at Sherman Oaks" in Los Angeles, California (*i.e.*, the first investment property relinquished by any of the plaintiffs in anticipation of a Section 1031 exchange for Huntsville real estate), and his subsequent acquisition of an interest in a replacement

---

[67] *See* doc. no. 139-14 (Michael Shiffman Dep., Feb. 22, 2010), at 44-48; Baswell-Guthrie Facts ¶¶ 26, 27.

[68] *Id.* ¶ 26; doc. no. 141-12 (Jeffrey Weiss Dep., Nov. 17, 2010), at 6-7.

[69] *See* 26 C.F.R. § 1.1031(k) – 1(g)(4)(iii)(B) (providing that "[a] qualified intermediary is a person who— . . . (B) Enters into a written agreement with the taxpayer (the 'exchange agreement') and, as required by the exchange agreement, [*i*] acquires the relinquished property from the taxpayer, [*ii*] transfers the relinquished property, [*iii*] acquires the replacement property, and [*iv*] transfers the replacement property to the taxpayer.") (alterations supplied).

property located at 6820 Moquin Drive in Huntsville's Cummings Research Park West, it appeared that requirement had been ignored by both Erica O'Leary and Thomas O'Shea. (Both halves of that transaction are discussed in Part IV(A), *infra*).[70] That initial impression, which proved to be mistaken, was based upon the following facts.

The letterhead of Erica O'Leary's January 26, 2007 cover letter, enclosing copies of documents related to the sale of O'Shea's interest in "The Plaza at Sherman Oaks," bears the name of "*North American Exchange Company*."[71] One of the documents included within that mailing — the "Exchange Agreement and Supplemental Closing Instructions"[72] — was executed by O'Leary on behalf of "*Timcor Exchange Corporation* dba North American Exchange Company, a California corporation."[73] Finally, the May 4, 2007 letter from O'Leary to the Wilmer

---

[70] *See* doc. no. 193-1 (Plaintiffs' Response to Court's Aug. 9, 2012 Order), "Ex. A (Part 1 of 2)" at 3 ("Exchange Agreement and Supplemental Closing Instructions"), ¶ D (stating that North American Exchange Company was "acting in the capacity of a 'qualified intermediary' as defined by Treasury Regulation 1.1031(k)-1(g)(4), and as such is engaged in the business of facilitating 1031 tax-deferred exchanges for its clients. Intermediary is not a 'disqualified person' as defined by Treasury Regulation 1.1031(k)-1(k).").

[71] *See id*. at 2.

[72] *Id*. at 3, ¶ D (stating that North American Exchange Company was "acting in the capacity of a 'qualified intermediary' as defined by Treasury Regulation 1.1031(k)-1(g)(4), and as such is engaged in the business of facilitating 1031 tax-deferred exchanges for its clients. Intermediary is not a 'disqualified person' as defined by Treasury Regulation 1.1031(k)-1(k).").

[73] *Id*. at 9. An internet search for information about Timcor Exchange Corporation and its relationship to "North American Exchange Company, a California corporation" proved frustrating, but apparently it also is (or became) a subsidiary of Washington Mutual Bank of Seattle, Wash. ("WaMu"). *See, e.g*., www.peterdrape.com/1031-exchange-info.asp (referencing "TIMCOR

& Lee Defendants, enclosing documents necessary to close the purchase of property located at 6820 Moquin Drive in Huntsville, was written on stationary bearing the letterhead of "*WaMu 1031 Exchange*."[74]  Even so, as it turns out, all three entities — *North American Exchange Company, Timcor Exchange Corporation*, and *WaMu 1031 Exchange* — had been commonly owned by Washington Mutual, Inc. of Seattle, Washington (abbreviated to "WaMu") since 2006.[75]  Consequently, to minimize confusion, this court will follow the parties' practice of referring to the entity employed by plaintiffs as the intermediary in all of the transactions at issue as either "**WaMu 1031 Exchange**" or, sometimes, just "**WaMu**."

### IV.  THE REPLACEMENT PROPERTY ACQUISITIONS

**A.**   **The Moquin and Fountain Acquisitions**

The first investment property relinquished by any of the plaintiffs in anticipation of a Section 1031 exchange for Huntsville real estate was Thomas

---

EXCHANGE CORP now operating Nationally as WaMu 1031 Exchange via Washington Mutual Bank"); www.trademarkia.com/timcor-exchange-corporation-1031-76610942.html (recording that a federal trademark registration was filed for "Timcor Exchange Corporation 1031" by Washington Mutual on Sept. 3, 2004, and that the description of Timcor's services provided to the U.S. Patent & Trademark Office was "Financial Consultation and management services relating to IRS § 1031 tax deferred property exchange transactions, including services as a qualified intermediary, and/or Accommodate, and/or Trustee in such transactions") (last visited Aug. 28, 2012); *see also* Justia Trademarks.com.

[74] *See* doc. no. 193-2, "Ex. A (Part 2 of 2)" at 29.

[75] *See*, *e.g.*, doc. no. 156-9 (Erica O'Leary Dep., Feb. 1, 2011), at 15-18, 31-32, 40-41, 44-45, 49-52, 112-113; *see also* www.sec.gov/Archives/edgar/data/933136/000127727706000 395/exh991to8kapril182006.html (last visited Aug. 29, 2012).

O'Shea's interest in a 392-unit multi-family apartment complex known as "The Plaza at Sherman Oaks," located at 4474–4500 Woodman Avenue in Los Angeles, California.[76]  He owned an undivided 2.300224% interest in the property as a tenant in common with other persons and entities who (or which) are not parties in this case.[77]  O'Shea entered into two agreements to sell his interest in the property for the aggregate amount of $1,895,384.58 on or about January 2, 2007;[78] that is, his interest was to be divided between two purchasers in the following manner:  1.873193% was to be sold to an entity known as "General Western Carmel Company" for "cash in the amount of $643,684.89 plus a pro rata portion of the existing debt on the Real Property attributable to the Interest (which Buyer shall receive a credit for at Closing) plus a pro rata portion of all existing unsecured debt of Seller (which Buyer shall assume and receive a credit for at Closing)";[79] and, 0.427031% was to be conveyed

---

[76] *See* doc. no. 139-29 (Moquin Identification Letter); www.theplazaatshermanoaks.com (last visited July 31, 2012).  "The Plaza at Sherman Oaks" sold on April 28, 2006 (*i.e.*, nine months *before* Thomas O'Shea sold his interest) for $82,400,000. *See* www.theharrisgroupmm.com/Proven-Results-THG-Closed-Transactions (last visited Aug. 2, 2012).

[77] *See* doc. no. 193 (Plaintiffs' Response to Court's Aug. 9, 2012 Order), ¶ 3 ("Thomas O'Shea held title as a tenant in common."); *id*. ¶ 2 ("Thomas O'Shea owned 2.300224 % with the balance of the ownership in either Friedkin Becker LP or unknown other fractional interest holders.").

[78] *See* doc. no. 193-1, "Ex. A (Part 1 of 2)" at 4-5 ("Exchange Agreement and Supplemental Closing Instructions"), ¶ 3(b) (reciting a "sales price of $1,895,384.58, less payment of costs of sale applicable thereto"); *see also id*. at 18 (same).

[79] *See* doc. no. 193-2, "Ex. A (Part 2 of 2)" at 4-5 (Purchase and Sale Agreement with General Western Carmel Co.) & ¶2(a) (reciting purchase price); *see also id*. at 15-16 & ¶ 2(a) (same).

to "F-B Realty Corporation" on similar terms.[80]

Thereafter, on or about January 26, 2007, Thomas O'Shea entered into an "Exchange Agreement" with the "WaMu 1031 Exchange" to act as "qualified intermediary" at the closing of the sale of his interests to the foregoing entities.[81]  The agreement assigned O'Shea's interests and sales contracts to WaMu, and directed that intermediary to transfer all of O'Shea's right, title, and interest in the "relinquished property" to the purchasers, and to

> hold the net proceeds [of sale] from the Closing . . . until such time as Exchangor has located suitable like-kind Replacement Property in which to exchange.  Thereafter Exchangor shall instruct Intermediary to acquire said Replacement Property on terms and conditions negotiated by Exchangor, as evidenced by a written agreement for the purchase thereof.[82]

The sales were closed on February 1 and March 1, 2007, respectively,[83] which meant that Thomas O'Shea, acting through his qualified intermediary, had to close on the acquisition of a replacement property no later than Tuesday, July 31, 2007: *i.e.*,

---

[80] *Id*. at 11-12 (Purchase and Sale Agreement with F-B Realty Corp.) & ¶ 2(a) (reciting a purchase price of "cash in the amount of $159,338.31 plus a pro rata portion of the existing debt on the Real Property attributable to the Interest (which Buyer shall receive a credit for at Closing) plus a pro rata portion of all existing unsecured debt of Seller (which Buyer shall assume and receive a credit for at Closing)"); *see also id*. at 22-23 & ¶ 2(a) (same).

[81] See the text accompanying note 75, *supra*.  *See also* doc. no. 193-1, "Ex. A (Part 1 of 2)" at 3 (Exchange Agreement and Supplemental Closing Instructions); *id*. at 18 (same).

[82] *Id*. at 4, ¶ 3(d), and at 19, ¶ 3(d) (same).  *See also id*. at 10 ("Notice of Assignment" executed by Thomas O'Shea in favor of North American Exchange Company), and 25 (same).

[83] *Id*. at 13-14 (Feb. 1, 2007 "Sellers Closing Statement") and 15-16 (Mar. 1, 2007 "Sellers Closing Statement").

180 consecutive days from February 1, 2007, *the earliest of the two sales of O'Shea's fractional interest in the relinquished property.*[84]

Two "replacement properties" were identified by Thomas O'Shea as potential like-kind exchanges on the identification notice he signed following divestment of his interest in The Plaza at Sherman Oaks: *i.e.*, 5320 I-55 North in Jackson, Mississippi (a property that is not at issue in this action);[85] and, 6820 Moquin Drive in Huntsville, Alabama (the subject of discussion in the following subsection).[86]

It is important to recognize that the Fountain property discussed in Part IV(A)(2), *infra*, was *not listed* in any identification notice signed by Thomas O'Shea. Therefore, and for that reason alone, the acquisition of the Fountain property could not have become a "replacement property" for a valid Section 1031 exchange.

---

[84] *Note well* that Erica O'Leary incorrectly advised the Wilmer & Lee Defendants that the "180th Day" — the "Last Day to close for this exchange" — was "**August 8, 2007**." Doc. no. 193-2, "Ex. A (Part 2 of 2)" at 29 (boldface emphasis in original). She apparently was counting from the second of the closings discussed in text, but that was contrary to Treasury Regulations. *See* 26 C.F.R. § 1.1031(k) – 1(b)(2)(iii) (providing that, if the exchanger sells more than one relinquished property, and the relinquished properties are transferred on different dates, the 45-day and 180-day time periods begin running on the earliest date upon which any of the properties are sold).

[85] *See* www.loopnet.com/Listing/16546319/5320-I-55-North-Jackson-MS (identifying this as an approximately 1.0 acre "Outparcel" located on Interstate Highway 55 at the Southwest corner of Jackson's premier automotive dealership, "Jackson Imports" (selling Land Rover, Jaguar, VW and Audi vehicles), valued at $560,000). "The Dealership underwent a $4.5mm renovation starting in 2007. The outparcel offers excellent visibility from Interstate 55, gaining exposure to approximately 97,000 vehicles per day. Access is provided from I-55 Frontage road and the cross street Reddoch Drive. The surrounding area is approximately 95% built up." *Id.* (last visited July 31, 2012).

[86] *See* doc. no. 139-29 (Moquin Identification Letter).

1.      **The Moquin transaction**

The Moquin transaction closed on or about May 8, 2007,[87] well within Section 1031's 180-day requirement, and involved the purchase of a 46,215 square foot office building constructed in 1989 on a 7.0 acre lot in Huntsville's Cummings Research Park West,[88] and located at 6820 Moquin Drive.[89]   The seller was "Susanne Bard, Trustee of the Ervin and Susanne Bard Family Trust," and the gross purchase price was $6,800,000.[90]   The qualified intermediary standing between Thomas O'Shea and the Bard Family Trust was the "WaMu 1031 Exchange."[91]   The agreement executed by O'Shea and Erica O'Leary, Senior Exchange Specialist for WaMu, was entitled "Assignment Agreement and Supplemental Closing Instructions (Tenant-in-Common Interest)."[92]   Pertinent portions of that agreement read as follows:

> A.      Exchangor and intermediary previously entered into an Exchange Agreement and Supplemental Closing Instructions, the terms of which are referred to and incorporated herein by this reference, pursuant to which Exchangor has transferred certain real property (the "Relinquished Property") through Intermediary to effect a delayed tax-

---

[87] *See* Wilmer & Lee Facts ¶ 26.

[88] Cummings Research Park is "[o]ne of the world's leading science and technology business parks." www.huntsvillealabamausa.com/new_exp/new_crp_toc.html (last visited Aug. 31, 2012).

[89] *See* www.loopnet.com/Listing/14616719/6820-Moquin-Drive-Huntsville-AL (last visited July 28, 2012).

[90] *See* doc. no. 139-18 (Moquin Purchase Agreement).

[91] See the text accompanying note 75, *supra*.

[92] Doc. no. 193-2 (Plaintiff's Response to Court's Aug. 9, 2012 Order), "Ex. A (Part 2 of 2)" at 30 (boldface emphasis omitted).

deferred exchange pursuant to the provisions of Section 1031(a) of the Internal Revenue Code.

B.    Exchangor has selected suitable like-kind property in which to exchange located in the County of **Madison**, State of **Alabama**, as to **a 25% beneficial interest** in property commonly known as **6820 Moquin Drive**, **Huntsville, Alabama** (the "Replacement Property"), legally described as follows:  [property description omitted in original]

C.    Exchangor has entered into an agreement (the "Purchase Agreement") to purchase the Replacement Property from **Susanne Bard, Trustee of the Ervin and Susanne Bard Family Trust** ("Seller") for a purchase price of **$6,800,000.00**.

. . . .

1.    **Assignment**.  Exchangor hereby conditionally assigns all of Exchangor's rights, title, and interest in and to the Purchase Agreement, and certain obligations thereunder[,] to Intermediary.  More particularly, Exchangor assigns to Intermediary Exchangor's obligation to purchase the Replacement Property from Seller, specifically conditioned upon Exchangor performing all other obligations required of Exchangor to Seller and any obligations surviving the closing and transfer of title.  Intermediary agrees to assume this obligation and perform said obligation in the manner provided for herein.

. . . .

3.    **Funding and Closing**.  In order to avoid the duplication of transfer fees, closing costs, title insurance expenses and the like, the parties agree as follows:

(a)    Exchangor's right to receive [title to] the Replacement Property may be accomplished by direct deeding from Seller to Exchangor.  Title to the Replacement Property will not be transferred to Intermediary at any time.

37

(b) *Closing Agent shall have Seller execute the appropriate deed in favor of Exchangor* and shall deliver said deed when Closing Agent obtains for Seller the agreed sales price, less payment for costs of sal applicable thereto, and subject to encumbrances of record, as evidenced by Closing Agent's HUD-1 or settlement statement approved by Exchangor, Seller[,] and Intermediary.

(c) All costs of acquiring the Replacement Property, including cash payments toward the purchase price and all other acquisition fees incident thereto, shall be borne first from the proceeds held by Intermediary [from the sale of Thomas O'Shea's interest in "The Plaza at Sherman Oaks" in Los Angeles] and then, to the extent necessary, from the funds of Exchangor.

. . . .

7. **Authorization to Release Funds to Close**. Execution of this Agreement by Exchangor constitutes an agreement and authorization by Exchangor that Intermediary may transmit exchange proceeds at the request of and upon the signature of Closing Agent in order to close the purchase of the Replacement Property.[93]

A fair reading of the parenthetical phrase in the title of the O'Shea/WaMu

Assignment Agreement — *i.e.*, "(*Tenant-in-Common Interest*)" — together with the

specification of the interest to be acquired stated in paragraph "B" ("a 25% beneficial

interest"), and the language in paragraph 3(b) stating that "*Closing Agent shall have*

*Seller execute the appropriate deed in favor of Exchangor*," clearly implies that the

Closing Agent was directed to prepare a deed in which the seller of the Moquin Drive

---

[93] *Id.* at 30-31 ("Assignment Agreement and Supplemental Closing Instructions (Tenant in Common Interest)") (boldface emphasis in original, italicized emphasis and bracketed alterations supplied).

property conveyed a 25% interest in the replacement property to Thomas O'Shea as a tenant in common with the other purchasers.

However, as will be discussed in greater detail in Part V of this opinion, *infra*, the deed to the Moquin Drive property did not vest any portion of the title in Thomas O'Shea, but in "Moquin, L.L.C.," an Alabama limited liability company. Further, the extent of O'Shea's fractional membership interest in that L.L.C. was less than 25%. Instead, the eleven members of Moquin, L.L.C., held the following fractional interests:

| | | |
|---|---|---|
| 1. | Thomas O'Shea | 22.483% |
| 2. | Jeri Holden | 22.483% |
| 3. | San Francisco Residence Club, Inc. | 11.241% |
| 4. | Staples Holding L.L.C. | 11.241% |
| 5. | Beth Mason Living Trust | 8.993% |
| 6. | Ronald and Loweeda Mitchell | 8.993% |
| 7. | Dean and Katy Russell | 4.496% |
| 8. | Fred and Martha Dolan | 4.496% |
| 9. | Scott McDermott | 4.856% |
| 10. | William Chapman | 4.856% |

11.  Roy Claytor                                        4.856%[94]

## 2.    The Fountain transaction

The Fountain transaction involved the simultaneous acquisition of a 10,000 square foot office building constructed in 1999 on a 2.30 acre lot in Huntsville's Nichols Commercial Park, at 4092 South Memorial Parkway.[95]  The seller was "Johnson Alabama L.L.C.," and the purchase price was $4,000,000.[96]  The original purchaser was defendant Scott McDermott, but he subsequently assigned his interest in and title to the property to "Fountain Partners, L.L.C.," an Alabama limited liability company.  The members of that limited liability company, and their respective fractional interests, were identical to those of Moquin, L.L.C., as listed in the preceding subsection.[97]  Again, however, the Fountain property was *not described* in the identification notice signed by Thomas O'Shea in connection with the sale of his interest in "The Plaza at Sherman Oaks" in Los Angeles.  Therefore, the acquisition of the Fountain property could not have become a "replacement property" for a valid Section 1031 exchange.  To the extent that plaintiffs claim otherwise, they are wrong.

## B.    The Corporate Drive Acquisition

---

[94] *See* doc. no. 139-34 (Moquin, L.L.C. Operating Agreement).

[95] *See* www.loopnet.com/Listing/16370577/4092-South-Memorial-Parkway-Huntsville-AL/ (last visited Aug. 2, 2012).

[96] *See* doc. no. 139-19 (Fountain Purchase Agreement).

[97] *See* doc. no. 139-35 (Fountain Partners, L.L.C. Operating Agreement).

The "relinquished property" sold in anticipation of purchasing a 50,400 square foot office building constructed on a 3.39 acre lot at 4955 Corporate Drive in Huntsville's Cummings Research Park East[98] was an apartment building located at 10471 Three Rivers Road, in Gulfport, Mississippi,[99] known as "Cedar Pointe."[100] The property was owned by the Trust of Thomas and Anne O'Shea ("the O'Shea Trust") and Kate Donahue, and each investor held an undivided 50% interest in the fee as tenants-in-common.[101]   It was sold on June 8, 2007 to "MS Palms Partners, L.L.C."[102] for approximately $4,740,000.[103]

Three "replacement properties" were identified by the O'Shea Trust and Kate Donahue as potential, like-kind exchanges in the identification notice signed following the sale of their interests in the Mississippi property: *i.e.*, 200 West Side Square in Huntsville, Alabama (a property implicated in the action assigned to Judge

---

[98]  *See* www.loopnet.com/Listing/16914169/4955-Corporate-Drive-Huntsville-AL/   (last visited Aug. 2, 2012).

[99]  *See* doc. no. 139-11 (O'Shea Plaintiffs' 1031 Exchanges).

[100]  *See id.*; *see also* doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010), at 106; www.apartmentratings.com/rate/MS-Gulfport-Cedar-Pointe-Apartments (last visited Aug. 4, 2012).

[101]  *See* doc. no. 193 (Plaintiffs' Response to Court's Aug. 9, 2012 Order) at 2, ¶ 4; *see also* doc. no. 193-7, Ex. C ("Plaintiff Kate Donahue's Answers and Objections to the First Set of Requests for Admissions Propounded by Defendant Cheryl Baswell-Guthrie").

[102]  *See* doc. no. 193-7 (Plaintiffs' Response to Court's Aug. 9, 2012 Order), "Ex. C" ("Plaintiff Kate Donahue's Answers and Objections to the First Set of Requests for Admissions Propounded by Defendant Cheryl Baswell-Guthrie") at 2, ¶ 4 (stating that "the Gulfport Property was sold to MS Palms Partners, LLC").

[103]  *See* doc. no. 139-11 (O'Shea Plaintiffs' 1031 Exchanges).  The evidentiary materials submitted by the parties do not provide a great deal of detail about that sale.

41

Kallon on this court);[104] 4955 Corporate Drive in Huntsville, Alabama (the subject of the present discussion); and, 100 Quality Circle in Huntsville, Alabama (the subject of the discussion in Part IV(D), *infra*).[105]

The seller of the Corporate Drive property was "DA Technology, L.L.C.," a Delaware limited liability company, and the purchase price was $5,400,000.[106] The qualified intermediary standing between the O'Shea Trust and Kate Donahue was, again, the WaMu 1031 Exchange.[107]

In an interesting twist discussed in Part V(B), *infra*, however, the Corporate Drive property was not directly sold by DA Technology, L.L.C., to any of the plaintiffs. Instead, the original purchaser was former-defendant Scott McDermott, who subsequently assigned his interest in and title to the property to an Alabama limited liability company known as "Corporate Drive L.L.C." The six members of that entity, and the fractional membership interests of each, were as follows:

1.  The Trust of Thomas and Anne O'Shea    25.00%

2.  Kate Donahue                          25.00%

---

[104] *See supra* note 2.

[105] *See* doc. no. 139-11 (O'Shea Plaintiffs' 1031 Exchanges); *see also* doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010) at 13-14.

[106] *See* doc. no. 139-28 (Corporate Drive Purchase Agreement).

[107] *See* doc. no. 139-39; *see also* doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010), at 228-31 (recounting communications with WaMu and WaMu employee Erica O'Leary regarding identification of Corporate Drive).

|   |   |
|---|---|
| 3.  Jeri Holden | 10.00% |
| 4.  Scott McDermott | 13.34% |
| 5.  William Chapman | 13.33% |
| 6.  Roy Claytor | 13.33%[108] |

## C.   **The Old Madison Pike Acquisition**

The "relinquished property" sold in anticipation of purchasing a 70,000 square foot office building constructed in 2007 at 7027 Old Madison Pike in Huntsville's Cummings Research Park West[109] was located at 851 California Street in the Nob Hill section of San Francisco, California.[110]   It was solely owned by the "San Francisco Residence Club, Inc.," a closely-held California corporation controlled by Anne Donahue O'Shea, Kate Donahue, Kevin Donahue, and Gwen Donahue, the sole shareholders and directors.[111]   The property was a five-story, 83-room hotel known as the "San Francisco Residence Club."[112]   The identity of the purchaser of that

---

[108] *See* doc. no. 139-27 (Corporate Drive L.L.C. Operating Agreement).

[109] *See* www.showcase.com/property/7027-Old-Madison-Pike/Huntsville/Alabama/6244520 (last visited Aug. 2, 2012).

[110] Doc. no. 139-11 (O'Shea Plaintiffs' 1031 Exchanges).

[111] Doc. no. 139-4 (Anne O'Shea Dep., Feb. 10, 2010), at 22; *see also* Wilmer-Lee Facts ¶ 7 (mentioning the "Donahue family"); Baswell-Guthrie Facts ¶ 11 (omitting mention of Gwen Donahue).

[112] Under the present ownership, the hotel rooms have been converted to fully-furnished apartments that are "ideal for students, interns, visiting professionals and tourists who are looking for an affordable and safe place to stay in San Francisco."  *See* http://www.851resclub.com/ (last visited Aug. 2, 2012).

property is not disclosed in the evidentiary materials, but it was sold for approximately $10,400,000.[113] The sale was closed on July 10, 2007, which meant that San Francisco Residence Club, Inc., acting through the WaMu 1031 Exchange, had to close on the acquisition of a replacement property no later than January 6, 2008: *that is*, 180 consecutive days from July 10, 2007.

Three "replacement properties" were identified by the San Francisco Residence Club, Inc., as potential like-kind exchanges for the gain realized from divestment of the corporation's interest in this property: *i.e.*, 200 West Side Square in Huntsville, Alabama (the property implicated in the action pending before Judge Kallon on this same court);[114] a property in Hawaii that has not been described in any detail in the record, but one that is not at issue in this action; and 7027 Old Madison Pike in Huntsville, Alabama, the subject of the present discussion.[115]

The seller of the Old Madison Pike property was "Triad Tech Point, L.L.C.," and the purchase price was $3,800,000.[116] The following entities and persons acquired the property as tenants in common, and the ownership interests of each were

---

[113] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 70-72; *see also* doc. no. 139-42 (Email of July 11, 2007 from Kate Donahue to Jeffrey Weiss), at 2 (stating that "the Hotel sold for 10.4M[.]").

[114] *See supra* note 2.

[115] Doc. no. 139-13 (John Kevin Donahue Dep., Feb. 10, 2011), at 159-62.

[116] *See* doc. no. 141-22 (Old Madison Pike Closing Affidavit); doc. no. 141-23 (Old Madison Pike Tenancy-in-Common Agreement).

44

as follows:

| | | |
|---|---|---|
| 1. | San Francisco Residence Club, Inc. | 91.8346% |
| 2. | TAK Tech Point, L.L.C. | 0.2624% |
| 3. | KKA CAS, L.L.C. | 0.0105% |
| 4. | 7027 Old Madison Pike, L.L.C. (McDermott) | 7.5715% |
| 5. | Jeri Holden | 0.0105% |
| 6. | Delta Trust (Elizabeth Mason IRA) | 0.0105%[117] |

## D.    The Quality Circle Acquisition

As noted in Part IV(B), *supra*, the O'Shea Trust and Kate Donahue had identified an office building located at 100 Quality Circle in Huntsville's Cummings Research Park as a potential like-kind replacement property in the identification notice they signed following the sale of their interests in the "Cedar Pointe Apartments" in Gulfport, Mississippi. The square footage and construction data is not disclosed in the record presented to this court, but the building appears to be occupied largely (if not altogether) by Wyle Laboratory's "CAS Group."[118] The seller was "Tera Properties, L.L.C.," and the purchase price was $11,250,000.[119] The original purchaser was defendant Scott McDermott, but he subsequently assigned his

---

[117] *See* doc. no. 141-23 (Old Madison Pike Tenancy in Common Agreement).

[118] *See* www.wyle.com/CAS/Pages/CAS-HuntsvilleHQ,AL.aspx (last visited Aug. 2, 2012).

[119] *See* doc. no. 141-30 (Quality Circle Purchase Agreement).

45

interest in (and title to) the property to "Quality Circle, L.L.C.," an Alabama limited liability company.   The eight members of that company (and their respective fractional ownership interests) were as follows:

| | | |
|---|---|---|
| 1. | San Francisco Residence Club, Inc. | 66.9% |
| 2. | Thomas O'Shea | 7.3% |
| 3. | Kate Donahue | 7.3% |
| 4. | Jeri Holden | 4.8% |
| 5. | Scott McDermott | 3.9% |
| 6. | Roy Claytor | 3.9% |
| 7. | Delta Trust (Elizabeth Mason IRA) | 3.8% |
| 8. | William Chapman | 2.1%[120] |

The O'Shea Trust and Kate Donahue contributed funds to the acquisition of this replacement property, but interestingly the Trust is not listed among the members of "Quality Circle, L.L.C."  It is also interesting to note that the parties who actually contributed funds to the acquisition of the Quality Circle property (i.e., the O'Shea Trust, Kate Donahue, KKA CAS, L.L.C., and TAK Tech Point, L.L.C.)[121] do not match those listed in the operating agreement of Quality Circle, L.L.C. (i.e., the San

---

[120] See doc. no. 141-34 (Quality Circle L.L.C. Operating Agreement).

[121] See doc. no. 139-2 (Anne O'Shea Dep., Sept. 30, 2010), at 239-44, 284-88.

46

Francisco Residence Club, Inc., Thomas O'Shea, Kate Donahue, Jeri Holden, Scott McDermott, Roy Claytor, Delta Trust, and William Chapman).[122]

## V. ACQUISITIONS CLOSED BY THE WILMER & LEE DEFENDANTS

The Wilmer & Lee Defendants served as the closing attorneys for the transactions described in Part IV, *supra*, as the "Moquin," "Fountain," and "Corporate Drive" acquisitions.

## A. Acquisition of the "Moquin Drive" and "Fountain" Properties

The Moquin Drive and Fountain acquisitions grew from the fact that, in November of 2006, while Thomas O'Shea was traveling with his friend Fred Haywood, a Hawaii-based real estate broker,[123] Haywood suggested that O'Shea consider investing in Huntsville real estate.[124] They traveled to the city, where Haywood introduced Thomas O'Shea to Scott McDermott.[125] During O'Shea's brief, initial visit to the area, McDermott accompanied him on a tour of several properties, including the one located on Moquin Drive.[126] O'Shea told McDermott that, if he purchased investment property in Huntsville, he wanted to do so as part of a Section

---

[122] Doc. no. 141-34 (Quality Circle L.L.C. Operating Agreement), at ECF 10-11.

[123] *See* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 50.

[124] *Id.* at 52.

[125] *Id.* at 52-53.

[126] *Id.* at 56-57, 60.

1031 like-kind exchange.  McDermott replied that he had experience with such acquisitions, but advised O'Shea that, in order to comply with the requirements of Alabama law on real estate acquisitions, he should employ a local attorney to close the transaction.[127]

Following his return to California, Thomas O'Shea told his wife, Anne, and her sister and brother, Kate and Kevin Donahue, that he was impressed by the investment potential of Huntsville real estate, and Scott McDermott's credentials.[128]

Thomas O'Shea returned to Huntsville in January of 2007, accompanied by his brother-in-law, Kevin Donahue.[129]  O'Shea again told McDermott that any Huntsville investment properties acquired by them needed to be structured as a "like-kind exchange" under Section 1031 of the Internal Revenue Code, and McDermott assured both men that he was "quite capable of doing that."[130]

O'Shea testified that, during one of his visits to Huntsville, McDermott disclosed that he had been "arrested" in connection with "some real estate transaction."[131]   O'Shea did not elaborate, other than to say that McDermott

---

[127] *Id.* at 55-56.

[128] *See* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010)*,* at 61-62.

[129] *Id.* at 64.

[130] *Id.* at 66.

[131] *See* doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 86.

"volunteered" the information.[132]  The nature of the conduct that precipitated the arrest is not clear, nor does the record establish whether McDermott was subsequently convicted of a crime, although the innuendo of O'Shea's *non sequitur* remembrance is that McDermott was convicted.

In February of 2007, Scott McDermott and Roy Claytor traveled to California, where they met Anne Donahue O'Shea and Kate Donahue.[133]

McDermott and his colleagues, Claytor and William Chapman, invited plaintiffs to join them in their plans to purchase the Moquin Drive property.[134] McDermott initially expected plaintiffs to be the sole investors in the property, but eventually assembled a group of other investors to purchase fractional interests of the whole fee.[135]  At least two of those other investors, Fred Haywood and Beth Mason, also intended for their investments to be part of a like-kind exchange.[136]  McDermott and his colleagues ultimately decided to forego the commission normally paid real-estate brokers for finding and bringing purchasers to the closing table, and instead took ownership stakes in what all of the purchasers hoped (and expected) would be

---

[132] *Id.* at 155.

[133] *See* doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 217-18.

[134] *See* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 60, 64.

[135] Doc. no. 139-15 (Scott McDermott Dep., Jan. 19, 2010), at 116.

[136] Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 155-56.

49

an income-producing investment.[137]

As discussed in Part IV(A), *supra*, Thomas O'Shea relinquished his interest in "The Plaza at Sherman Oaks" in Los Angeles prior to acquisition of the Moquin Drive proprety.  That sale occurred on or about February 9, 2007.[138]  He filled out a form identifying two possible replacement properties in anticipation of a like-kind exchange:  the Moquin property; and an investment property located in Jackson, Mississippi.[139]  Thomas O'Shea sent that form to the WaMu 1031 Exchange.[140]

The plaintiff "San Francisco Residence Club, Inc.," had planned to sell the hotel from which its name is derived as part of a like-kind exchange for replacement-investment property, but the sale did not close.[141]  The potential purchaser of the Residence Club Hotel forfeited earnest money, and San Francisco Residence Club, Inc., invested that money in the Moquin property instead.[142]  Thus, the ownership interest of the San Francisco Residence Club, Inc., in the Moquin Drive property was a cash investment, and not intended to be part of a like-kind exchange.[143]

---

[137] *Id.* at 220.

[138] *See* doc. no. 139-29 (Moquin Identification Letter).

[139] *Id.*

[140] *Id.*

[141] *See* doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 148-49.

[142] *Id.*

[143] *See* doc. no. 139-13 (Kevin Donahue Dep., Feb. 2, 2011), at 269 (testifying that Moquin and Fountain "weren't targeted by SFRC" as replacement properties).

The Moquin Drive property had only one or two tenants at the time of the acquisition at issue in this suit, and that fact made it difficult to obtain a purchase-money loan on attractive terms.[144]  As best this court can ascertain, it was for that reason that the McDermott Defendants suggested that the parties combine the purchase of Moquin with the acquisition of an additional parcel, the so-called "Fountain property."[145]  Plaintiffs agreed to that arrangement.[146]

### 1.    Samuel Givhan's involvement

During January of 2007, McDermott instructed Samuel Givhan to organize two Alabama limited liability companies: "Moquin, L.L.C."; and "Fountain Partners, L.L.C."[147]  McDermott was named the "manager" of both entities.[148]  McDermott signed a purchase agreement for the Moquin property on behalf of Moquin, L.L.C. on January 30, 2007.[149]  He signed a purchase agreement for the Fountain property

---

[144] *Compare* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 2, 2010) at 79-80 (testifying that there was one tenant, and that he could not remember who it was) *with* doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 115 (testifying that there were two tenants, Northrop Grumman and LG).

[145] Doc. no. 139-3 (Thomas O'Shea Dep., Sept. 28, 2010), at 80.

[146] *See id.* at 79-82.  Note well, however, that — as discussed in Parts IV(A) and IV(A)(2), *supra* — Thomas O'Shea did not identify the Fountain property as a replacement property for the purposes of effecting a Section 1031 like-kind exchange.

[147] Wilmer & Lee Facts ¶ 12.

[148] *Id.*

[149] *See* doc. no. 139-18 (Moquin Purchase Agreement), at ECF 18.

*on behalf of himself as an individual* on March 2, 2007.[150]  On or about April 25, 2007, McDermott prepared a "private placement memorandum" ("PPM") on each of the limited liability companies for presentation to potential investors.[151]  Plaintiffs allege in their Second Amended Complaint that McDermott's PPMs were misleading.[152]  Even so, it is important to note that neither Sam Givhan nor any other member of the Wilmer & Lee law firm was involved in the preparation of the PPMs, and the content of the PPMs is not at issue here.[153]

### 2.    The "Ireland conference call"

Anne and Thomas O'Shea were in Ireland from April through the end of August 2007.[154]  Scott McDermott placed a telephone call to them in early July,[155] during which they discussed the requirements necessary to comply with Section 1031, including the 45-day and 180-day requirements for identifying and closing on the acquisition of replacement properties.[156]  In response to questions asked by the

---

[150] *See* doc. no. 139-19 (Fountain Purchase Agreement), at ECF 18.

[151] *See generally* doc. nos. 139-20, 139-21 (Moquin, L.L.C. PPM, Fountain Partners, L.L.C. PPM).

[152] Doc. no. 65 ¶¶ 43-48.

[153] Wilmer & Lee Facts ¶ 15.

[154] Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 109.

[155] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 75-76.  The exact date of the call is uncertain, but it was "[p]robably July 10th or 11th."  Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 83.

[156] Doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 257-58.

O'Sheas, McDermott utilized a feature on his telephone equipment that allowed him to call Givhan, and patch him into a three-way conference call.[157]

Givhan explained to the O'Sheas that they needed to be "on title . . . [and hold] an undivided interest in the property" in order to comply with the requirements of Section 1031 and qualify for favorable, deferred tax treatment as a "like-kind exchange."[158]  Givhan told the O'Sheas that they would not qualify for deferred tax treatment under Section 1031 if the title to the replacement properties was vested in a limited liability company that had not been "on the title" to the relinquished properties.[159]  Thomas O'Shea confirmed during his deposition testimony that Givhan's statements were consistent with his (O'Shea's) understanding of the tax rules that applied to Section 1031 exchanges.[160]  Even so, neither McDermott nor Givhan informed the O'Sheas that title to the Moquin and Fountain properties had been vested in limited liability companies, nor did either McDermott or Givhan indicate that the same would be true of Corporate Drive.[161]  Rather, McDermott and Givhan told the O'Sheas that "they would do that": *i.e.*, ensure that the Corporate

---

[157] *Id.* at 196.

[158] *Id.* at 197 (alteration supplied).  *See also id.* at 200 ("He assured us that whatever we do with 1031 exchanges, we'd have to invest our money as undivided interest in the property.").

[159] *Id.* at 259 ("He told me that you could not go on title on [*sic*] an LLC.").

[160] *Id.* at 198.

[161] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 75-76.

Drive transaction would comply with Section 1031.[162]   Based on the Ireland conference call, the O'Sheas concluded that McDermott and Givhan "were on the ball."[163]

Anne O'Shea took handwritten notes during the Ireland conference call.[164] She wrote: "For 1031 [treatment] should not buy through an LLC"; *and*, "everybody should have a direct interest [*that is*, an] undivided interest in the property."[165]   Her notes do not specify who among the four participants to the conference call made those statements but, presumptively, it was Givhan.

In any event, the Ireland conference call that occurred in early July 2007 was the only conversation Thomas O'Shea had with Givhan during that year.[166]

### 3.    WaMu forwards funds and forms to Givhan

The WaMu 1031 Exchange provided Givhan the funds that Thomas O'Shea intended to invest in the acquisition, and sent him a form with disbursement instructions on May 4, 2007.[167]   That form indicated that Thomas O'Shea's

---

[162] *Id.*

[163] *Id.* at 76.

[164] Doc. doc. 139-41 (Notes of Anne O'Shea).

[165] *Id.* (alterations supplied).

[166] *See* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 273-74; doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 74-76.

[167] *See* doc. no. 156-10 (Moquin WaMu Form).

54

investment was part of a like-kind exchange pursuant to Section 1031.[168]  *The form referenced the Moquin property only*, which was consistent with the identification form that Thomas O'Shea had previously provided to WaMu.[169]  The WaMu form transmitted to Givhan also stated that *Thomas O'Shea* had executed the purchase agreement with the seller of the Moquin Drive property.  That statement was not correct.  *Moquin, L.L.C.*, not Thomas O'Shea, *had executed the purchase agreement.*[170]  The WaMu form included an attachment entitled "notice of assignment" that was signed by Thomas O'Shea, but not by the seller of the Moquin property.[171]

Thomas O'Shea executed a valid power-of-attorney on May 2, 2007, by the terms of which he vested McDermott with the authority to act on his behalf.[172]  At some undisclosed point in time, O'Shea's brother-in-law, Kevin Donahue, also executed a power-of-attorney naming McDermott as his attorney-in-fact.[173]

On May 4, 2007, McDermott assigned the Fountain purchase agreement — *a*

---

[168]  *Id.* at ECF 4 (stating that the transaction was arranged "for the specific purpose of qualifying for deferred gain treatment under the provisions of Section 1031(1) of the Internal Revenue Code").

[169]  *Id.* at ECF 2.  *See also* Part IV(A), *supra*.

[170]  *See generally* doc. no. 139-18 (Moquin Purchase Agreement).

[171]  Doc. no. 156-10 (Moquin WaMu Form), at ECF 4.

[172]  Wilmer & Lee Facts ¶ 23.

[173]  *See* doc. no. 139-34 (Moquin, L.L.C. Operating Agreement), at ECF 25.

contract that he had signed in his own name on March 2, 2007 — to Fountain Partners, L.L.C.[174]

Between May 2nd and 5th, 2007, Sam Givhan repeatedly requested Scott McDermott to provide him with tenancy-in-common agreements, so that he could close the transaction in compliance with Section 1031.[175] Even so, Givhan's secretary emailed the Moquin Drive purchase agreement to WaMu's exchange specialist Erica O'Leary on May 4, 2007, and that agreement indicated on its face that Moquin, L.L.C. was the purchaser.[176] (The record that has been provided to this court is not clear on the question of whether that email was sent before or after Givhan received the WaMu form listing Thomas O'Shea as the purchaser of the Moquin property.[177])

Thomas O'Shea signed the Moquin, L.L.C. operating agreement, and purchased a membership in the limited liability company on May 8, 2007.[178] On the same day, Scott McDermott, acting as attorney-in-fact for Kevin Donahue, signed the same agreement on behalf of San Francisco Residence Club, Inc.[179] The amount of

---

[174] Wilmer & Lee Facts ¶ 24.

[175] *See* doc. no. 156-27 (Givhan Email of May 2, 2007); doc. no. 156-29 (Givhan Email of May 4, 2007); doc. no. 156-30 (Givhan Email of May 4, 2007); doc. no. 156-31 (Givhan Email of May 5, 2007); doc. no. 156-13 (Samuel Givhan Dep., Feb. 17, 2010), at 41-43.

[176] Doc. no. 139-33 (Email from Teresa Pinson to Erica O'Leary).

[177] The email was sent at 9:36 a.m. *Id.* The WaMu Form is dated, but does not list a specific time of day. *See* doc. no. 156-10 (Moquin WaMu Form).

[178] Wilmer & Lee Facts ¶ 26.

[179] Doc. no. 139-34 (Moquin, L.L.C. Operating Agreement), at ECF 25.

money invested by Thomas O'Shea in Moquin, L.L.C., purchased a membership share of 22.483%.[180]  San Francisco Residence Club, Inc., used the earnest money forfeited by the prospective purchaser, who was either unable or unwilling to carry through with the purchase of the San Francisco Residence Club Hotel, to acquire a membership share of approximately half that amount, 11.241%.[181]  The McDermott Defendants, who had opted to forego the commissions normally paid real estate brokers in lieu of obtaining ownership stakes in the investment, acquired roughly fifteen percent of the membership interests, and the other investors acquired the remaining membership interests, which aggregated roughly fifty-two percent.[182] Nevertheless, Thomas O'Shea owned the largest individual membership interest in Moquin, L.L.C.[183]

Also on May 8, 2007, Scott McDermott, acting through the powers-of-attorney executed by Thomas O'Shea and Kevin Donahue, signed the Fountain Partners, L.L.C. operating agreement on behalf of Thomas O'Shea and San Francisco Residence Club, Inc.[184]  Thomas O'Shea, San Francisco Residence Club, Inc., the

---

[180] *Id.* at ECF 32.

[181] *Id.*

[182] *Id.* at ECF 31-32.

[183] *See id.*

[184] Doc. no. 139-35 (Fountain Partners, L.L.C. Operating Agreement), at ECF 27.  In fact, McDermott signed the document on behalf of all of the members of Fountain Partners, L.L.C.

McDermott Defendants, and the other investors acquired fractional membership shares in Fountain Partners, L.L.C., that were equal to their respective ownership interests in Moquin, L.L.C.[185]

On that same day, Thomas O'Shea signed "Unanimous Written Consent" documents ratifying the purchase agreements, and authorizing Scott McDermott to act on his behalf.[186]  McDermott signed the same "Unanimous Written Consent" documents on behalf of Kevin Donahue for San Francisco Residence Club, Inc.[187]

The purchase agreements listed the limited liability companies as the purchasers of the Moquin Drive and Fountain properties, whereas the forms forwarded to Samuel Givhan by the WaMu 1031 Exchange directed him to prepare a deed in which the seller conveyed a 25% interest in the Moquin Drive replacement property to ("in favor of") Thomas O'Shea as a tenant-in-common with the other purchasers.[188]  Even so, Givhan closed the transactions according to the terms of the

---

[185] *See id.* at ECF 35-36.

[186] Doc. no. 139-36 (Moquin, L.L.C. Unanimous Written Consent), at ECF 6; doc. no. 139-37 (Fountain Partners, L.L.C. Unanimous Written Consent), at ECF 4.

[187] Doc. no. 139-36 (Moquin, L.L.C. Unanimous Written Consent), at ECF 5; doc. no. 139-37 (Fountain Partners, L.L.C. Unanimous Written Consent), at ECF 3.

[188] *See* doc. no. 156-10 (Moquin WaMu Form), at ECF 2 ("Closing Agent [Givhan] shall have Seller execute the appropriate deed in favor of Exchangor [Thomas O'Shea].") (alterations supplied); *see also* the discussion in Part IV(A)(1), *supra*.  The Fountain purchase agreement actually listed McDermott as the purchaser but, as noted above, he had assigned it to Fountain Partners, L.L.C.

purchase agreements, following the instructions of Scott McDermott,[189] who was the manager of Moquin, L.L.C., and Fountain Partners, L.L.C.[190]

Thus, despite Givhan's comments to Anne and Thomas O'Shea during the Ireland conference call, and his repeated requests to McDermott to provide tenancy in common agreements, Givhan followed the instructions of McDermott, and vested title to the Moquin Drive and Fountain properties in the limited liability companies of which McDermott was manager.  Givhan never informed either Thomas O'Shea or Erica O'Leary at the WaMu 1031 Exchange that there was any conflict between WaMu's instructions and the purchase agreements.[191]

Even though the purchase agreements named the limited liability companies as the purchasers, the agreements could have been assigned to individuals, purchasing as tenants in common, at any time prior to closing:[192]  a contingency that is discussed in Part V(D), *infra*.  In fact, Givhan was asking McDermott for agreements assigning the interest of the L.L.C.s to the various members of each liability company as tenants

---

[189] *See* doc. no. 139-1 (Samuel Givhan Dep., Dec. 4, 2009), at 104-05 ("McDermott told me to do it that way as [*sic*] I closed the transaction according to contract.").

[190] *Id.* at 71-72 ("In that transaction, I represented Moquin, LLC and Fountain Partners, LLC.").

[191] *See* doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 74-75 (testifying that neither Givhan nor McDermott told him that there might be any issues with Section 1031 compliance); doc. no. 139-5 (Erica O'Leary Dep., Feb. 1, 2011), at 294.

[192] Doc. no. 155 (Response in Opposition to Motion for Summary Judgment of Wilmer & Lee Defendants, filed by Plaintiffs), at "Additional Undisputed Facts" ¶¶ 20-21 (hereafter 1 Plaintiffs' Facts).

in common in the days immediately before closing.[193]  McDermott did not provide such agreements to Givhan, however, and Givhan closed the transactions in accordance with McDermott's instructions, thus vesting title in the limited liability companies.[194]

Prior to closing the Moquin Drive and Fountain acquisitions, Givhan had a number of conversations with John Gragg, an attorney for the lender, Eurohypo Aktiengesellschaft (a German bank doing business in the United States as "Eurohypo AG"),[195] and Charles Callahan, one of the employees of that lending institution.[196] During one of those conversations, Mr. Callahan stated that the loan had not been underwritten for the acquisition of the two properties by a group of individuals and/or entities as tenants in common, and that the loan had not been priced on such a transaction.[197]  Givhan understood that statement to mean that any attempt to restructure the transactions to assign the interests of Moquin, L.L.C., and Fountain Partners, L.L.C., to the members of each limited liability company and, thereby, to

---

[193] *Id.* ¶¶ 23-24.

[194] *See* doc. no. 139-1 (Samuel Givhan Dep., Dec. 5, 2009), at 104-05.

[195] *See, e.g.,* doc. no. 139-31 (Exhibit "EE" to the Wilmer & Lee Defendants' Brief in Support of Summary Judgment: *i.e.,* Givhan's May 8, 2007 title opinion letter to the lending institution).

[196] *See* doc. no. 156-15 (Samuel Givhan Dep., May 16, 2011), at 42-44; *see also* doc. no. 139-1 (Samuel Givhan Dep., Dec. 5, 2009), at 201-02 (identifying the roles of Messrs. Gragg and Callahan).

[197] *Id.* at 43.

vest title in the various investors as tenants in common, would require the loan to go "back through underwriting, [and] there would be a higher return to the lender [presumably, *e.g.*, greater closing costs and/or a different interest rate]."[198]

The purchase of the Moquin Drive and Fountain properties closed as one transaction, funded by one loan.[199]  *None of the individual plaintiffs attended the closing of the transaction.*[200]  In fact, both of the O'Sheas still were in Ireland, and they did not return to the United States until late August of that year.[201]

## B.    Acquisition of the "Corporate Drive" Property

McDermott also invited plaintiffs to participate in the purchase of the so-called "Corporate Drive" property.[202]  McDermott instructed Givhan to organize an Alabama limited liability company known as "Corporate Drive, L.L.C." in April of 2007.[203]  McDermott once again was designated the manager of the company.[204]  Kate Donahue signed the Corporate Drive, L.L.C. operating agreement on April 18, 2007.[205]  Both Anne and Thomas O'Shea then were in Ireland, so Kate Donahue signed the

---

[198] *Id.* at 44.

[199] Wilmer & Lee Facts ¶ 26.

[200] *Id.*

[201] Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 109.

[202] The property is located at 4955 Corporate Drive, Huntsville, Alabama.  Doc. no. 156-11 (Corporate Drive WaMu Form, O'Shea Trust), at ECF 3.

[203] Wilmer & Lee Facts ¶ 17.

[204] *Id.*

[205] Doc. no. 139-27 (Corporate Drive, L.L.C. Operating Agreement), at ECF 28.

61

operating agreement for both, in their capacity as trustees of the O'Shea Trust.[206]

Kate Donahue and the O'Shea Trust each committed to a twenty-five percent share

of Corporate Drive, L.L.C (*i.e.*, a total of 50%).[207]   The McDermott Defendants

acquired a forty percent interest, and the remaining ten percent was acquired by

another investor, Jeri Holden.[208] On April 19, 2007, McDermott signed an agreement

to purchase the Corporate Drive property *on behalf of himself alone*, and not

Corporate Drive, L.L.C.[209]

In preparation for their investment in the Corporate Drive property, McDermott

distributed *pro forma* financial statements relating to anticipated income from the

property.[210]  Plaintiffs alleged that those financial statements were misleading.[211]  It

is important to note, however, that — as was the case with the Moquin Drive and

Fountain private placement memoranda discussed earlier — neither Givhan nor the

Wilmer & Lee law firm was involved in the preparation or distribution of

McDermott's *pro forma* financial statements.[212]

---

[206] *Id.*  Anne O'Shea testified that Kate Donahue signed their names on their behalf and with their permission.  Doc. no. 139-4 (Anne O'Shea Dep., Feb. 10, 2010), at 143-46.

[207] Doc. no. 139-27 (Corporate Drive, L.L.C. Operating Agreement)*,* at ECF 30.

[208] *Id.* at ECF 29-30.

[209] Doc. no. 139-28 (Corporate Drive Purchase Agreement), at ECF 17.

[210] Doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010), at 249-50.

[211] Doc. no. 65 (Second Amended Complaint) ¶ 69.

[212] Wilmer & Lee Facts ¶ 31.

Kate Donahue and the O'Shea Trust sold their interests in the "Cedar Pointe" apartments located in Gulfport, Mississippi on June 7, 2007.[213]   They identified Corporate Drive as one of the three, prospective "replacement properties" for the relinquished Mississippi property pursuant to 26 U.S.C. § 1031.[214]   Plaintiffs' purchase money for the Corporate Drive transaction was deposited with Givhan, and WaMu sent forms to Wilmer & Lee for that transaction on June 27, 2007.[215]   Again, as had been the case with the WaMu form relating to Thomas O'Shea's Moquin Drive-Fountain transaction, the WaMu forms related to acquisition of the Corporate Drive property called for title to be placed "in favor of" the named plaintiff-purchasers, and had been signed by the relevant plaintiff-purchasers, but not by the sellers of the Corporate Drive property.[216]

Kate Donahue executed a "Unanimous Written Consent" form for Corporate Drive, L.L.C. on July 5, 2007.[217]   She also signed the document on behalf of Anne and Thomas O'Shea in their capacity as trustees of the O'Shea Trust, because both still

---

[213] Baswell-Guthrie Facts ¶ 96.

[214] *See* Part IV(B), *supra*.  *See also* doc. nos. 156-11, 156-12 (Corporate Drive WaMu Forms).  The first form relates to the O'Shea Trust, and the second relates to Kate Donahue.  The O'Shea Trust and Kate Donahue also identified the "Quality Circle" property, discussed below, as a replacement property, but apparently did so on separate forms.

[215] Doc. nos. 156-11, 156-12 (Corporate Drive WaMu Forms).

[216] *Id.*

[217] Doc. no. 139-43 (Corporate Drive, L.L.C. Unanimous Written Consent), at ECF 3.

were in Ireland.[218]  That document purported to ratify a purchase agreement for the Corporate Drive property, but the space in the document for insertion of the date of the purchase agreement was left blank.[219]  Even so, the "Unanimous Written Consent" form listed the same purchase price and property description stated in the purchase agreement that had been executed by Scott McDermott on April 19, 2007, on behalf of himself and not Corporate Drive, L.L.C.[220]  On the same day, July 5, 2007, Givhan sent an email to McDermott, stating that he still needed Section 1031 documents for the transaction.[221]

The Corporate Drive transaction closed on July 13, 2007, with title vested in Corporate Drive, L.L.C.[222]  Kate Donahue and Thomas O'Shea each signed a personal guaranty for any debt of that limited liability company.[223]  As had been the case with the Moquin Drive and Fountain acquisitions, *no plaintiff attended the closing*. Worse*, each of the plaintiffs signed closing documents without reading them.*[224]

---

[218] *See* doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 451.

[219] Doc. no. 139-43 (Corporate Drive, L.L.C. Unanimous Written Consent), at ECF 2.

[220] *Compare id.* at ECF 2 *with* doc. no. 139-28 (Corporate Drive Purchase Agreement) ¶ 2(a).

[221] Doc. no. 156-37 (Givhan Email July 5, 2007).  *See also* 26 C.F.R. § 1.1031(k)-1(c)(4)(i)(A).

[222] *See, e.g.*, doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 200.

[223] Doc. nos. 139-44, 139-45 (Guaranties).  The first was signed by Kate Donahue, the second by Thomas O'Shea.

[224] *See* doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 347; doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010) at 225; doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 216.

Although Givhan had previously advised Anne and Thomas O'Shea during the Ireland conference call that the Corporate Drive acquisition would not qualify for Section 1031 status if title to the property was vested in a limited liability company, as opposed to each of the plaintiffs as tenants in common, and even though Givhan had repeatedly told McDermott the same thing, Givhan closed the transaction and vested title to the property in Corporate Drive, L.L.C.

The Ireland conference call that occurred in early July 2007 was the only conversation Thomas O'Shea had with Samuel Givhan during that year, and he did not learn that the Moquin Drive, Fountain, and Corporate Drive acquisitions failed to meet the requirements of Section 1031 until plaintiffs' California attorneys examined the deeds in November of that year.[225]

C.    **The Role of California Attorney Jeffrey Weiss**

Jeffrey Weiss is a California attorney who, as early as six years before the events leading to the commencement of this action, had represented the O'Sheas on tax matters.[226]  Documents produced during discovery establish that Kate Donahue emailed closing documents relating to the plaintiffs' potential investment in Moquin,

---

[225] *See* doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 273-74; doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 74-76.

[226] Doc. no. 139-12 (Jeffrey Weiss Dep., Feb. 23, 2010), at 10.

L.L.C., and Fountain Partners, L.L.C., to Weiss on May 1, 2007.[227]  Despite that unequivocal fact, Jeffrey Weiss conveniently professed during his deposition that he did not "recall" receiving those documents, nor "recall" having any discussions with any of the plaintiffs regarding the transactions prior to the date upon which each closed.[228]  Moreover, Kate Donahue did not invest in the Moquin and Fountain properties; instead, only Thomas O'Shea and San Francisco Residence Club, Inc. did so.

Kate Donahue emailed Weiss "another urgent question" about Section 1031 compliance on July 11, 2007, three days prior to closing the Corporate Drive acquisition (July 13th).[229]  Weiss responded the following day, copying both Anne and Thomas O'Shea, as well as Kevin Donahue, on his response.[230]  He provided specific information regarding the criteria that a transaction must meet to satisfy the requirements for a Section 1031 exchange.[231]

Despite those facts, clearly indicating that Weiss was solicited and provided

---

[227] Doc. nos. 139-22, 139-23, 139-24, 139-25 (Emails from Kate Donahue to Jeffrey Weiss).

[228] Doc. no. 139-12 (Jeffrey Weiss Dep., Feb. 23, 2010), at 28-41.

[229] Wilmer & Lee Facts ¶ 35.

[230] Doc. no. 139-42 (Email of Jeffrey Weiss to Donahues and O'Sheas).

[231] *Id.*  Among other things, Weiss wrote:  "Kate mentioned something about the land such that you might not be acquiring any interest in the existing land/dirt, but only contributing funds in some manner to the future development.  This could be a problem." *Id.*  This court is not sure what to make of that statement in view of 26 C.F.R. §1.1031(a)–1(b), providing that "[t]he fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class."

advice to the plaintiffs, Kate Donahue testified that plaintiffs relied *solely* upon *Givhan* to protect their interests.[232]

**D**.     **Reformation of Titles to the Properties Closed by Givhan**

After the closings of the Moquin Drive, Fountain, and Corporate Drive property acquisitions, plaintiffs retained California attorneys Jeffrey Weiss and Michael Shiffman to advise them in connection with the next two Huntsville properties they intended to purchase.[233]

Shiffman reviewed the documents from the prior acquisitions in November 2007, and discovered that title to all three properties had been vested in limited liability companies.[234] *Nevertheless, he advised plaintiffs that they could reform the deeds to vest title in the names of each of the investors as tenants in common and still comply with the requirements of Section 1031.*[235]   Scott McDermott traveled to California in November of 2007 to meet with Anne and Thomas O'Shea, Kate Donahue, Kevin Donahue, Michael Shiffman, and Jeffrey Weiss.   He had two purposes for that trip:   discuss the Section 1031 compliance problems with the transactions that already had closed; and, plan the next two acquisitions.[236]

---

[232] Doc. no. 139-10 (Kate Donahue Dep., Nov. 18, 2010), at 232-33.

[233] Baswell-Guthrie Facts ¶ 26.

[234] *Id.* ¶ 33.

[235] Wilmer & Lee Facts ¶ 43; doc. no. 141-6 (Michael Shiffman Dep., Nov. 26, 2010), at 46.

[236] Baswell-Guthrie Facts ¶¶ 35-37.

Anne and Thomas O'Shea, Kate Donahue, Kevin Donahue, Michael Shiffman, Jeffrey Weiss, and defendant Cheryl Baswell-Guthrie — the attorney who McDermott had chosen to replace Samuel Givhan as closing attorney for the next two acquisitions — prepared tenancy in common agreements for each of the three acquisitions that had been closed by Givhan.[237]  Plaintiffs and McDermott agreed to execute the tenancy in common agreements.  *Before those agreements could be consummated*, *however*, *disputes arose between plaintiffs and McDermott, and title to the Moquin Drive*, *Fountain*, *and Corporate Drive properties was not transferred from the limited liability companies to the investors as tenants in common.*[238]

Even so, the O'Sheas' and Kate Donahue's 2007 federal income tax returns misrepresented the transactions — *i.e.*, those in which they had relinquished their interests in the California and Mississippi properties, and then closed upon the acquisitions of the Moquin Drive, Fountain, and Corporate Drive properties — as "like-kind exchanges" that complied with Section 1031 of the Internal Revenue Code.[239]  It was only after commencement of this action that titles to those three properties were reformed to conform with Section 1031.  Thus far, plaintiffs have

---

[237] Wilmer & Lee Facts ¶ 43.

[238] *Id.* ¶ 44.

[239] Doc. no. 156-20 (Donald Wilson Dep., Nov. 17, 2010), at 23-25, 29-30.

suffered no adverse tax consequences.[240]  *In fact, as a result of plaintiffs' settlement with the McDermott Defendants, plaintiffs no longer have any interest in the Moquin Drive, Fountain, or Corporate Drive properties.*[241]

**E.**   **The Issue of the $50,000 Check**

In the early stages of plaintiffs' involvement with the McDermott Defendants, Thomas O'Shea wrote a check in the amount of $50,000 for use in the possible purchase of a commercial office building located on Sparkman Drive in Huntsville.[242] McDermott gave those funds to Givhan for deposit in his firm's escrow account, to be used in the event that the "Sparkman Drive property" was acquired.[243]  Plaintiffs did not consummate the purchase of that property, however, and Givhan admitted that he mistakenly used those funds as part of the consideration paid for purchase of the Moquin Drive and Fountain properties.[244]  The Wilmer & Lee Defendants do not dispute that Thomas O'Shea "is entitled to recover" those funds.[245]

---

[240] Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 186.

[241] Wilmer & Lee Facts ¶ 47.

[242] Thomas O'Shea testified that the "Sparkman Drive" property was the "CAS building on Sparkman Drive."  Doc. no. 139-3 (Thomas O'Shea Dep., Feb. 9, 2010), at 281.

[243] *See* 1 Plaintiffs' Facts ¶ 28.

[244] *See id.* ¶ 29.

[245] *Id.* ¶ 30 (undisputed by the Wilmer & Lee Defendants).

# VI. ACQUISITIONS CLOSED BY THE BASWELL-GUTHRIE DEFENDANTS

Cheryl Baswell-Guthrie served as the closing attorney for the transactions described in Part IV, *supra*, as the "Old Madison Pike" and "Quality Circle" acquisitions.

## A.    Lead-Up To Old Madison Pike and Quality Circle Acquisitions

Scott McDermott traveled to California in November of 2007 for the purpose of meeting with Thomas O'Shea, Anne O'Shea, Kate Donahue, Kevin Donahue, Michael Shiffman, and Jeffrey Weiss.  Among other issues, they discussed the possible acquisition of two other properties in Huntsville, generally referred to as "Quality Circle" and "Old Madison Pike."[246]  The Old Madison Pike property is sometimes referred to as "Tech Point."[247]  Plaintiffs reiterated the importance of vesting titles to those properties in the names of the individual investors as tenants in common, in order to qualify for favorable tax treatment as like-kind exchanges under Section 1031.[248]  McDermott stated that he was aware of plaintiffs' intention, and assured them that the transactions would be closed properly.[249]  He also informed plaintiffs that he had terminated his professional relationship with Samuel Givhan,

---

[246] This is the same meeting discussed in Part V(D) *supra*.

[247] Baswell-Guthrie Facts ¶ 26.

[248] *See* doc. no. 141-6 (Michael Shiffman Dep., Nov. 16, 2010), at 34.

[249] *See* Baswell-Guthrie Facts ¶¶ 40-41.

and that the closing attorney for the transactions would be defendant Cheryl Baswell-Guthrie.[250]

At some point in time, Scott McDermott caused two additional limited liability companies to be organized under Alabama law: *i.e.*, "7027 Old Madison Pike, L.L.C.," and "Quality Circle, L.L.C." McDermott was designated the manager of each.[251] By the time McDermott retained Baswell-Guthrie, the terms of the purchase agreements for the Old Madison Pike and Quality Circle properties had already been negotiated, and the purchase agreements drafted by Samuel Givhan.[252] Further, McDermott never asked Baswell-Guthrie to represent plaintiffs; plaintiffs were not involved in the decision to retain her as the closing attorney; and, there was no retention agreement between Baswell-Guthrie and plaintiffs.[253] Nonetheless, McDermott told plaintiffs that Baswell-Guthrie represented the purchasing group (including plaintiffs) as a whole.[254]

In preparation for their investment in the Old Madison Pike and Quality Circle properties, plaintiffs established two Alabama limited liability companies: "KKA

---

[250] *Id.* ¶ 43.

[251] *Id.* ¶ 51.

[252] *See id.* ¶¶ 52, 99.

[253] *Id.* ¶¶ 53, 57, 58.

[254] *See* doc. no. 141-6 (Michael Shiffman Dep., Nov. 16, 2010), at 33-34 ("Scott had said he hired another lawyer to represent the buyers' borrowing group whose name was Cheryl Baswell-Guthrie.").

CAS, L.L.C.," the members of which were Kate Donahue, Kevin Donahue, and Anne

Donahue O'Shea; and "TAK Tech Point L.L.C.," the members of which were Thomas

O'Shea, Anne O'Shea, and Kate Donahue.  Baswell-Guthrie drafted the operating

agreements for both entities.[255]  She also served as the registered Alabama agent for

each.[256]

## B.   Old Madison Pike (a/k/a "Tech Point")

Plaintiff San Francisco Residence Club, Inc., sold its eponymous hotel on July

10, 2007.[257]  The corporation identified three potential replacement properties for

Section 1031 treatment:  one was located in Hawaii; a second was the "Park Tower"

property in Huntsville that formed the basis of the companion case in this District

assigned to Judge Kallon;[258] and the third was the Old Madison Pike property that is

implicated in the present action.[259]  The two Alabama limited liability companies —

TAK Tech Point, L.L.C. and KKA CAS, L.L.C. — also intended to invest in the Old

Madison Pike property.[260]  Those companies were not participating as Section 1031

---

[255] 2 Plaintiffs' Facts ¶ 11.

[256] *Id.* ¶ 13.  The Baswell-Guthrie Defendants "clarified" this fact to indicate that Baswell-Guthrie's sole responsibility as the registered agent was to receive mail.  Doc. no. 166 (Reply in Support of Summary Judgment, filed by Baswell-Guthrie Defendants), at 3.

[257] Doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010), at 113.

[258] *San Francisco Residence Club, Inc., et al. v. Park Tower, L.L.C., et al.*, Civil Action No. 08-1423-AKK-NE.

[259] *See* doc. no. 139-13 (John Kevin Donahue Dep., Feb. 2, 2011), at 159-62.

[260] *See* doc. no. 141-23 (Old Madison Pike Tenancy-in-Common Agreement), at ECF 15.

exchangors; indeed, because neither limited liability company had owned an interest in the relinquished property, neither company could participate in Section 1031 exchanges.

In addition to San Francisco Residence Club, Inc. and the two limited liability companies controlled by plaintiffs, "7027 Old Madison Pike, L.L.C." (controlled by McDermott) and two other investors were part of the investment group.[261]

At the meeting between McDermott, plaintiffs, and plaintiffs' California attorneys held in California during November of 2007, it had been agreed that Jeffrey Weiss would draft the tenancy in common agreements for the Old Madison Pike and Quality Circle transactions.[262]   McDermott informed Weiss of the percentages of ownership each investor would acquire in the properties on November 29, 2007.[263] San Francisco Residence Club, Inc., was investing the largest amount in the Old Madison Pike property, over ninety-one percent of the total.[264]   Later that day, Weiss emailed the tenancy in common agreements for both properties to Cheryl Baswell-

---

[261] *Id.*

[262] Baswell-Guthrie Facts ¶ 63.

[263] 2 Plaintiffs' Facts ¶ 14.

[264] Doc. no. 141-23 (Old Madison Pike Tenancy-in-Common Agreement), at ECF 15.  San Francisco Residence Club, Inc., provided 91.8348% of the funds.  TAK Tech Point L.L.C. contributed 0.2624% and KKA CAS, L.L.C. provided 0.0105%.  7027 Old Madison Pike, L.L.C. provided 7.8715%, and the other investors contributed the remaining 0.0210%.  *Id.*

Guthrie.[265]

The initial draft of the tenancy in common agreement for the Old Madison Pike acquisition named "7027 Old Madison Pike, L.L.C." as the manager of the property, and required the owners to provide sixty days' notice of an intent to terminate the manager.[266]  Early in the morning of November 30, 2007, Baswell-Guthrie emailed Weiss a revised draft of the agreement, in which she added the requirement that the manager be given **written** notice of the owners' intent to terminate.[267]  The word "written" was in boldface and underlined, as were the other changes made by Baswell-Guthrie to the language originally drafted by Weiss.[268]  A revised version of the Quality Circle tenancy in common agreement, containing the same change, was also attached to the email.[269]

Later that day, McDermott emailed Baswell-Guthrie, asking her to add a "with cause" condition to the termination section of the tenancy in common agreements.[270]  Baswell-Guthrie then emailed McDermott, Shiffman, Weiss, and Kevin Donahue

---

[265] Baswell-Guthrie Facts ¶ 16.  Baswell-Guthrie was using her husband's email account over the course of the Old Madison Pike transaction, because hers was malfunctioning.  *Id.* ¶ 15.

[266] *Id.* ¶ 17.

[267] *Id.* ¶ 19.

[268] *Id.*

[269] *Compare* doc. no. 159-25 (November 30, 2007 Email and Attachments), at ECF 3-21 (Old Madison Pike Tenancy in Common Draft) *with id.* at ECF 22-45 (Quality Circle Tenancy in Common Draft).

[270] 2 Plaintiffs' Facts ¶ 20.

another set of revisions to the agreements.[271]  In the Old Madison Pike tenancy in common agreement, she replaced "7027 Old Madison Pike, L.L.C." with the name of Scott McDermott as manager of the property, and removed the boldface and underlining from the adjective "written."[272]  She did not add a "with cause" condition to that draft, however.[273]  The same changes were made to the draft of the Quality Circle tenancy in common agreement attached to the same email.  Also on November 30, 2007, both Shiffman and Weiss indicated that they approved of the revised agreements and would authorize their clients to sign them.[274]

During the afternoon hours of the same day, Anne O'Shea, using Thomas O'Shea's email account, sent an email to all of the attorneys — California as well as Baswell-Guthrie — asking whether anyone objected to the *plaintiffs' preference* for signing, notarizing, and faxing *only the signature pages of the tenancy in common and operating agreements* due to the length of each of those documents.[275] Apparently, no one objected, because plaintiffs subsequently signed and faxed only the signature pages.[276]  Kevin and Kate Donahue signed the Old Madison Pike

---

[271] *See id.* ¶ 21.

[272] *Id.*

[273] *Id.*

[274] *See id.* ¶ 24.

[275] 2 Plaintiffs' Facts ¶ 27.

[276] *Id.* ¶ 29.  The Baswell-Guthrie Defendants "clarified" that fact by highlighting evidence that suggested that plaintiffs possibly may have signed the agreement at a later time, and backdated

tenancy in common agreement on behalf of San Francisco Residence Club, Inc.[277]

Kate Donahue also signed on behalf of KKA CAS, L.L.C.[278]  Thomas O'Shea signed

on behalf of TAK Tech Point, L.L.C.[279]  Thus, the Old Madison Pike transaction

closed on November 30, 2007, with title held by all of the investors as tenants in

common.[280]  *Note well, however, that neither the individual plaintiffs nor their*

*California attorneys read the documents as finally revised prior to the time the*

*signature pages were signed, dated, notarized, and faxed, nor did any of them attend*

*the closing in person.*[281]

Four days after the Old Madison Pike closing (*i.e.*, on December 3, 2007),

Baswell-Guthrie emailed to plaintiffs and their California attorneys five documents

that pertained to the upcoming Quality Circle transaction.[282]  Shiffman responded,

pointing out problems with the text of some of those documents.[283]  Shortly thereafter,

Baswell-Guthrie emailed the O'Sheas and Kevin Donahue, but not Shiffman or

---

it.  Doc. no. 166 (Reply in Support of Summary Judgment, filed by Baswell-Guthrie Defendants), at 4.

[277] Doc. no. 141-23 (Old Madison Pike Tenancy-in-Common Agreement), at ECF 10.

[278] *Id.* at ECF 14.

[279] *Id.* at ECF 11.

[280] Baswell-Guthrie Facts ¶ 69.

[281] *Id.* ¶¶ 70-71, 75-76.

[282] 2 Plaintiffs' Facts ¶ 30.  Baswell-Guthrie still was using her husband's account.  *Id.*

[283] *Id.*

Weiss, additional documents related to the Quality Circle acquisition.[284]  In addition, she attached a full copy of the executed Old Madison Pike tenancy in common agreement.[285]  *That* version of the Old Madison Pike agreement stated that McDermott could only be terminated as manager upon sixty days' written notice and "with good cause."[286]  As previously noted, none of the prior versions of the agreement contained the "good cause" condition.  Nevertheless, the document Baswell-Guthrie sent plaintiffs on December 3rd included the signature pages they had faxed to her on November 30th.[287]  None of the witnesses deposed in this case admitted to inserting the "good cause" provision.[288]  Plaintiffs believe Baswell-Guthrie added it, perhaps at the behest of McDermott, after plaintiffs had signed the signature pages that they assumed would be added to the prior version of the agreement.[289]  The full, executed agreement containing the "good cause" condition

---

[284] Doc. no. 159-39 (Baswell-Guthrie Email and Attachments).

[285] *Id.*

[286] *Id.*

[287] *Id.*

[288] *See* Baswell-Guthrie Facts ¶ 79.  Plaintiffs denied this fact by stating that they know that they did not insert the clause, and electronic evidence strongly suggests that Baswell-Guthrie did. Doc. no. 157 (Response in Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs), at 4-5.

[289] Defendants suggest that plaintiffs may have backdated their signature pages.  However, at summary judgment, the court must view the facts in the light most favorable to plaintiffs, and here that means giving credence to the date on the face of the document.

77

was not sent to plaintiffs' California attorneys at any time in 2007.[290]  Even so, that version of the document was recorded in the Probate Records of Madison County, Alabama on December 10, 2007.[291]

Baswell-Guthrie emailed Thomas O'Shea, Kate Donahue, and Kevin Donahue the closing affidavit for the Old Madison Pike transaction on December 4, 2007, asking them to return the signature pages within two hours.[292]  That affidavit identified "One Source Title & Escrow L.L.C." as the title agent, Cheryl Baswell-Guthrie as an agent of "One Source," and Baswell-Guthrie, P.C., as an affiliated entity.[293]  The closing affidavit included a waiver provision stating, in relevant part, that:

> Purchasers and Sellers hereby acknowledge that the following disclosure was made concerning the closing of subject transaction:  . . . the law firm of Baswell-Guthrie, P.C., represents 7027 Old Madison Pike, LLC (the entity) and not the individual members of the entity. . . .  There may exist a potential conflict of interest between the Purchaser(s), Borrower(s), the Lender, and/or the Title Agent in consummating this transaction. . . .  The parties acknowledge they have not received nor relied on any legal advice from the Title Agent related to this transaction, but only from their respective legal counsel, and hereby fully release and waive any and all claims they may have against the Title Agent, its agent's affiliates and/or assigns.[294]

---

[290] 2 Plaintiffs' Facts ¶ 42.

[291] Baswell-Guthrie Facts ¶¶ 77-78.

[292] Doc. no. 159-4 (Email Transmitting Closing Affidavit).

[293] Doc. no. 141-22 (Old Madison Pike Closing Affidavit), at ECF 3.

[294] *Id.*

Thomas O'Shea executed the affidavit on behalf of TAK Tech Point, L.L.C.[295]  Kate Donahue executed it on behalf of KKA CAS, L.L.C.[296]  She and Kevin Donahue signed for San Francisco Residence Club, Inc.[297]  The deed consummating the transaction was recorded in the Probate Records of Madison County, Alabama on December 31, 2007.[298]

## C.   Quality Circle

The final property acquisition involved in this case was the purchase of another office building in Huntsville's Cummings Research Park located at 100 Quality Circle.  As previously discussed in Part IV(B) of this opinion, *supra*, the O'Shea Trust and Kate Donahue identified the Quality Circle property as a potential replacement property for the Gulfport, Mississippi "Cedar Pointe" apartment complex they relinquished in June of 2007.[299]  The 180-day period during which they had to close the acquisition of a replacement property in order to qualify for tax deferral under Section 1031 gave them a deadline of December 4, 2007.[300]  TAK Tech Point, L.L.C. and KKA CAS, L.L.C. also took part in the investment, but the funds

---

[295] *Id.* at ECF 9.

[296] *Id.* at ECF 7.

[297] *Id.* at ECF 10.

[298] Doc. no. 132-1 (Old Madison Pike Statutory Warranty Deed).

[299] *See* Baswell-Guthrie Facts ¶¶ 96-97.

[300] *Id.* ¶ 98.

contributed by those companies to the purchase price of the Quality Circle property were not part of a like-kind exchange.[301]

Scott McDermott and Samuel Givhan prepared the purchase agreement for the Quality Circle acquisition before the date on which McDermott replaced Givhan with Cheryl Baswell-Guthrie as the closing attorney.[302]  The purchasers were listed as Scott McDermott, Thomas O'Shea, or their assigns.[303]  McDermott executed the agreement on behalf of himself alone in May of 2007.[304]  That purchase agreement made no mention of Section 1031.[305]  Plaintiffs had given McDermott the authority to apply for a purchase-money loan for the transaction.[306]  McDermott submitted a loan application to National Integrity Life Insurance Company in October 2007.  That application named "Quality Circle, L.L.C." as the borrower, despite the fact that the purchase agreement listed Thomas O'Shea and Scott McDermott as the purchasers.[307]  *Neither plaintiffs nor their California counsel reviewed the loan application before*

---

[301] *Id.* ¶ 101.

[302] *Id.* ¶ 99.

[303] Doc. no. 141-30 (Quality Circle Purchase Agreement), at ECF 3.

[304] *Id.* at ECF 3, 20.

[305] Baswell-Guthrie Facts ¶ 100.

[306] *Id.* ¶ 103.

[307] *Id.* ¶ 104; doc. no. 141-30 (Quality Circle Purchase Agreement), at ECF 3.  The fifth amendment to the purchase agreement, dated November 8, 2007, lists Quality Circle, L.L.C. "as successor in interest" to Thomas O'Shea and Scott McDermott.  *Id.* at ECF 28.  It is unclear when McDermott assigned the contract to Quality Circle, L.L.C.  The fourth amendment to the purchase agreement, dated October 10, 2007, does not mention Quality Circle, L.L.C.

*closing.*[308]

As noted above, Jeffrey Weiss and Cheryl Baswell-Guthrie were exchanging drafts of a tenancy in common agreement for the Quality Circle property concurrently with their exchange of drafts of the Old Madison Pike tenancy in common agreement. Thomas and Anne O'Shea (in their capacity as trustees of the O'Shea Trust) and Kate Donahue (in her individual capacity and as manager of KKA CAS, L.L.C.) executed the signature pages of the Quality Circle tenancy in common agreement on November 30, 2007.[309]  The Quality Circle tenancy in common agreement contained the same "good cause" condition for terminating the manager as the Old Madison Pike tenancy in common agreement.[310]

Michael Shiffman transmitted an email to Baswell-Guthrie on November 26, 2007, informing her that there was a problem with the structure of the Quality Circle acquisition.  It was the same old problem:  the transaction was arranged with the purchasers as members of a limited liability company, rather than as tenants in common.[311] Baswell-Guthrie contacted the lending institution, National Integrity Life Insurance Company, about the prospect of revising the mortgage and other closing

---

[308] Baswell-Guthrie Facts ¶ 105.

[309]  *See* doc. no. 141-25 (Email of Anne O'Shea to Jane Shea), at ECF 3-25 (Quality Circle Tenancy-in-Common Agreement in Executed Form).

[310] *See id.*

[311] Baswell-Guthrie Facts ¶ 109.

documents; she was told that the lender would not approve a loan to the individual purchasers as tenants in common until all of its fees were paid, and all of its due diligence  requirements for the issuance of a loan to individual investors had been complied with.[312]  Nevertheless, Baswell-Guthrie repeatedly told Shiffman that the transaction was proceeding as planned.[313]  Indeed, Baswell-Guthrie and McDermott did not inform Shiffman until December 3, 2007 — the day before the expiration of the 180-day rule — that the lender would not approve a loan to the individual plaintiffs as tenants in common, unless all of the lender's due diligence requirements had been satisfied.[314]  That could not happen immediately, however, because the employee of the lender who could approve a re-structuring of the loan was out of the office.[315]  Baswell-Guthrie indicated that the lender *likely* would give its approval to a restructuring within two weeks.[316]

Plaintiffs, however, could not wait two weeks to close the transaction; they had to close on the property by December 4, 2007, in order to qualify for their desired tax

[312] *See* doc. no. 159-12 (Email Exchange of Baswell-Guthrie, Jamie Redwine, and Others), at ECF 2 (discussing the fees and procedures needed for approval).  The email cited was sent in the course of the effort to transfer title to a tenancy in common post-closing, but it demonstrates that the lender required administrative issues to be resolved, rather than having any significant objection to lending to a group of tenants in common.

[313] 2 Plaintiffs' Facts ¶ 53.

[314] Doc. no. 141-6 (Michael Shiffman Dep., Nov. 16, 2010), at 95.

[315] 2 Plaintiffs' Facts ¶ 53.

[316] *Id.*

treatment under Section 1031.[317]  Thus, plaintiffs were presented with a Hobson's choice:  they could close the Quality Circle transaction with title vested in a limited liability company and hope to reform the title afterward, or forgo the opportunity to close on the transaction within the 180-day window required to qualify the acquisition for favorable tax treatment under Section 1031.[318]  Plaintiffs — *acting on the advice of their California attorney, Michael Shiffman* — decided to close on the transaction with title vested in a limited liability company.[319]

Thus, in order to timely close on the acquisition of the Quality Circle property, plaintiffs executed an operating agreement for Quality Circle, L.L.C.[320]  Despite the fact that the O'Shea Trust, Kate Donahue, KKA CAS, L.L.C., and TAK Tech Point, L.L.C. were the parties contributing funds to the acquisition, they were not the same group of plaintiffs who or which executed the operating agreement.  Kate Donahue did sign the agreement.[321]  She, along with Kevin Donahue, signed on behalf of San

---

[317] Baswell-Guthrie Facts ¶ 98.

[318] *Id.* ¶ 116.

[319] *Id.* ¶ 117.  Plaintiffs' response to this fact was to "[a]dmit that Shiffman advised his clients to close the Quality Circle transaction temporarily in an LLC, but deny that it was a permanent solution, or that it was contemplated that title would be filed with the LLC as sole owner."  Doc. no. 157 (Response in Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs), at 8.

[320] Baswell-Guthrie Facts ¶ 118.

[321] Doc. no. 141-34 (Quality Circle, L.L.C. Operating Agreement), at ECF 36.

Francisco Residence Club, Inc.[322]   Thomas O'Shea signed in his individual capacity only, but neither Thomas O'Shea nor San Francisco Residence Club, Inc. contributed funds toward the purchase price of Quality Circle.[323]   The other plaintiffs that did contribute funds — *i.e.*, the O'Shea Trust, KKA CAS, L.L.C., and TAK Tech Point, L.L.C. — were not parties to the operating agreement.   The inconsistency between, on the one hand, those parties who or which provided the funds for acquisition of the property and, on the other hand, the parties that executed the operating agreement, apparently went without notice.   *Plaintiffs did not read the operating agreement before signing it.*[324]

Although the investors had intended to take title to the Quality Circle property as tenants in common, and even executed a tenancy in common agreement, Quality Circle, L.L.C. was the purchaser in which title to the property actually was vested. Thus, the Quality Circle, L.L.C. operating agreement — and *not* the Quality Circle tenancy in common agreement — governed the management of the property.   The limited liability company operating agreement designated McDermott as the manager of the Quality Circle property.[325]   Unlike the Old Madison Pike tenancy in common

---

[322] *Id.* at ECF 36-37.

[323] *Id.* at ECF 37; doc. no. 139-2 (Anne O'Shea Dep., Sept., 30, 2010), at 243.

[324] Baswell-Guthrie Facts ¶ 119.

[325] *Id.* ¶ 120.

agreement, however, the L.L.C. operating agreement did not contain a "good cause" condition.[326]

The transaction closed on December 4, 2007, with title vested in Quality Circle, L.L.C.[327]  At the time of closing, Baswell-Guthrie told Shiffman that, in addition to the deed vesting title to the property in Quality Circle, L.L.C., she was going to obtain a deed vesting title in the investors as tenants in common.[328]  She said that she would file the deed transferring title from the limited liability company to the tenants in common when the lending institution approved that arrangement, within two weeks of closing.[329]  Note well, however, that the mortgage contained a provision stating that lender approval was required to transfer title to a tenancy in common, and *Shiffman later admitted that he then understood that there was no guarantee the lender would approve the conversion.*[330]

After the transaction closed, Baswell-Guthrie contacted the lending institution in an attempt to obtain approval for conversion of the ownership interests to a tenancy

---

[326] *Id.* ¶ 140.

[327] *Id.* ¶ 124.

[328] 2 Plaintiffs' Facts ¶ 53.

[329] *Id.*

[330] Baswell-Guthrie Facts ¶¶ 122-23.  *See also* doc. no. 141-6 (Michael Shiffman Dep., Nov. 16, 2010), at 153-54 ("Q:  At the time it was closed as an LLC as a matter of necessity, there was no guarantee that the lender would approve the transfer from an LLC to a TIC?  A:  No.  Q:  Was it your belief that it was probable that it was going to happen?  A:  Yes.").

85

in common.[331]  Based on the lender's response, she informed the California attorneys that the issue was in the hands of the lender.[332]  Despite the fact that the acquisition did not comply with the requirements of Section 1031, the O'Sheas and Kate Donahue falsely listed the Quality Circle transaction as a Section 1031 like-kind exchange on their 2007 tax returns.[333]  The O'Sheas did not file their return until late 2009, after commencing this action.[334]  At the time, title to the property was still vested in Quality Circle, L.L.C.[335]  To date, plaintiffs have suffered no adverse tax consequences.[336]

## D.   Potential Conflict of Interest

After the transactions closed, Shiffman emailed Baswell-Guthrie.[337]  A dispute had arisen between the Old Madison Pike lender and the borrowers:  *i.e.*, plaintiffs and the McDermott Defendants.[338]  Shiffman stated that he assumed Baswell-Guthrie was an agent of the title company, and asked whether she would have a conflict of interest if she represented the borrowers.[339]  Baswell-Guthrie responded, stating that:

---

[331] Baswell-Guthrie Facts ¶ 126.

[332] *Id.* ¶ 128.

[333] *Id.* ¶ 135.

[334] *Id.* ¶ 136.

[335] *See* 2 Plaintiffs' Facts ¶ 52 (stating that a corrective deed was filed in April of 2011).

[336] Baswell-Guthrie Facts ¶ 137.

[337] 2 Plaintiffs' Facts ¶ 48.

[338] *Id.*

[339] *Id.*

"So long as the Borrowers do not become at odds with one another . . . I can proceed and represent everyone.  If at a later time, . . . the Borrowers become at odds with each other or . . . with One Source Title, then I would have to withdraw from representing any of the Borrowers and One Source Title."[340]  She told him that plaintiffs did not need to retain separate local counsel.[341]

Although Baswell-Guthrie's response had indicated a *potential* conflict of interest in her representation of a party adverse to plaintiffs, plaintiffs did not solicit any advice from her regarding Section 1031 or the structure of the transactions.[342] Indeed, McDermott and plaintiffs' California attorneys were solely responsible for structuring the transactions.[343]  Baswell-Guthrie provided an opinion letter to National Integrity Life Insurance Company on December 4, 2007.[344]  That letter represented that Baswell-Guthrie "acted as counsel for the above-referenced Borrower, Quality Circle, L.L.C.[,] and [that] Tom O'Shea, Anne O'Shea, and Kate Donahue (each, a 'Guarantor,' and collectively, the 'Guarantors') are represented by separate legal counsel, Michael Shiffman . . . ."[345]

---

[340] Doc. no. 159-49 (Email of Cheryl Baswell-Guthrie Regarding Conflicts of Interest).

[341] 2 Plaintiffs' Facts ¶ 49.

[342] Baswell-Guthrie Facts ¶ 108.

[343] *Id.*

[344] Doc. no. 159-43 (Baswell-Guthrie Opinion Letter).

[345] *Id.* at ECF 1 (alterations supplied).  Note well that plaintiffs have the gall to argue that, by this letter, Baswell-Guthrie stated that she represented *them*.  Doc. no. 157 (Response in

Thomas O'Shea testified that he never met Baswell-Guthrie at any time prior to the closings.[346]  Moreover, plaintiffs did not pay Baswell-Guthrie *directly*.  Instead, she was indirectly compensated out of the escrow monies, but those funds were largely provided by plaintiffs.[347]

## E.   Dispute With McDermott

In August of 2008, plaintiffs decided to remove McDermott as the manager of the Old Madison Pike property because they were not satisfied with his performance, and because they believed that they had "good cause" to do so.[348]  Two years later, in August of 2010, McDermott filed a statement of claims against plaintiffs in a proceeding submitted to the American Arbitration Association, based in part on his allegedly wrongful termination from his position as manager of the Old Madison Pike property.[349]  McDermott denied that "good cause" existed to remove him.[350]  At the conclusion of arbitration in May 2011, plaintiffs settled their disputes with

---

Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs, at 19.

[346] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 232, 506.  Nor did he meet her at the closings, because he did not attend them.

[347] 2 Plaintiffs' Facts ¶ 10.

[348] Baswell-Guthrie Facts ¶¶ 89-90.

[349] *Id.* ¶ 94.

[350] Doc. no. 159-18 (Scott McDermott Dep., Oct. 1, 2010), at 11 (stating that the tenancy-in-common agreement required his termination "to be with good cause and that [he] dispute[d] that there was good cause") (alterations supplied).

McDermott and relinquished their interests in the Moquin, Fountain, and Corporate Drive properties.[351]

Plaintiffs also terminated McDermott as manager of the Quality Circle property, pursuant to the Quality Circle, L.L.C. operating agreement.[352]  That operating agreement did not contain a "good cause" condition.[353]  Even so, McDermott sued plaintiffs over his termination.[354]  He alleged that San Francisco Residence Club, Inc. did not have an ownership stake in the company and, thus, San Francisco Residence Club could not validly vote to terminate him.[355]  In February 2011, plaintiffs settled their disputes with McDermott over Quality Circle.[356]  As part of the settlement, they agreed to change title to the Quality Circle property to a tenancy in common.[357]  A corrective deed was filed in the Probate Records of Madison County in April 2011.[358]

---

[351] *See* doc. no. 130 (Notice of Conclusion of Arbitration); Wilmer & Lee Facts ¶ 47.

[352] Baswell-Guthrie Facts ¶ 139.

[353] *Id.* ¶ 140.

[354] *Id.* ¶ 141.

[355] Doc. no. 159-18 (Scott McDermott Dep., Oct. 1, 2010), at 99.

[356] 2 Plaintiffs' Facts ¶ 51.

[357] *Id.*

[358] *Id.* ¶ 52.

## VII.  CHOICE OF GOVERNING LAW

The parties dispute the substantive law that should govern plaintiffs' claims.

It is, of course, well-settled that, when a federal court exercises jurisdiction over a

controversy based upon the parties' diversity of citizenship and the requisite amount

in controversy, the court normally

> will apply the conflict-of-laws rules of the forum state.  As a preliminary
> matter, the court must characterize the legal issue and determine whether
> it sounds in torts, contracts, property law, etc.  Once it has characterized
> the legal issue, it determines the choice of law rule that the forum state
> applies to that particular type of issue.

*Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233,

1240 (11th Cir. 2007) (citations omitted).  The parties agree that plaintiffs' claims

sound in tort.[359]

Alabama generally follows the principle of *lex loci delicti* when determining

the substantive law that should govern tort claims asserted between citizens of

different states in an Alabama forum:  that is, "an Alabama court will determine the

substantive rights of an injured party according to the law of the state where the

injury occurred."  *Fitts v. Minnesota Mining & Manufacturing Co.*, 581 So. 2d 819,

---

[359] *See* doc. no. 155 (Plaintiffs' Brief in Opposition to Summary Judgment Motion of Wilmer & Lee Defendants), at 27 ("California law should govern all tort and related statutory issues in the event of a conflict of laws."); doc. no. 165 (Reply Brief of Wilmer & Lee Defendants), at 4-8 (arguing for the application of Alabama law based on Alabama choice of law rules for torts); doc. no. 166 (Reply Brief of Baswell-Guthrie Defendants), at 12-14 (same).

820 (Ala. 1991).  Where, as here, the injuries allegedly suffered by the plaintiffs are financial, the location where the injury was felt normally is the determinative consideration.  *Id.*  "[T]he place of injury is the locale in which the last event necessary to make a defendant liable for the alleged tort occurs."  *Chambers v. Cooney*, No. 07-0373-WS-B, 2007 WL 2493682, at *11 (S.D. Ala. Aug. 29, 2007) ("*Chambers I* ").

Plaintiffs argue that, as California citizens, any financial injury they suffered must have occurred in California; and that, under Alabama's choice of law rule, California provides the proper substantive rules of decision.  In response, defendants argue that, because the harm arose from the purchase and sale of Alabama real estate, and the transactions were closed in Alabama, this State's substantive law should govern.  Defendants emphasize the fact that plaintiffs' residency in California is the only connection to that state, and that in *Chambers v. Cooney*, 535 F. Supp. 2d 1255 (S.D. Ala. 2009) ("*Chambers II* "), the case upon which plaintiffs rely, the court merely *assumed* that the law of the plaintiffs' home state would apply *because it was not disputed by the parties*.  Specifically, the *Chambers II* opinion observed that

> it appears that the injury from the alleged tortious interference would have been felt by Dr. Cooney in New York, such that New York law would apply under the *lex loci delicti* doctrine.  *No party has argued otherwise, at least for purposes of the pending Motion to Dismiss, so the Court will not explore that question further at this time.*

91

*Chambers II*, 535 F. Supp. 2d at 1260 n.4 (emphasis supplied).  Even so, defendants'
argument ignores the fact that the *Chambers II* opinion cited the *Chambers I* decision
(in which the governing law *was disputed*) for the proposition that financial injury
occurs where the injured party resides.  *See Chambers I*, 2007 WL 2493682, at *11
(citing, *inter alia*, *The Bradbury Co. v. Teissier-duCros*, 387 F. Supp. 2d 1167, 1173
(D. Kan. 2005) (holding that Georgia law applied to a claim of tortious interference
where the injury was financial, the injured parties were citizens of Georgia, and the
financial injury was felt in Georgia)).

Defendants also cite *The Mitchell Co., Inc. v. Campus*, No. 07-0177-KD-C,
2008 WL 183344 (S.D. Ala. Jan. 16, 2008), for the proposition that, as the location
of the real estate, Alabama law should govern.  In that case, the plaintiff alleged that
one of its former employees had made misrepresentations and engaged in self-dealing
when arranging for the company to purchase seven parcels of real estate.  Four of the
properties were located in Florida, and three were in Alabama.  *See* Second Amended
Complaint ¶ 13, *The Mitchell Co.* (No. 07-0177-KD-C), 2008 U.S. Dist. Ct. Pleadings
576289.  The defendants — *i.e.*, the employee and two of his alleged co-conspirators
— were all Florida citizens.  *Id.* ¶¶ 7-9.  Although the plaintiff was an Alabama
corporation, and the injury was financial, the court applied Florida law in ruling on
the defendants' motions to dismiss.  *The Mitchell Co.*, 2008 WL 183344, at *3 n.5.

Even so, *The Mitchell Co.* decision is not particularly persuasive, because the plaintiff did not address the choice of law issue in its brief. *Id.* The court simply stated that the plaintiff alleged that "the wrongs occurred in Florida." *Id.*

As noted at the beginning of this opinion, the parties to this action are embroiled in litigation before other judges on this court.[360] In one of those other actions, Judge Abdul K. Kallon addressed the parties' nearly-identical arguments on the choice of law question, and held that "because Plaintiffs suffered their alleged financial injury arising from the common law tort claims in California, [the] law [of that state] governs these claims." *San Francisco Residence Club, Inc., et al. v. Park Tower, LLC, et al.*, Civil Action No. CV-08-1423-NE-AKK, slip op. at 11 (N.D. Ala. Jan. 12, 2012) ("*Park Tower*") (alterations supplied). To the extent that Judge Kallon determined that the financial injury occurred "in" California, this court agrees. Even so, this court is not convinced that he was correct when concluding that "there is no overarching Alabama public policy that demands the application of Alabama law in the face of *lex loci delicti*." *Id.* at 10.

## A. The Public Policy Exception to the Rule of *Lex Loci Delicti*

Although Alabama generally follows the principle of *lex loci delicti* when determining the substantive law that should govern tort claims asserted between

---

[360] *See supra* note 2 for a list of the other actions filed in this court.

citizens of different states in an Alabama forum, the location of the injury is not the only consideration taken into account.  Alabama courts reject foreign law when the application of that law would be contrary to the public policy of the State.  *See*, *e.g.*, *Caine v. St. Louis & S.F.R. Co.*, 95 So. 876, 877 (Ala. 1923) ("While it is well recognized that the statutes of another state have no extraterritorial force, yet rights acquired thereunder will always, in comity, be enforced, *if not against the public policy of the laws of the state where redress is sought.*" (emphasis supplied)).  *See also* Restatement (First) of Conflict of Laws § 612 (1934) ("No action can be maintained upon a cause of action created in another state the enforcement of which is contrary to the strong public policy of the forum.").

A state's public policy "is to be found in its constitution, its statutes, the decision[s] of or settled rules laid down by its courts, and the prevailing social and moral attitudes of the community."  16 Am. Jur. 2d *Conflict of Laws* § 18 (2012) (bracketed alteration supplied).  The exception is more likely to apply if the state has memorialized its public policy in a statute.  *Id.*  The public policy exception is infrequently applied, because it is intended to be "narrow and should be applied only in rare circumstances."  *Id.*

### 1.     The Alabama Legal Services Liability Act

Prior to enactment of the Alabama Legal Services Liability Act of 1988

("ALSLA"), many forms of action could be asserted against persons providing legal services within this State, including claims like those asserted by plaintiffs in Count 4 of their Second Amended Complaint, which are based upon California law. When enacting the ALSLA, the Alabama Legislature included a preamble explaining the motivation for and purposes of the new law. Due to the importance of that statement of legislative intent to the resolution of the question of whether the statutory innovations forced upon common-law forms of action by the ALSLA represents a "strong public policy," it is set out in full below:

> It is hereby declared by the Legislature of the State of Alabama that a crisis threatens the delivery of legal service to the people of Alabama and that the quality of legal services which should be made available to the citizens of this state is in jeopardy. It is the declared intent of this Legislature to insure that quality legal services continue to be available at reasonable costs to the citizens of the State of Alabama. This Legislature finds and declares that the increasing threat of legal actions against legal service providers contributes to an increase in the cost of legal services and places a heavy burden upon those who can least afford such cost and that the threat of such legal actions contributes to the expense of providing legal services to be performed by legal service providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential legal services caused by the threat of such litigation constitutes a danger to the welfare of the citizens of this state, and that this article should be given effect immediately to help control the spiraling cost of legal services and to insure the continued availability of vital legal services. In addition, this Legislature finds that legal service providers are experiencing great and increasing difficulties in obtaining professional liability insurance and that there is a great and rapid increase in the cost of professional liability insurance. This Legislature finds that both the

availability and the cost of professional liability insurance is in direct consequence to the threat of legal actions against Alabama legal service providers. *It is the intent of the Legislature to establish a* **comprehensive** *system governing* **all** *legal actions against legal service providers*. The Legislature finds that in order to protect the rights and welfare of all Alabama citizens and in order to provide for the fair, orderly and efficient administration of legal actions against legal service providers in the courts of this state, *this article provides a* **complete** *and* **unified** *approach to legal actions against legal service providers and* **creates a new and single form of action and cause of action exclusively governing the liability of legal service providers** known as a legal service liability action and provides for the time in which a legal service liability action may be brought and maintained is required.

Ala. Code § 6-5-570 (1975) (2005 Replacement Vol.) (all emphasis supplied).

The foregoing statement of legislative intent makes it perfectly clear that any difference in the remedies available against legal service providers under the laws of Alabama and California is not the result of mere happenstance. Instead, it is the result of a conscious effort by the Alabama Legislature to affirmatively abolish common-law causes of action for so-called "legal malpractice claims." The State's Legislature has affirmatively stated a strongly-worded public policy against the maintenance of common-law tort actions against persons providing legal services within Alabama. That public policy precludes the application of foreign law, and limits plaintiffs' remedies against both the Wilmer & Lee Defendants and Baswell-Guthrie Defendants to claims asserted under the Alabama Legal Services Liability Act of 1988.

Plaintiffs admit that Alabama's public policy is sufficiently strong to require

the application of the Alabama Legal Services Liability Act to the legal malpractice claims that are asserted in Count 3 of their Second Amended Complaint, but they make a twofold argument for the application of California law to other claims arising from the same factual circumstances.  First, they argue that Alabama courts have interpreted the Alabama Legal Services Liability Act to allow common-law claims brought against attorneys by *non-clients*.  In that regard, plaintiffs have pled alternative (and inherently contradictory) theories in their Second Amended Complaint. On the one hand, plaintiffs affirmatively allege in Count 3 that an attorney-client relationship existed between them and, at varying times, both Samuel Givhan and Cheryl Baswell-Guthrie.  Plaintiffs admit that those claims are subject to the Alabama Legal Services Liability Act.

On the other hand, plaintiffs inconsistently allege in Count 4 of their Second Amended Complaint — *on the basis of exactly the same nucleus of operative facts undergirding their claims in Count 3* — that *no attorney-client relationship existed between them and either Samuel Givhan or Cheryl Baswell-Guthrie*; and that those defendants are accordingly liable to plaintiffs under common-law causes of action. Moreover, plaintiffs insist in the second part of those allegations that California law governs their common-law claims.  This court is not persuaded by plaintiffs' arguments.

97

### 2. Plaintiffs' argument that non-clients can assert common-law claims against Alabama attorneys

Plaintiffs rely on four cases for the proposition that non-clients can assert common-law claims against attorneys, despite the "single cause of action" rule of the ALSLA. All of those cases are readily distinguishable from the present action, as demonstrated by the following discussion.

### a. *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800 (Ala. 1999)

The first case relied upon by plaintiffs is *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800 (Ala. 1999). That action arose out of a dispute between attorneys over the division of a legal fee. The plaintiff-attorney, William C. Cunningham, and the defendant law firm, Langston, Frazer, Sweet & Freese, P.A., had entered into a contractual arrangement to equally divide any fee earned in the prosecution of class action claims. *Id.* at 801-02. An attorneys' fee of $1,000,000 was awarded, but Langston Frazer delivered only one percent of that amount ($10,000) to Cunningham. *Id.* at 802. Cunningham brought suit against the Langston Frazer firm, alleging claims for breach of contract and several torts. *Id.* Langston Frazer moved for dismissal. In doing so, the law firm did not contend that Cunningham's complaint was factually deficient but, instead, argued that "Cunningham's various claims relating to the alleged breach of contract must be

98

brought under the Alabama Legal Services Liability Act." *Id.* The trial court granted

the motion, and Cunningham appealed. *Id.* The Alabama Supreme Court reversed,

holding that the Alabama Legal Services Liability Act "does not apply to an action

filed against a 'legal service provider' *by someone whose claim does not arise out of*

*the receipt of legal services.*" *Id.* at 804 (emphasis supplied).[361]

> **b**.   ***Fogarty v. Parker, Poe, Adams & Bernstein, L.L.P.***, 961 So. 2d
> 784 (Ala. 2006)

The second case relied upon by plaintiffs, *Fogarty v. Parker, Poe, Adams &*

*Bernstein, L.L.P.*, 961 So. 2d 784 (Ala. 2006), arose out of a dispute over a real estate

investment. The plaintiffs, Mr. and Mrs. Forgarty, purchased minority shares in three

limited liability companies, including one that was colorfully named "Confederate

---

[361] In reaching that conclusion, the Alabama Supreme Court quoted the preamble to the Alabama Legal Services Liability Act at length, and contrasted the preamble with hypothetical scenarios to demonstrate that the Act  was not intended to preclude every cause of action against an attorney, such as a contract claim asserted by one attorney against other attorneys for an alleged breach of a fee-sharing agreement.

> For example, was the legislature responding to the threat of legal actions against attorneys in regard to such things as a law firm's contracting to have a drink machine placed in its office but then failing to pay in accordance with its contract; an attorney's involvement in a motor-vehicle accident; or an attorney's dispute with his neighbor over a landline?

*Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 803-04 (Ala. 1999). The court answered each hypothetical question in the negative, and concluded with the statement quoted in text: *i.e.*, "from the language of the statute, . . . the ALSLA does not apply to an action filed against a 'legal service provider' *by someone whose claim does not arise out of the receipt of legal services.*" *Id.* at 804 (emphasis supplied).

99

Money, L.L.C." *Id.* at 786.  The majority shareholder in each of the three L.L.C.s was

a closely-held corporation.  *Id.*  The Fogartys' investment funded a real estate venture

in Gulf Shores, Alabama that declined in value.  *Id.*[362]  The Fogartys traveled from

their home in South Carolina to Gulf Shores in the hope of determining what went

wrong.  *Id.*  They suspected that the majority shareholders in the venture had

misrepresented the financial health of the project.  *Id.*  The accountant for

Confederate Money, L.L.C., allowed Mrs. Fogarty limited access to the company's

books, further fueling the Fogartys' suspicions.  *Id.*

The Fogartys returned to South Carolina, where they received a letter from  a

North Carolina law firm named Parker, Poe, Adams & Bernstein, L.L.P. ("Parker

Poe").  *Id.*  That letter stated that Parker Poe represented the majority owner of the

limited liability companies, and that the Fogartys would not be permitted to again

have access to the books of Confederate Money, L.L.C.  *Id.*  The Parker Poe letter

also threatened legal action if the Fogartys continued to seek access to the records.

*Id.*  The firm asserted that Alabama law did not permit the Fogartys to review the

books, which was a misrepresentation.  *Id.*  Parker Poe later mailed the Fogartys

additional letters, stating that they would not be permitted additional contact with the

---

[362] The opinion of the Alabama Supreme Court does not indicate whether the other limited
liability companies also suffered losses.

accountant for Confederate Money, L.L.C. *Id.* Ultimately, "Parker Poe removed the books and records of Confederate Money from Alabama specifically to prevent the Fogartys from having access to those books and records." *Id.*

The Fogartys sued numerous defendants, including the Parker Poe law firm. The claims asserted against Parker Poe sounded in, among other theories, fraud and conspiracy to defraud. *Id.* at 788. Parker Poe moved to dismiss the claims, arguing that the Alabama Legal Service Liability Act subsumed such common-law causes of action, and replaced them with a single, statutory form of action. The trial court granted the motion. *Id.* at 787. The Alabama Supreme Court reversed. In doing so, the Court cited *Cunningham*, and emphasized that the counts of the Fogartys' complaint directed at the Parker Poe law firm did

> not allege tortious conduct resulting from *the receipt of legal services*
> by the Fogartys from Parker Poe. Also, Parker Poe, in arguing that no
> "privity" existed between itself and the Fogartys, expressly states that
> it never provided legal services to the Fogartys.

*Id.* at 789 (emphasis supplied). For those reasons, the Court held that the Alabama Legal Services Liability Act did not apply to the Fogartys' claims, and was not their exclusive remedy. *Id.*

     **c**.    ***Smith v. Math***, 984 So. 2d 1179 (Ala. Civ. App. 2007)

The third case relied upon by plaintiffs is *Smith v. Math*, 984 So. 2d 1179 (Ala.

Civ. App. 2007). That action arose from the wrongful conduct of an attorney named Leonard Norman Math when representing an entity known as the "Max Federal Credit Union." Math filed a collection suit against Robert Lee Smith, Sr. to collect a debt owed by Smith to the credit union. *Id.* at 1181. Math subsequently obtained a default judgment against Smith. *Id.* That judgment was vacated, however, in response to Smith's motion establishing that he had not been properly served with process. *Id.* Nevertheless, *after* the default judgment was set aside, and with knowledge of that fact, attorney Leonard Math recorded the vacated judgment in the Probate Records of Montgomery County, Alabama — thereby imposing a lien upon any real property owned by Smith. *Id.* Smith made numerous requests for Math to correct the invalid filing, but he never attempted to do so. *Id.* Eventually, the trial court ruled in favor of Math's credit union client on the merits of its debt-collection claim. *Id.* Even so, Smith sued Math, alleging damages on the basis of the adverse effect that the falsely-recorded default judgment had on his business affairs, and sought to recover the costs incurred in correcting the recording. *Id.* Attorney Math moved for summary judgment, arguing that Smith had asserted a claim for "legal malpractice," which had to be brought under the Alabama Legal Services Liability Act. *Id.* at 1182. Math also argued that he was entitled to summary judgment on any legal malpractice claim because Smith was not his client. *Id.* The trial court granted

102

summary judgment, and Smith appealed.  *Id.* at 1183.  The Alabama Court of Civil Appeals reversed.

The Court began its review by determining "whether Smith's complaint states general tort claims or claims of legal malpractice under the ALSLA."  *Id.* at 1185. The court discussed *Cunningham* and other cases before focusing its discussion on *Fogarty*, and concluding that, in the *Fogarty* opinion, the Alabama Supreme Court had "extended the language in *Cunningham* to apply to a case in which the plaintiffs had not received legal services [from attorneys employed in the North Carolina law-firm named as a defendant,] but were adversely affected by the attorney's [provision of] legal services to a third party."  *Id.* at 1187 (alterations supplied).  The court reasoned that "*Cunningham* and *Fogarty* both expressly state that the ALSLA did not apply because the plaintiffs in those cases had not *received* legal services from the defendant attorneys."  *Id.* (emphasis in original).  The *receipt* of legal services was the "determinative" fact, and it was lacking in the *Smith* case.  *Id.*  Accordingly, the Court of Civil Appeals held that the Alabama Legal Service Liability Act did not apply.  *Id.* at 1188.  In doing so, the Court reiterated that "not all valid claims against legal-service providers are legal-malpractice claims," and remanded the case to the trial court, saying that Smith's complaint stated cognizable "claims of common-law negligence, if not fraud, against Math."  *Id.*

103

### d. *Line v. Ventura*, 38 So. 3d 1 (Ala. 2009)

The final case relied upon by plaintiffs, and the decision upon which they seem to place the most weight, is *Line v. Ventura*, 38 So. 3d 1 (Ala. 2009). That action arose out of the misconduct of Billie B. Line, an attorney formerly licensed to practice law in Huntsville, Alabama, for actions taken in his role as the "joint-control representative" of a conservatorship established for the benefit of a minor named Tranquilino Ryan Ventura. During Ventura's minority, he was awarded a $500,000 judgment in a wrongful death action arising from his father's death. *Id.* at 4. His mother retained attorney Line to establish a conservatorship for receipt and safekeeping of those funds. *Id.*

Alabama law required the mother to obtain a bond to guarantee the proper performance of her statutory duties as the court-appointed Conservator of her son's estate. *Id.* She applied for a bond through The Hartford Insurance Company. *Id.* Hartford had an explicit policy of requiring the execution of a "joint control agreement" before issuing a bond controlling the expenditure of funds held in a conservatorship account. *Id.* Such agreements stated that the bank holding the conservatorship funds could not honor any draft on the account unless the draft was co-signed by *both* the Conservator *and* a "joint-control representative": a person explicitly designated as Hartford's "Company Representative." *Id.* Billie B. Line

104

signed the agreement as Hartford's "joint-control representative." *Id.* at 4-5. The purpose of the agreement was to protect both The Hartford and the Conservator's ward during his minority by vesting the "joint-control representative" with the responsibility for determining whether expenditures proposed by the Conservator were appropriate uses of the ward's conservatorship funds.

Despite the fact that he "understood that he was obligated to review and approve every expenditure," Line did not perform any review. *Id.* at 5. Instead, he signed somewhere between 50 and 150 *blank checks* drawn on the conservatorship's bank account, and gave those checks to the mother. *Id.* She used the checks to purchase polo lessons for Ventura, a polo pony, and a BMW automobile. *Id.* at 6. She also bought a house (obligating the conservatorship on the loan), "invested in a number of schemes," and transferred $350,000 of the conservatorship's assets to a brokerage group without providing any instructions as to the nature of investments to be pursued by the brokerage group. *Id.* As a result of the mother's profligate spending, the conservatorship funds had been "effectively exhausted" by the time Ryan Ventura attained the age of majority. *Id.*

Ventura instituted legal proceedings as an adult and, after the probate court found that the conservatorship was a fraud upon both the court and upon Ventura, he instituted a separate action against attorney Line. *See id.* Ventura's claims sounded

105

in negligence, wantonness, and breach of fiduciary duty. *Id.* at 3. Hartford also sued Line to recover the payment it had to make under the company's bond. *Id.* The case went to trial, and Line moved for judgment as a matter of law, arguing that the Alabama Legal Services Liability Act barred the common-law claims. *Id.* The trial court denied the motion, and the jury found in favor of both Ventura and Hartford. *Id.* at 3-4. Line appealed the denial of his motion, but the Alabama Supreme Court affirmed the judgment.

The Court quoted extensively from *Cunningham*, and cited the other cases discussed above. The Court concluded "that those cases hold that the ALSLA applies only to claims against legal-service providers arising out of the provision of legal services." *Id.* at 11. The Court found that "the evidence is effectively uncontroverted that neither Ventura nor Hartford was Line's client, and Line provided legal services to neither. Accordingly, the ALSLA has no application to Ventura's and Hartford's claims against Line." *Id.* Instead, said the Court, "the record strongly supports the inference that Line undertook an entirely separate fiduciary obligation to Ventura and Hartford by explicitly agreeing to participate in the conservatorship by co-signing checks and being 'actively involved' with the conservatorship funds." *Id.* That is, Line's duties stemmed not from his status as the legal-services provider who arranged the conservatorship for Ventura's mother, but from the affirmative duties he

106

undertook by executing The Hartford's "joint-control agreement."  By becoming the company's representative, Line thereby was charged with the fiduciary responsibility of determining whether expenditures proposed by the Conservator were appropriate uses of conservatorship funds, held in trust until such time as the ward attained the age of majority.

### 3.    Analysis of the cases relied upon by plaintiffs, and their application to public policy

The foregoing decisions by the Alabama Supreme Court and Court of Civil Appeals serve to clarify that the Alabama Legal Services Liability Act is a statutory form of action that subsumes common-law "legal malpractice" causes of action that arise out of the provision of legal services by a legal-services-provider to a plaintiff-client of the defendant legal-services-provider.

Count 3 of the plaintiffs' Second Amended Complaint (their ALSLA claim) alleges that defendants Samuel Givhan and Cheryl Baswell-Guthrie were their attorneys, and that those defendants committed legal malpractice in their deficient provision of legal services.[363]  In Count 4 of their complaint, plaintiffs alternatively allege that those defendants were *not* their attorneys, and that those defendants

---

[363] *See* doc. no. 65 (Second Amended Complaint) ¶ 166 ("At all times pertinent to the Fountain, Moquin, and Corporate Drive transactions, O'Shea Trust and Kate Donahue were in an attorney client relationship with Wilmer & Lee and its agent and shareholder Givhan."); *id.* ¶ 176 ("At all times pertinent to the Tech Point and Quality Circle transactions, Plaintiffs were in an attorney client relationship with Cheryl Baswell-Guthrie and Baswell-Guthrie  P.C.").

committed common-law torts in providing legal services to others.[364]    Additionally,

in Count 11, the plaintiffs allege that Givhan and Baswell-Guthrie breached fiduciary

"escrow duties" in the course of closing the transactions.[365]    In other words, Counts

4 and 11 of plaintiffs' Second Amended Complaint alleges misconduct that is outside

the scope of the Alabama Legal Services Liability Act.

As plaintiffs present them, the four cases discussed in the preceding

subsections demonstrate a willingness of Alabama courts to allow non-clients to

maintain common-law tort claims against legal services providers.    Such a

representation of those holdings is, at best, overly simplistic, if not an affirmative

misrepresentation of the law by plaintiffs' counsel.    All of the cases are

distinguishable from the facts of the present controversy.

In *Cunningham*, there was nothing resembling the provision or receipt of legal

services between the plaintiff-attorney and defendant law-firm.    The action

---

[364] *Id.* ¶ 183 ("Alternatively, if they were not in an attorney-client relationship with Kate Donahue and O'Shea Trust, Wilmer & Lee and Givhan took all relevant actions while providing legal services to other parties, including the Individual Conspirators, in the Fountain, Moquin, and Corporate Drive transactions."); *id.* ¶ 196 ("Alternatively, and in the event that they were not in an attorney-client relationship with Plaintiffs, Cheryl Baswell-Guthrie and Baswell-Guthrie P.C. took all relevant actions pertaining to Tech Point and Quality Circle in the course of providing legal services to the Individual Conspirators and/or other parties.").

[365] *Id.* ¶ 279 ("Wilmer & Lee and Givhan served as the escrow agent for the closing of the Fountain, Moquin, and Corporate Drive transactions and as such owed a duty to carry out faithfully the instructions of the parties to the closing."); *id.* ¶ 286 ("One Source served as the escrow agent for the closing of the Tech Point and Quality transactions and as such owed a duty to carry out faithfully the instructions of the parties to the closing and properly handle all documentation transmitted to it.").

commenced by the plaintiff-attorney (Cunningham) against the defendant law-firm (Langston Frazer) was premised entirely on the defendant law-firm's breach of a fee-sharing agreement.

In both *Fogarty* and *Smith*, the defendant-attorneys had committed tortious acts against the plaintiffs in the course of representing third parties. However, those actions were unquestionably adversarial in nature. In *Fogarty*, for example, the Parker Poe law firm threatened to sue the Fogartys and unlawfully removed documents from the state; in *Smith*, attorney Leonard Math represented a client that was suing Smith to collect a debt. Those factual situations are not comparable to the facts here.

It is not disputed that Samuel Givhan and Cheryl Baswell-Guthrie acted as closing attorneys for the transactions at issue, or that they held and eventually disbursed plaintiffs' escrow funds.[366] Thus, there is no question that those defendants were providing "legal services" when they committed the acts alleged by plaintiffs in Counts 4 and 11 of their Second Amended Complaint. Plaintiffs' claims against those attorneys — regardless of whether the claims are framed under the Alabama Legal Services Liability Act, or as a common-law negligence claim, or as "escrow

---

[366] The parties *do* dispute whether those defendants were *legally* "escrow agents," but there is no *factual* question that plaintiffs delivered funds for them to hold until closing, and that defendants disbursed those funds at closing. On the basis of those facts, plaintiffs allege that such disbursement actually violated the defendants' escrow duties.

agent liability" — are claims that arose out of the provision of legal services by Alabama legal-services-providers to the plaintiff-clients of the Alabama legal-services-providers.  And in this State, it is the strong public policy that all such actions should be brought under, and governed by, the Alabama Legal Services Liability Act.

The *Line* case, though less readily distinguishable from the facts before this court, is distinguishable, nevertheless.   Disbarred attorney Billie B. Line unquestionably provided legal services *to the mother* when he filed the pleadings necessary to create a conservatorship for the mother's minor son, the beneficiary of a substantial wrongful death judgment.  But it was not the provision of those services that led to suit by Tanquilino Ryan Ventura after he attained the age of majority.  Instead, liability rested upon Line's breach of *contractually-created* fiduciary duties that he had affirmatively assumed and accepted by executing Hartford's "joint-control agreement."  Line's duties as "joint-control representative" were not part of the legal services he had provided to the mother.  Moreover, they did not constitute separate legal services on behalf of either of the plaintiffs in the suit against Billie B. Line (*i.e.*, the former ward and The Hartford Insurance Company).

Sam Givhan and Cheryl Baswell-Guthrie, however, *did* provide legal services to plaintiffs when they acted as closing attorneys during the real estate acquisitions

110

at issue.

This court can conceive of no outcome more contrary to the policy expressed in the Alabama Legal Services Liability Act than to subject an Alabama attorney, closing on a real estate transaction involving the purchase of real property located wholly within Alabama, to liability under the legal-malpractice schemes of every jurisdiction in which the purchasers or sellers of that property might happen to reside.[367]   For that reason, this court concludes that it would be error to apply the substantive law of California — a law that would allow plaintiffs to pursue non-ALSLA remedies for the alleged legal malpractice of Alabama attorneys.   The Alabama Legal Services Liability Act provides the exclusive remedy available to plaintiffs under the facts of this controversy.  Accordingly, summary judgment is due to be granted in favor of defendants Samuel Givhan, Wilmer & Lee, P.A., Cheryl Baswell-Guthrie, Baswell-Guthrie, P.C., and One Source Title & Escrow L.L.C. on plaintiffs' common-law claims in Count 4, and their "escrow agent" claim in Count 11.

The "elder abuse" claim found in Count 10 of plaintiffs' Second Amended Complaint is, in essence, a legal-malpractice claim against Givhan, inasmuch as it

---

[367] To provide additional remedies to foreign plaintiffs, while limiting the remedies available to Alabama plaintiffs, would further undermine the stated purpose of the ALSLA.

111

stems from his role as an escrow agent and closing attorney.  Thus, summary judgment in favor of Givhan is equally appropriate on that claim.

This court recognizes that the foregoing conclusion conflicts with that of Judge Abdul Kallon, who did not find a sufficiently strong public policy to justify deviation from the application of California law under the traditional principles of *lex loci delicti*.  Even so, this court respectfully disagrees.  It is noteworthy that, by the time Judge Kallon's case reached the summary judgment stage, the plaintiffs had voluntarily dismissed their ALSLA claim.  *See Park Tower,* slip op. at 30 n.19.  In the case before this court, however, in which plaintiffs continue to pursue their ALSLA claim, it would be incongruous to allow them simultaneously to prosecute their common-law legal-malpractice claims.

The choice of law issue now having been resolved, the court will proceed to analyze plaintiffs' remaining claims under the governing Alabama law.[368]

---

[368] At oral argument, counsel suggested that the question of choice of law may be best resolved by certification of a question to the Alabama Supreme Court.  However, the Legislature has spoken very clearly and extensively regarding the scope and purpose of the ALSLA in the preamble to that statute.  Therefore, this court does not believe that it would be efficacious to refer a question to the Alabama Supreme Court.  *See, e.g., Price v. Time, Inc*., 416 F.3d 1327, 1333-34 (11th Cir. 2005) ("To the disappointment of the district court (and this one as well), the Alabama Supreme Court declined to answer the certified question, as it had every right to do and has done on occasion before.").

# VIII. INCONSISTENCIES AMONG THE ALLEGATIONS OF THE COMPLAINT, THE UNCONTESTED FACTS, AND ARGUMENTS IN BRIEFS

Before discussing the substance of plaintiffs' claims under the Alabama Legal Services Liability Act, it is necessary to point out the inconsistencies among the factual allegations of, and the claims alleged in, various counts of plaintiffs' Second Amended Complaint, the uncontested facts, and the arguments asserted in plaintiffs' briefs.

All of plaintiffs' claims grew from the five acquisitions summarized in Part IV of this opinion, and then discussed in more detail in Parts V and VI, *supra*. Not every plaintiff was involved in each acquisition. Thus, not every plaintiff asserted a claim under the Alabama Legal Services Liability Act on the basis of each transaction. Significantly, however, the plaintiffs asserting the claims do not always match those who or which were involved in the transaction on which a claim is based.

Plaintiffs' claims under the ALSLA are presented in Count 3 of their Second Amended Complaint. Within that count, two distinct claims are asserted against the Wilmer & Lee Defendants, while another two (or, depending upon how one chooses to read plaintiffs' disorienting ramblings, possibly three) claims are alleged against the Baswell-Guthrie Defendants.

## A. Claims Against the Wilmer & Lee Defendants

113

The two claims alleged against Samuel Givhan and the Wilmer & Lee law firm in Count 3 of plaintiffs' Second Amended Complaint are as follows: *first*, Thomas O'Shea asserts a claim against those defendants on the basis of his $50,000 check that, allegedly, was misappropriated by Givhan;[369] *in addition*, the O'Shea Trust and Kate Donahue assert a claim against the Wilmer & Lee Defendants based upon their contention that the Moquin, Fountain, and Corporate Drive acquisitions were not structured in compliance with Section 1031.[370]  As noted at least twice before, however, the Fountain property was *not listed* in any identification notice signed by Thomas O'Shea.[371]  Therefore, and for that reason alone, the acquisition of the Fountain property could not have become a "replacement property" for a valid Section 1031 exchange; and, the only transactions that can properly be the focus of the claim asserted by the O'Shea Trust and Kate Donahue against the Wilmer & Lee Defendants are the Moquin and Corporate Drive acquisitions.

**1.    Variance between the factual allegations and Count 3 of the complaint, on the one hand, and uncontested facts on the other**

In that section of plaintiffs' Second Amended Complaint containing the factual allegations supporting each Count of the complaint, plaintiffs state that *the O'Shea*

---

[369] *See* doc. no. 65 (Second Amended Complaint) ¶¶ 171-75.

[370] *Id.* ¶¶ 166-70.

[371] See the discussion in Parts IV(A) and IV(A)(2) of this opinion, *supra*.

114

*Trust* and *the San Francisco Residence Club, Inc.*, provided funds for the acquisition of the Moquin and Fountain properties.[372]  That allegation is not consistent with the allegations of Count 3, however, in which plaintiffs allege that the *O'Shea Trust* and *Kate Donahue* invested in those properties.[373]  Inconsistencies of greater significance than those, however, are found in the uncontested facts of record, which establish that *Thomas O'Shea* and *the San Francisco Residence Club, Inc.*, were the only plaintiffs to invest in the Moquin Drive and Fountain properties.[374]  Thomas O'Shea invested Section 1031 funds derived from the divestiture of his interest in "the Plaza at Sherman Oaks" in Los Angeles.[375]  The funds invested by the San Francisco Residence Club, Inc., in the Moquin Drive and Fountain acquisitions were not linked to the sale of property as part of a Section 1031 exchange.  Instead, as discussed in Part V(A), *supra*, that corporate entity *had* planned to sell its "Residence Club Hotel" as part of a like-kind exchange, but the sale did not close,[376] and the prospective purchaser forfeited earnest money.  It was that money which the San Francisco

---

[372] *See* doc. no. 65 (Second Amended Complaint) ¶¶ 53-54.

[373] *Id.* ¶ 168.

[374] See the discussion in Part IV(A), *supra*, establishing that Thomas O'Shea and the San Francisco Residence Club, Inc., acquired 22.483% and 11.241%, respectively, of the interest in the Moquin and Fountain acquisitions.  No other plaintiff in this action acquired an interest in either of those acquisitions.

[375] See the discussion in Part IV(A), *supra*.

[376] *See* doc. no. 139-2 (Anne O'Shea Dep., Sept. 29, 2010) at 148-49.

115

Residence Club, Inc., invested in the Moquin Drive and Fountain acquisitions.[377]
Thus, the ownership interest of the San Francisco Residence Club in the Moquin
Drive property was a cash investment, and not part of a like-kind exchange.[378] Hence,
the San Francisco Residence Club, Inc., is not a proper plaintiff to the claim alleged
against the Wilmer & Lee Defendants in Count 3.

It also should be noted that, even though Thomas O'Shea also is named as a
plaintiff in Count 3 of the Second Amended Complaint, he is a plaintiff in a different
claim altogether:  *i.e.*, the contention that Samuel Givhan (and, thereby, the Wilmer
& Lee firm) breached duties imposed by the Alabama Legal Services Liability Act
for allegedly misappropriating O'Shea's $50,000 check.

## B.   Claims Against the Baswell-Guthrie Defendants

Count 3 of plaintiffs' Second Amended Complaint also includes at least two
claims against the Baswell-Guthrie Defendants.  That Count first alleges that those
defendants breached their duty to an undefined group of "plaintiffs" by modifying the
tenancy in common agreements for the Old Madison Pike and Quality Circle
properties *after* the execution of the signature pages of each agreement by the

---

[377] *Id.*

[378] *See* doc. no. 139-13 (John Kevin Donahue Dep., Feb. 2, 2011), at 269 (testifying that
Moquin and Fountain "weren't targeted by SFRC" as replacement properties).

relevant participants in the acquisitions.[379]   The problem with that claim lies in

identifying who (or which entities) constitute the undefined group of "plaintiffs" who

complain in paragraph 179 of the Second Amended Complaint about the alleged

modification.   The only plaintiffs that may properly assert such a claim are those

entities that invested in the acquisition of the Old Madison Pike property:  *i.e.*, the

San Francisco Residence Club, Inc.; KKA CAS, L.L.C.; and TAK Tech Point,

L.L.C.[380]   To the extent that any other plaintiff asserts a claim on the basis of the

alleged modification, those claims are due to be dismissed.

In addition, the O'Shea Trust and Kate Donahue assert a second claim against

the Baswell-Guthrie Defendants based upon the contention that those defendants

failed to take the actions necessary to ensure that the Quality Circle acquisition would

close in compliance with Section 1031.[381]   Once again, inconsistencies abound.  The

body of the Second Amended Complaint alleges that three plaintiffs — *i.e.*, the

O'Shea Trust, Kate Donahue, and KKA CAS, L.L.C. — provided funds for the

acquisition of the Quality Circle property.[382]   In reality, a fourth plaintiff, TAK Tech

---

[379] *See* doc. no. 65 (Second Amended Complaint) ¶ 179.  Because a slightly different group of plaintiffs was involved in each transaction, the alleged modification of the tenancy in common agreements by Cheryl Baswell-Guthrie actually appears to constitute *two* claims.  However, any claim based on the Quality Circle tenancy in common agreement is due to be dismissed, anyway.

[380] See the discussion in Parts IV(C) and VI(B), *supra*.

[381] *See* doc. no. 65 (Second Amended Complaint) ¶¶ 180-82.

[382] *Id.* ¶ 113.

117

Point, L.L.C., contributed funds to the acquisition. Regardless, the O'Shea Trust and Kate Donahue were the only plaintiffs to invest funds derived from the relinquishment of a Section 1031 property; and, therefore, they were the only plaintiffs who could have suffered damages as a result of the allegedly-improper structuring of the transaction. Further adding to the confusion surrounding the Quality Circle transaction is the fact that the plaintiffs who (or which) actually signed the operating agreement of "Quality Circle, L.L.C.," the entity that acquired title to the Quality Circle property, were Kate Donahue, San Francisco Residence Club, Inc., and Thomas O'Shea — a group that matches neither those who invested funds, nor those who were named in the complaint.[383]

## C. The Omissions of Counsel

Neither plaintiffs' nor defendants' attorneys mentioned any of the foregoing inconsistencies in their summary judgment briefs. Plaintiffs' attorneys simply framed their arguments on the Moquin and Fountain transactions as if Thomas O'Shea had been properly named as the plaintiff asserting the claim from the beginning. The parties also failed to draw distinctions among the other plaintiffs in their discussion

---

[383] *See* doc. no. 141-34 (Quality Circle Operating Agreement), at ECF 36-37. *See also* Part IV(D) and the text accompanying note 120, *supra*, listing the members of "Quality Circle, L.L.C." as: San Francisco Residence Club, Inc.; Thomas O'Shea; Kate Donahue; Jeri Holden; Scott McDermott; Roy Claytor; Delta Trust (Elizabeth Mason IRA); and William Chapman.

of the other claims.  No party addressed the fact that plaintiff Anne Donahue O'Shea

has not asserted a single claim in this action — other than in her representative

capacity as a Trustee of the O'Shea Trust.

## IX. ANALYSIS OF THE CLAIMS BROUGHT AGAINST THE WILMER & LEE DEFENDANTS

As a result of the discussion in Part VII, *supra*, finding that Alabama law

provides the controlling rules of decision, only two claims remain pending against the

Wilmer & Lee Defendants:  *i.e.*, Count 2 of the Second Amended Complaint, in

which plaintiffs claim that those defendants violated Alabama securities law; and

Count 3 of the same complaint, in which plaintiffs contend that the Wilmer & Lee

Defendants breached their duties under the Alabama Legal Services Liability Act.

### A. Alabama Securities Violation (Count 2)

Plaintiffs allege that the Wilmer & Lee Defendants violated Alabama's "blue

sky laws"[384] by materially aiding in the sale of unregistered securities:  *i.e.*, plaintiffs

contend that the interests acquired by the O'Shea Trust and Kate Donahue in

Corporate Drive, L.L.C. were unregistered securities and, therefore, unlawful.[385]

---

[384] A "blue sky law" is a "state statute establishing standards for offering and selling securities, the purpose being to protect citizens from investing in fraudulent schemes or unsuitable companies." *Black's Law Dictionary* 196 (9th ed. 2009). The adjectival term *blue sky* "originated with an early description of the purpose of state security laws as protecting investors against 'speculative schemes which have no more basis than so many feet of blue sky.'" *Gilford Partners v. Pizitz*, 630 So. 2d 404, 406 n.3 (Ala. 1993).

[385] The O'Shea Trust and Kate Donahue acquired an interest in Corporate Drive, L.L.C.  See

Alabama law requires that — with some statutory exceptions that are not relevant here — all securities sold within the State must be registered. *See* Ala. Code § 8-6-4 (1975). The purchaser of an unregistered security is provided a private right of action against the seller of that security. *Id.* §§ 8-6-19(a)-(b). The statutory scheme further provides that:

> Every person who directly or indirectly controls a person liable under subsections (a) or (b) of this section, including every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and *every dealer or agent who materially aids in such conduct is also liable jointly and severally with and to the same extent as the person liable under subsection (a) or (b),* unless he is able to sustain the burden of proof that he did not know, and in [the] exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

*Id.* § 8-6-19(c) (emphasis and alteration supplied).[386]

The Wilmer & Lee Defendants do not dispute plaintiffs' assertion that the interests acquired by the O'Shea Trust and Kate Donahue in Corporate Drive, L.L.C. were securities that should have been registered under Alabama law. Instead, those

---

the discussion in Part IV(B) of this opinion, *supra*.

[386] Arguably, a claim brought against an attorney under the Alabama statute to which this note is appended is precluded by the ALSLA. However, the sale of securities does not seem to fall within any traditional notion of "legal services." Moreover, the securities law cause of action is itself based in statute, not a common-law claim. The current version of the law was enacted after the ALSLA, and it includes no specific exemption for attorneys. *See* 1990 Ala. Act 90-527 (modifying the securities laws). Whether a securities claim is actually barred by the ALSLA is not material, because summary judgment is due to be granted on the claim, regardless.

defendants argue that Givhan's role in the transaction did not "materially aid" the purchase of such securities by the O'Shea Trust and Kate Donahue.  Plaintiffs and the Wilmer & Lee Defendants both rely on the same case as support for their respective arguments:  *i.e.*, *Foster v. Jesup & Lamont Securities Co., Inc.*, 482 So. 2d 1201 (Ala. 1986).  The complaining party in that case was a purchaser of unregistered securities who sued a brokerage house involved in offering the securities for sale.  The Eleventh Circuit certified to the Alabama Supreme Court the question of whether the following circumstances were sufficient to satisfy the requirements of the statute quoted in the preceding paragraph, *i.e.*, Alabama Code § 8-6-19(c):[387]

> (a) The firm's name was displayed prominently on an offering document used in connection with the sale, and the firm was presented in the document as the issue's primary best efforts underwriter, even though the firm had withdrawn from the offering;

> (b) The buyer relied on the firm's participation in the offering in reaching his decision to purchase an interest;

> (c) There is substantial evidence in the record from which we must infer that the jury found that an underwriter customarily is responsible for controlling distribution of the offering documents in a private offering;

> (d) The firm's president told the buyer's accountant that the firm was 'involved' in the offering document after the firm had rescinded its agreement to help sell the security;

---

[387] *See Foster v. Jesup & Lamont Sec. Co., Inc.*, 782 F.2d 901 (11th Cir. 1986).  At the time, the provision currently codified at § 8-6-19(c) was found at § 8-6-19(b).

121

(e) The buyer did not directly communicate with the brokerage firm in reaching his decision to invest;

(f) The buyer met with the promoter of the issue to discuss the promoter's background and to discuss various business aspects of the venture before deciding to invest;

(g) The buyer delivered his check to the promoter in exchange for the security.

*Foster*, 482 So. 2d at 1205.

The Alabama Supreme Court held in response that, under the circumstances outlined in the question certified by the Eleventh Circuit, the brokerage firm would be liable.  *Id.* at 1206.  The Court quoted at length from a law review article explaining the low hurdle that a plaintiff must surmount in order to succeed on a claim under § 8-6-19, stating that the persons listed in that section

> are included on the basis of what may be considered an express statutory aiding and abetting theory, since the employee, broker-dealer, or agent must have "materially aid[ed] in the sale."  Therefore, to hold a person liable a plaintiff need not show any active connivance or participation by the alleged control person[; instead] all he need to do is establish the defendant's *status* . . . plus the fact of the seller's liability.

*Id.* at 1207 (quoting J. Michael Rediker, *Alabama's "Blue Sky Law" — Its Dubious History and Its Current Renaissance*, 23 Ala. L. Rev. 667, 714 (1971)) (first alteration and emphasis in Rediker, second alteration supplied).  The Alabama Supreme Court further noted that a defendant's actions need not have been a

122

"substantial factor" in the plaintiff's decision to purchase the unregistered security in order to qualify as "material aid."  *Foster*, 482 So. 2d at 1207.

### 1.    **Beyond *Foster***

*Dicta* in the *Foster* opinion suggests that the "materially aided" requirement is a low hurdle for a plaintiff to clear when presenting a securities fraud claim.  The Alabama Supreme Court did not rule that the facts in *Foster* established the minimum involvement needed to establish liability.  On the contrary, the Court quoted with approval a passage from a law review article suggesting that the threshold was actually significantly lower than the factual circumstances presented in the Eleventh Circuit's certified question.  Nevertheless, this court is not convinced that an attorney acting in the traditional and ordinary course of representing a client would be liable for "materially aiding" in the sale of unregistered securities by that client.[388]

Although *Foster* appears to be the only Alabama case to address the "materially aiding" requirement under the State's securities laws, other courts have examined substantially similar provisions from the statutes of other states.  Those courts have repeatedly held that an attorney acting within the scope of the traditional advisory

---

[388]Recall that *Foster* involved a *brokerage house* defendant accused of materially aiding the sale of unregistered securities, not, as in this case, a legal-services-provider performing traditional legal services.  Thus, while *Foster* offers some guidance on the meaning of the "materially aiding" requirement, the Wilmer & Lee defendants' status as legal-service-providers is a significant factual distinction that takes this case out of the (otherwise controlling) purview of *Foster*.

123

role of a legal services provider does not "materially aid" in the sale of securities by his client.  This court finds the decisions discussed in the following subsections to be persuasive.

      **a**.    ***CFT Seaside Investment Limited Partnership v. Hammet***, 868 F. Supp. 836 (D. S.C. 1994)

The District of South Carolina considered the question of whether a law firm and one of its attorneys were liable under South Carolina's "blue sky" statutes in *CFT Seaside Investment Limited Partnership v. Hammet*, 868 F. Supp. 836 (D. S.C. 1994). The defendants in that case had provided the plaintiffs — investors in a beachfront development — with an opinion letter regarding the developer's compliance with South Carolina law.  *Id.* at 839-40.  The defendants then became aware of proposed legislation regarding coastal development, but did not inform the plaintiffs of the potential impact of that legislation on the plaintiffs' investment if the legislative proposals were enacted.  *Id.* at 840.  Thereafter, the legislative proposals were, in fact, enacted by the state's legislature, but the defendants opined that the statutes would have no materially adverse impact on the development.  *Id.*  The plaintiffs invested in the beachfront development, and the defendants served as the closing attorneys and escrow agents for the transaction.  *Id.* at 841.

As a result of the new legislative requirements, however, the development was

subjected to additional administrative burdens and delays. *Id.* The lending institution ultimately foreclosed on the property, and the plaintiffs lost their investment. *Id.* They sued the defendants alleging, among other causes of action, two violations of South Carolina securities laws. The district court granted summary judgment in favor of the defendants. The court first determined that the defendants were not "sellers" of securities under South Carolina law. Relying on the decision of the South Carolina Supreme Court in *Biales v. Young*, 432 S.E. 2d 482 (S.C. 1993), the court stated that "a seller's *attorney* does not become a 'seller' merely by speaking directly with a buyer to assure the buyer of certain facts relevant to the transaction, nor by serving as escrow agent for funds to be released to the seller." *CFT Seaside Investment Limited Partnership*, 868 F. Supp. at 842 (emphasis supplied). The court held that, even though the defendant-attorneys had "assured Plaintiffs of certain facts regarding the transaction, and served a[s] Plaintiffs' escrow agents, *there is no evidence that Defendants persuaded or urged Plaintiffs to purchase the securities*." *Id.* at 843 (alteration and emphasis supplied). The court further held that, even though the defendants "may have been . . . a substantial factor in causing Plaintiffs to purchase the securities," the defendants' actions in providing plaintiffs legal advice and acting as escrow agents did not transform the attorneys into "sellers." *Id.*

The district court next examined the defendants' liability under a South

Carolina statute that closely parallels the language of the Alabama provision at issue here. South Carolina Code § 35-1-1500 stated that "every broker-dealer *or agent* who *materially aids* in the sale [is] also liable jointly and severally with and to the same extent as the seller." S.C. Code § 35-1-1500 (emphasis and alteration supplied) (recodified as amended at S.C. Code § 35-1-509(g)(4)). The court considered the statutory definition of the term "agent" and determined that it "does not include attorneys who merely render legal advice or draft documents for use in securities transactions." *CFT Seaside Investment Limited Partnership*, 868 F. Supp. at 844. The court held that the statute applied to people directly involved in selling, or soliciting the sale of, securities — and *not* to "professionals such as attorneys engaging in their traditional advisory functions." *Id.* *See also In re Infocure Securities Litigation*, 210 F. Supp. 3d 1331, 1363-66 (N.D. Ga. 2002) (holding that a law firm that did not "step[] outside the bounds of attorneys in a run-of-the-mill merger transaction" was not liable under the securities laws of South Carolina, or under similar laws of North Carolina and Michigan) (bracketed alteration supplied).

  **b**.   ***Ward v. Bullis***, 748 N.W. 2d 397 (N.D. 2008)

  The Supreme Court of North Dakota also considered the question of whether the securities laws of that state applied to attorneys in *Ward v. Bullis*, 748 N.W. 2d 397 (N.D. 2008). That case arose when an employee sought to raise funds to exercise

126

his option to purchase stock in his employer.  The employee, Michael Volk, retained

the defendant-attorney, James Bullis, to organize several limited liability companies.

*Id.* at 400.  The companies did not have any employees, and each listed Bullis's law

office as its address.  *Id.*  Volk exercised his stock options and transferred the shares

thus acquired from his employer to the limited liability companies.  *See id.*  Security

interests in the limited liability companies then were offered for sale, and the interests

were priced at an amount that allowed Volk to realize a profit above the price at

which he had exercised his stock options.  *Id.*  In selling those interests to investors,

Bullis collected the purchase money and distributed the shares.  *Id.*  He also collected

a commission on the sales.  *Id.* at 400-01.  Bullis signed at least one purchase and sale

agreement on behalf of one of the limited liability companies without Volk's

knowledge or approval.  *Id.* at 401.  Roughly two years after Volk and Bullis

established their network of holding companies, Volk's employer ceased operations.

As a result, the security interests in the companies lost all value, and some of the

investors sued Volk and Bullis.  *Id.*  The state trial court granted summary judgment

in favor of the attorney, James Bullis, and the plaintiffs appealed.  *Id.* at 402.

The North Dakota statute on which the plaintiffs' action had been premised

provided that, in the case of the sale of an unregistered security, any "agent of or for

such seller who shall have participated or aided in any way in making such sale shall

127

be jointly and severally liable to such purchaser." N.D. Cent. Code § 10-04-17(1).

The statute defined the term "agent" narrowly, but the plaintiffs argued that, when

interpreting the statute, the court should adopt the common-law definition of that

term: a definition that typically includes an attorney. *Ward*, 748 N.W. 2d at 403. The

North Dakota Supreme Court declined to adopt that construction, however. Instead,

the Court cited cases from several other jurisdictions, including the opinion of the

United States District Court for the District of South Carolina in *CFT Seaside*

*Investment, supra*, and concluded that:

> An attorney who merely provides legal services, drafts documents used
> in the purchase or sale of the security, or engages in the legal
> profession's traditional advisory functions is not an agent within the
> meaning of N.D.C.C. § 10-04-02(1). To be liable as an agent, the
> attorney must do more than act as legal counsel[; instead], the attorney
> must actively assist in offering securities for sale, solicit offers to buy,
> or actually perform the sale.

*Id.* at 405 (alteration supplied). Nevertheless, the North Dakota Supreme Court

ultimately concluded that there was a genuine issue of material fact regarding the

question of whether James Bullis had acted outside the scope of the "traditional

advisory functions" of an attorney. Accordingly, the Court reversed the trial court's

decision granting summary judgment in favor of Bullis and remanded the case for

trial. *Id.* at 405-06.

      **c**.    ***San Francisco Residence Club, Inc., et al. v. Park Tower, LLC,***

*et al.*, Civil Action No. 08-1423-NE-AKK (N.D. Ala. Jan. 12, 2012)

The companion case assigned to Judge Kallon on this same court, *i.e.*, *San Francisco Residence Club, Inc., et al. v. Park Tower, LLC, et al.*, Civil Action No. 08-1423-NE-AKK (N.D. Ala. Jan. 12, 2012), involves many of the same persons and entities named as parties to this action, but arose from a separate real estate transaction.[389]  As part of that transaction, plaintiffs purchased an interest in "Park Tower, L.L.C.," an Alabama limited liability company.  *Id.* at 14.  Samuel Givhan, one of the Wilmer & Lee Defendants in the present action, also drafted the articles of organization for that limited liability company, drafted its operating agreement, and prepared ownership certificates for the plaintiffs' investments in the company.  *Id.* at 24-25.  He also served as the title and escrow agent for the transaction, roles that plaintiffs allege gave Givhan a pecuniary motive to see the transaction close and, therefore, to see that the security interests in Park Tower, L.L.C. were sold.  *Id.* at 25-26.

Even so, Judge Kallon held that there was "no persuasive reason to extend secondary liability for securities violations, under Ala. Code § 8-6-19, to attorneys exercising their 'traditional advisory role.'"  *Id.* at 23.  In that regard, Judge Kallon

---

[389] *See supra* note 2.

concluded that the drafting of documents related to a limited liability company is not "outside the traditional advisory role of transactional attorneys." *Id.* at 25.  Further, Judge Kallon held that there was, at most, a "tenuous connection" between Givhan's motivation as a closing attorney to see a real estate transaction close, and the sale of securities. *Id.* at 26.  Finally, Judge Kallon concluded that Givhan "did not leave the traditional role of [a] transactional attorney[] and materially aid in the sale of securities by operating as an escrow agent or holding funds in trust." *Id.* at 27 (alterations supplied).

## 2.  Application of the *ratio decidendi* of the preceding decisions to the issues raised in the present action

The alleged "securities" at issue in this action are the interests that the O'Shea Trust and Kate Donahue purchased in Corporate Drive, L.L.C.[390]  The Wilmer & Lee Defendants argue that Samuel Givhan did not "materially aid" defendant Scott McDermott in the sale of those securities, because Givhan was *less* actively involved in their sale than the defendant whose involvement was deemed sufficient to create liability by the Alabama Supreme Court in *Foster*.  The Wilmer & Lee Defendants contrast the facts of *this case* to those in *Foster*.  Unlike the defendant in *Foster*, which was a securities firm, Wilmer & Lee is a law firm, and it has never sold

---

[390] *See* doc. no. 155, at 23 ("The claim clearly concerns only the Corporate Drive transaction, not the Moquin and Fountain transactions.").

securities.  Wilmer & Lee never agreed to sell securities or to receive a commission for doing so.  Wilmer & Lee's name does not appear on documentation containing false information that provided the basis for plaintiffs' decision to invest.[391]  Finally, Samuel Givhan did not vouch for the reputation or reliability of the McDermott Defendants.  Thus, from the perspective of the Wilmer & Lee Defendants, this case is easily distinguished from *Foster*.

In response, plaintiffs argue that Samuel Givhan provided *more aid* in the sale of the Corporate Drive, L.L.C. securities than did the brokerage firm sued in *Foster*. In support of that argument, plaintiffs point to the following facts:

1.   During the "Ireland conference call," Givhan told the O'Sheas that they "needed to take title to the properties as an undivided interest" and that he "would do that";

2.   Givhan assured the O'Sheas that their investment in the Corporate Drive property would comply with the "three property" rule of Section 1031;[392]

3.   Givhan sent an email to Mr. O'Shea shortly before closing, in which he stated that he needed Section 1031 assignment documents, thereby implying that the transaction was structured to comply with Section 1031, when in fact it was not;

---

[391] Although the name of the firm did appear in the Private Placement Memoranda for the Moquin-Fountain transaction, there was no such document for the Corporate Drive property.

[392] The so-called "three property rule" allows a taxpayer to identify any three properties, regardless of their market value, as "replacement properties" for any given "relinquished property." *See* 26 C.F.R. § 1.103(k) – 1(c)(4)(i)(A), quoted in Part II, *supra*.

4.      Givhan disbursed plaintiffs' purchase funds without obtaining a
deed in their names as individuals, in contravention to the
instructions in the WaMu forms;

5.      Givhan spoke with WaMu employee Erica O'Leary without
revealing to her that he considered himself "at liberty" to close
the transaction according to the purchase agreement, rather than
according to the WaMu instructions;

6.      Givhan did not reveal to plaintiffs that he intended to follow the
purchase agreement, rather than the WaMu instructions;

7.      Givhan assisted McDermott in assigning his rights in the
purchase agreement to Corporate Drive L.L.C., rather than to
plaintiffs as tenants in common.[393]

Significantly, the reader should note that plaintiffs fail to state what any of the

foregoing actions have to do with *selling securities*.  Even so, their theory appears to

be that Samuel Givhan was instrumental in convincing plaintiffs to participate in the

Corporate Drive transaction, as a result of which they purchased the Corporate Drive,

L.L.C. securities.

Notably, however, plaintiffs have not advanced any facts demonstrating that

Givhan was acting outside the traditional role of an attorney.  He organized Corporate

Drive, L.L.C. in accordance with the instructions of McDermott:  an action that is

squarely within the typical duties of a lawyer.  Likewise, Givhan's role in closing the

transaction and serving as the escrow agent fall within the purview of ordinary legal

---

[393] *See* doc. no. 155, at 25-26.

work.  Givhan's failure to comply with the WaMu instructions does not transform his participation in the closing to one of "materially aiding" in the sale of unlawful securities.  Although Givhan's actions arguably constituted legal malpractice, they were not outside the scope of ordinary attorney duties.  As in the *Park Tower* case assigned to Judge Kallon, there is not a close connection between the actions taken by Givhan to close the real estate transaction and the sale of securities.

On the other hand, the instant case is potentially distinguishable from the *Park Tower* controversy because of Givhan's statements during the "Ireland conference call," to which there was no parallel in *Park Tower*.  Yet, the statements Givhan made during the course of that telephone conversation do not involve the promotion of the sale of *securities*.  Instead, during that call Givhan provided plaintiffs his opinion regarding the eligibility of the Corporate Drive transaction for tax deferral under Section 1031.  He told plaintiffs that they needed to take title to the property as tenants in common, each holding undivided interests, in order to qualify for tax deferral under Section 1031.  That was a correct statement of the law.  In fact, plaintiffs could not identify any incorrect statement made by Givhan during the conference call.[394]

Plaintiffs' argument that Givhan materially aided in the sale of unlawful

---

[394] Wilmer & Lee Facts ¶ 33.

133

securities by telling them that the transaction would comply with Section 1031 is directly contradicted by their admission that he told them that they had to be "on the title" for the transaction to comply: *i.e.*, they could not own the property through a limited liability company.    Ultimately, none of Givhan's statements during the conference call can be  reasonably characterized as designed to persuade plaintiffs to *purchase securities*.   As explained in *Park Tower*, Givhan's statements may have helped convince plaintiffs to proceed with the *real estate* transaction, but that fact does not automatically make him liable for *securities* fraud.  *See Park Tower*, slip op. at 26.

In summary, the facts of record indicate that Givhan was acting within the traditional advisory role of a transactional attorney.  He drafted documents, opined on the requirements for a transaction to receive favorable tax treatment under Section 1031, served as the escrow agent, and closed the transaction.  *See CFT Seaside Investment Limited Partnership*, 868 F. Supp. at 844.  He did not receive a commission for the sale of the securities, and it is clear that Scott McDermott, not Samuel Givhan, was controlling Corporate Drive, L.L.C.  *Cf. Ward*, 748 N.W.2d at 400-01.  The fact that the transaction did not comply with the requirements of Section 1031 does not change the fact that the statements Givhan made regarding those compliance requirements were true, nor does it transform him into an agent of a

securities dealer.   Thus, summary judgment is due to be granted in favor of defendants Samuel Givhan and Wilmer & Lee, P.A., on plaintiffs' claims for violations of Alabama's securities statutes.

**B**.   **Claims Asserted Against the Wilmer & Lee Defendants Under the Alabama Legal Services Liability Act (Count 3)**

A plaintiff asserting a claim under the Alabama Legal Services Liability Act ("ALSLA") must prove that the defendant legal-service-provider failed to comply with (*i.e.*, "breached") the applicable standard of care, and that his failure ("breach") was the proximate cause of the injuries or damages complained of.   *See*, *e.g*., Ala. Code §§ 6-5-572(1), (4) (1975) (2005 Replacement Vol.); 1 *Alabama Pattern Jury Instructions – Civil* § 25A.00, at 314 (2d ed. 1993) (Supp. 2011); *Independent Stave Co., v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala. 1996); *see also, e.g.*, *Borden v. Clement*, 261 B.R. 275, 282 (N.D. Ala. 2001) (citing *Independent Stave*, *supra*).

The standard of care that applies in an action founded on the Alabama Legal Services Liability Act is statutorily defined as "such reasonable care and skill and diligence as other similarly situated legal service providers in the same general line of practice in the same general area ordinarily have and exercise in a like case." Ala.

135

Code § 6-5-580(1); *see also id.* § 6-5-572(3)(a).[395]

Thus, in order to prove that the Wilmer & Lee Defendants failed to comply with ("breached") the applicable standard of care, plaintiffs must demonstrate that Samuel Givhan (1) failed to exercise that degree of reasonable care, skill, and diligence (2) that *similarly situated attorneys* (3) providing legal services in *the same general line of practice* (4) in the same *general locality or area* (5) ordinarily have and exercise in a *similar case*.

Further, the Alabama Supreme Court has held that the Alabama Legal Services Liability Act includes an implicit requirement that the plaintiff offer expert testimony to establish both the standard of care that applied in the locality or area in which the defendant-attorney practiced law, and that the defendant-attorney failed to comply with it.  *See, e.g.*, *Green v. Ingram*, 794 So. 2d 1070, 1072 (Ala. 2001) ("Expert testimony is required in order to establish deviation from a standard of care in connection with [an] alleged breach [of an attorney's standard of care].") (quoting *Tonsmeire v. AmSouth Bank*, 659 So. 2d 601, 605 (Ala. 1995)) (alterations in

---

[395] Another section of the Alabama Legal Services Liability Act defines the applicable standard of care with slightly different terminology, substituting the phrase "same general locality" for the phrase "same general area" used in the section quoted in text.  *Compare* Ala. Code § 6-5-572(3) with § 6-5-580(a).  Nevertheless, that is a distinction without a difference:  it is clear that the two phrases "should be considered synonymous."  1 *Alabama Pattern Jury Instructions – Civil* § 25A.01, at 318 (2d ed. 1993) (Supp. 2011).

*Tonsmeire*).[396]

## 1.   **Plaintiffs' proposed expert witness**

Plaintiffs have proffered Joe Vaulx Crockett, III — a real estate attorney who practices in Nashville, Tennessee[397] — as an expert witness to provide testimony regarding whether Samuel Givhan satisfied the applicable standard of care for a closing attorney practicing in Huntsville, Alabama.[398]   Crockett has opined that Givhan breached the applicable standard of care in four ways:

1.    Givhan disbursed plaintiffs' funds "in a manner contrary to the written exchange instructions from WaMu 1031 Exchange";

2.    Givhan failed to notify plaintiffs or WaMu regarding the discrepancies between the WaMu forms and the manner in which he disbursed the funds;

3.    Givhan "failed to cause the Moquin and Corporate Drive properties to be conveyed to plaintiffs . . . as required by both the written instructions of WaMu and commonly accepted practices for 1031 exchanges";

4.    Givhan failed to seek clarification from plaintiffs or WaMu regarding the discrepancies between the WaMu forms and the

---

[396] There is an exception to the expert testimony requirement if the attorney's breach of the standard care "is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it." *Valentine v. Watters*, 896 So. 2d 385, 394 (Ala. 2004). That exception does not apply here, however.  The question of how Givhan should have proceeded when faced with conflicting instructions is clearly one that implicated his "professional judgment." *See Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 684 (Ala. 2009).

[397] *See id.* at 143.

[398] *See* doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011).

purchase agreements.[399]

The Wilmer & Lee Defendants have moved to exclude Crockett's testimony.[400] Their motion is based on two contentions:  Crockett is not qualified to testify about the standard of care exercised by attorneys in the Huntsville, Alabama area; and, Crockett's opinions lack a factual foundation.  The following discussion will focus upon the first contention.

### a.     Crockett's qualifications

Crockett practices law in Nashville, Tennessee.[401]   In addition to his legal practice, he owns a title and escrow company.[402]   During his career, he has handled "probably" 100 like-kind exchanges.[403]  He has been involved in real estate closings in numerous states, including Alabama.[404]  Crockett testified that he could not identify a specific instance in which he participated in a like-kind exchange involving Alabama real estate, although he recalled one transaction that "may have" involved an Alabama property.[405]   He is not licensed to practice in Alabama, nor has he

---

[399] Doc. no. 156-24 (Expert Report of Joe Vaulx Crockett), at 1-2.

[400] Doc. no. 186 (Motion to Preclude Testimony of Plaintiffs' Expert Witness).

[401] *See* doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011), at 143.

[402] *Id.* at 89-90.

[403] *Id.* at 90.

[404] *Id.* at 87.

[405] *Id.* at 87-89.

attended any seminars dealing with commercial real estate practices in Alabama.[406]

He has never testified in court as an expert on the closing of commercial real estate

transactions, or on any other subject.[407]  In preparing for his testimony, Crockett did

not consult any Alabama attorneys to confirm whether his opinions were consistent

with either Alabama law or the customs and practices of attorneys practicing real

estate law in the Huntsville, Alabama area.[408]  He also did not conduct independent

research into the requirements of Alabama law.[409]  Finally, he does not consider

himself to be an expert in "legal malpractice" issues.[410]

> **b**.   **Analysis**

The Wilmer & Lee Defendants argue that Crockett's lack of familiarity with

Alabama law, or the customs and practices of attorneys practicing real estate law in

the Huntsville, Alabama area should preclude him from offering opinion testimony

about either the standard of care that applied to Samuel Givhan when closing the

property acquisitions at issue, or whether Givan failed to comply with that standard.[411]

This court agrees.

---

[406] Doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011), at 33-34.

[407] *Id.* at 34.

[408] *Id.*

[409] *Id.* at 35.

[410] *Id.* at 36.

[411] *See* doc. no. 186 (Motion to Preclude Testimony of Plaintiffs' Expert Witness), at 4.

"[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 601 (alteration supplied).   Although there is a dearth of Alabama caselaw on the interpretation of the "same general area" requirement of the standard of care that applies to claims under the Alabama Legal Services Liability Act, the "Notes on Use" to that Act's pattern jury instructions state that:

> Unlike the standard of care for physicians under the Alabama Medical Liability Act . . ., the definition of "same general locality or area" has not been broadened to encompass a national legal community or even a statewide legal community standard.  Attorneys are subject to any number of local rules (*written and unwritten*) and procedures.  The outer boundaries of the defendant-attorney's "same general locality or area" may vary from case to case, according to the facts of the particular case.

1 *Alabama Pattern Jury Instructions — Civil* § 25A.01, at 318-19 (2d ed. 1993) (Supp. 2011) (emphasis in original).  That definition precludes the plaintiffs' expert witness from offering testimony about the standard of care that applied to Samuel Givhan when closing the property acquisitions at issue in this case.  Crockett does not practice in Alabama, and is not licensed to do so.[412]  Crockett's deposition testimony indicates that he did not apply, or even attempt to learn, Alabama law when preparing to render opinions on the propriety of Givhan's actions.[413]  Instead, he opined about

---

[412] Doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011), at 33.

[413] *Id.* at 34-35.

"commonly accepted practices" and "common sense," and applied those principles to Givhan's actions.[414]  But those principles do not define the standard of care under the Alabama Legal Services Liability Act, which measures the actions of the defendant legal-services provider against that degree of reasonable care, skill, and diligence that similarly situated attorneys providing legal services in the same general line of practice in the same general locality or area ordinarily have and exercise in a similar case.  *See*, *e.g.*, Ala. Code §§ 6-5-572(3)(a), 580(1).

Crockett's deposition testimony is largely focused on the requirements of Section 1031, and the role of a closing attorney in a transaction intended to be a like-kind exchange.  While those issues unquestionably form part of the underlying basis for plaintiffs' claims against Samuel Givhan and the Wilmer & Lee law firm, the *claims under consideration* in this part of the plaintiffs' Second Amended Complaint, *i.e.*, Count 3, are for violations of the Alabama Legal Services Liability Act.  Any witness who proposes to provide expert opinion testimony in connection with such a claim *must be competent* to testify about that degree of reasonable care, skill, and diligence that similarly situated attorneys providing legal services in the same general line of practice in the same general locality or area ordinarily have and exercise in a

---

[414] Doc. no. 156-24 (Expert Report of Joe Vaulx Crockett), at 2; doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011), at 196 ("I think there's probably that duty in every state."); *id.* at 139 ("I don't know of any specific authority other than maybe just common sense.").

141

similar case.  Regardless of the nature and extent of Crockett's experience with like-kind exchanges and real estate transactions in general, he does not possess the requisite experience or competence to testify on the standard of care expected of real estate attorneys closing property acquisitions in Huntsville, Alabama.  *Cf. Brett v. Berkowtiz*, 706 A.2d 509 (Del. 1996) (holding that an out-of-state attorney who was familiar with Delaware *law* could *not* testify as an expert because he was not familiar with the *practice* of law by Delaware attorneys).

One argument advanced by plaintiffs merits separate discussion.  They contend that Crockett is qualified to testify because the duties of attorneys in closing a transaction intended to comply with Section 1031 "do not vary by state; rather, the same standard of care applies across the Nation."[415]  That argument is premised on the fact that Section 1031 is part of the Internal Revenue Code, which applies equally in all states.  Thus, they argue, "the standard of care imposed . . . by the courts in Alabama . . . is precisely the same as the standard of care in any other state."[416]  That argument is unavailing, as it confuses an *attorney's standard of care* as established by the ALSLA with the *legal requirements* of Section 1031.  While the standard of care may, or may not, require flawless execution of and strict compliance with

---

[415] Doc. no. 189 (Plaintiffs' Response in Opposition to Motion to Exclude Testimony), at 6.
[416] *Id.*

Section 1031's legal requirements in order to avoid malpractice liability under the Alabama Legal Services Liability Act, the two are not synonymous.

The law of Alabama, as expressed in the pattern jury instructions promulgated by the Alabama Supreme Court under its statutory rule-making authority, expressly states that the standard of care for a claim under the Alabama Legal Services Liability Act does *not* "encompass a *national legal community* or even a statewide legal community standard. Attorneys are subject to any number of local rules (*written and unwritten*) and procedures." 1 *Alabama Pattern Jury Instructions — Civil* § 25A.01, Use Note 3, at 319 (first emphasis supplied, second in original). The standard of care applicable to real estate attorneys closing property acquisitions similar to those at issue in this case in the Huntsville, Alabama area may, or may not, be the same as those that apply in other areas, even other states; and, indeed, in many situations, it probably is. But, plaintiffs have produced no *evidence* to support that assertion. Instead, they make a conclusory *argument* that the standard of care must be uniform across the nation, because the Internal Revenue Code is involved. As noted heretofore, however, the claims at issue are for alleged violations of the Alabama Legal Services Liability Act, and it is that statute that defines the applicable standard of care.

Plaintiffs also cite several cases in support of their argument that Joe Vaulx

143

Crockett need not be licensed to practice law in Alabama in order to offer expert opinion testimony on the standard of care that applied to Samuel Givhan, and, whether he breached that standard. Those cases are distinguishable, however. *See Smith v. Haynsworth, Marion, McKay & Geurard*, 472 S.E. 2d 612, 614 (S.C. 1996) (rejecting a strict "locality" standard of care and adopting a statewide standard of care for legal malpractice claims); *Hjelle v. Ross, Ross & Santini*, No. 2:07-cv-00006-WDM-KLM, 2007 WL 5328994, at *1 (D. Wyo. Dec. 19, 2007) (allowing experts who "have familiarized themselves sufficiently with Wyoming law to testify regarding the standard of care in similar cases in Wyoming"); *Victory Lane Productions, L.L.C. v. Paul, Hastings, Janofsky & Walker*, No.Civ.A. 3:04CV819-WHB-AGN, 2006 WL 83501, at *4 (S.D. Miss. Jan. 12, 2006) (allowing the testimony of an expert witness who was not licensed to practice law in Mississippi, but was "a well respected and long-standing professor of law at the University of Mississippi School of Law").

Plaintiffs also cite two cases from the State of Washington in which the courts of that state held that a lawyer not admitted to the Washington bar was not, *per se*, excluded from offering expert testimony. *See Walker v. Bangs*, 601 P.2d 1279, 1282-83 (Wash. 1979); *Channel v. Mills*, 890 P.2d 535, 543 (Wash. App. 1995) (citing *Walker*). In light of the narrowly-defined geographic scope of the standard of care

stated in the Alabama Legal Services Liability Act, however, the court does not find those cases to be either pertinent or persuasive.

Finally, plaintiffs argue that Givhan breached the applicable standard of care by closing the transactions in accordance with the purchase agreements and "Unanimous Written Consent" forms, rather than closing them in accordance with the WaMu instruction forms. Plaintiffs further contend that, by closing the transactions in that manner, Givhan clearly breached his duty to follow his clients' instructions and, thus, no expert testimony is required.[417] That argument ignores the fact that, regardless of whether any of the plaintiffs may or may not have been Givhan's "clients," the limited liability companies unquestionably *were* his clients. Thus, he was presented conflicting sets of closing instructions.

When faced with conflicting instructions, Givhan was placed in a situation that required him to exercise his "professional judgment." *Cf. Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 684 (Ala. 2009). Thus, expert testimony *is necessary* to define the standard of care that applied to Givhan in those circumstances, and, to opine whether he breached that standard of care. *See, e.g.*, *Green v. Ingram*, 794 So. 2d 1070, 1072 (Ala. 2001). However, plaintiffs have not presented any admissible expert testimony.

---

[417] *Id.* at 10.

145

The Wilmer & Lee Defendants, on the other hand, have offered expert testimony in support of their position that Givhan did not breach the applicable standard of care.[418]   When the defendant in a legal-malpractice case has offered "evidence that makes a *prima facie* showing that the defendant did not act negligently, then, in order to defeat the summary judgment motion, the plaintiff must rebut the defendant's *prima facie* showing with expert testimony indicating that the defendant lawyer did act negligently." *McDowell v. Buford*, 646 So. 2d 1327, 1328 (Ala. 1994).   Thus, the plaintiffs' claims based upon the Alabama Legal Services Liaibility Act, and arising from the Moquin, Fountain, and Corporate Drive acquisitions, fail as a matter of law, and summary judgment is due to be granted in favor of defendants Samuel Givhan and Wilmer & Lee, P.A.

C.   **The Claim for Thomas O'Shea's $50,000 Check (Count 3)**

When presenting their arguments on the plaintiffs' claims under the Alabama Legal Services Liability Act, the parties largely ignore the $50,000 check that Thomas O'Shea deposited with Givhan as earnest money for the acquisition of the "Sparkman Drive" property: an acquisition transaction that never occurred.   Plaintiffs

---

[418] *See* doc. no. 141-39 (Gene Gray Dep., May 16, 2011), at 60-61.   Although plaintiffs cited Gray's deposition in opposing summary judgment to demonstrate that Gray always follows disbursement instructions, they have not challenged his competence to testify.   *See* doc. no. 155 (Response in Opposition to Motion for Summary Judgment of Wilmer & Lee Defendants, filed by Plaintiffs), at 9.

confined their arguments about those funds to their discussion of the "elder abuse" claim they asserted under California law.[419]   Due to the strong public policy of Alabama, which mandates that the Alabama Legal Services Liability Act govern all of plaintiffs' claims against the Wilmer & Lee Defendants, that claim is due to be dismissed.[420]   Nevertheless, Thomas O'Shea did assert a separate claim under the Alabama Legal Services Liability Act on the basis of Givhan's alleged misappropriation of the funds derived from the $50,000 check.[421]

*Significantly, the Wilmer & Lee Defendants admit that Thomas O'Shea* "is entitled to recover" *that money.*[422]

Although Thomas O'Shea has not filed a cross-motion for summary judgment, this court has the power to "grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1).  Subdivision (f) was added to Rule 56 by the 2010 amendments to the Federal Rules of Civil Procedure.  That provision was intended to bring into the text of the Rule a procedure that has "grown up in practice."  Adv. Comm. Notes to Fed. R. Civ. P. 56(f) (2010 Amends.).

Based on the admission of the Wilmer & Lee Defendants, there is no genuine

---

[419] *See* doc. no. 155 (Response in Opposition to Motion for Summary Judgment of Wilmer & Lee Defendants, filed by Plaintiffs), at 37.

[420] *See* the discussion in Part VII of this opinion, *supra.*

[421] Doc. no. 65 (Second Amended Complaint) ¶¶ 171-75.

[422] *See* 1 Plaintiffs' Facts ¶ 30 (undisputed by the Wilmer & Lee Defendants).

issue of material fact relating to the $50,000 check.  Accordingly, the court will enter judgment, *sua sponte*, in favor of Thomas O'Shea and against Samuel Givhan and Wilmer & Lee, P.A., for the sum or amount of $50,000.

## X.  ANALYSIS OF THE CLAIMS BROUGHT AGAINST THE BASWELL-GUTHRIE DEFENDANTS

Plaintiffs have two claims that remain pending against two of the Baswell-Guthrie Defendants.  They allege in Count 3 of their Second Amended Complaint that Cheryl Baswell-Guthrie and Baswell-Guthrie, P.C. violated the Alabama Legal Services Liability Act with regard to the transactions leading up to the Old Madison Pike acquisition by inserting a "good cause" prerequisite for removal of the manager of that facility in the tenancy in common agreement after they signed, notarized, and transmitted facsimile copies of the signature pages pertaining to a previous version of that document that did not include such a condition.[423]  Plaintiffs also allege that Cheryl Baswell-Guthrie inserted a similar condition in the Quality Circle tenancy in common agreement, and that she failed to ensure that the Quality Circle acquisition complied with the requirements of Section 1031.[424]  Finally, plaintiffs allege that One

---

[423] As discussed in Part VI(A) of this opinion, *supra*, the initial draft of the tenancy in common agreement for the Old Madison Pike acquisition named "7027 Old Madison Pike, L.L.C." as the manager of the property, and required the owners to provide sixty days' notice of an intent to terminate the manager.

[424] As will be seen below, plaintiffs' arguments with regard to the Quality Circle transaction do not mirror the allegations of their Second Amended Complaint.

Source Title & Escrow, L.L.C., violated the duties of an "escrow agent" by modifying the tenancy in common agreements.[425]

## A.    Existence of an Attorney-Client Relationship Between Plaintiffs and Baswell-Guthrie

The first issue that must be addressed is whether an attorney-client relationship existed between plaintiffs and Cheryl Baswell-Guthrie.

There is no letter of engagement or similar formal contract demonstrating that Cheryl Baswell-Guthrie represented plaintiffs.  Moreover, plaintiffs did not seek Section 1031 advice from Baswell-Guthrie.[426]  Thomas O'Shea testified that he never met Baswell-Guthrie before the transactions closed.[427]  Plaintiffs did not directly compensate Baswell-Guthrie for legal services.  Instead, she was compensated out of the escrow accounts for the two transactions, but which were largely funded by plaintiffs.[428]  Finally, there is no question that plaintiffs had retained California attorneys Michael Shiffman and Jeffrey Weiss by the time Scott McDermott brought Cheryl Baswell-Guthrie into the fold.  Many of Baswell-Guthrie's communications were actually with those attorneys, rather than with plaintiffs themselves.  Even so, Baswell-Guthrie occasionally communicated directly with plaintiffs.  Baswell-Guthrie

---

[425] *See* doc. no. 65 (Second Amended Complaint) ¶ 287.

[426] Baswell-Guthrie Facts ¶ 108.

[427] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 28, 2010), at 232, 506.

[428] 2 Plaintiffs' Facts ¶ 10.

organized KKA CAS, L.L.C. and TAK Tech Point, L.L.C. in Alabama on behalf of the individual plaintiffs, and served as the registered agent for those companies in this State.

Following the closing of the Old Madison Pike acquisition, Baswell-Guthrie emailed Thomas O'Shea, Kate Donahue, and Kevin Donahue a closing affidavit and asked them to sign it. Those three plaintiffs, acting on behalf of TAK Tech Point L.L.C., KKA CAS L.L.C., and San Francisco Residence Club, Inc., executed the document, which contained a provision stating that One Source Title & Escrow L.L.C., Baswell-Guthrie's title company, did not represent them.[429] The scope of that disclaimer extended to Cheryl Baswell-Guthrie, as an agent of One Source Title, and to her law firm as an affiliated entity. In connection with the Quality Circle acquisition, Baswell-Guthrie executed an opinion letter that clearly indicated that she represented only Quality Circle, L.L.C., and that plaintiffs were represented by their own counsel, Michael Shiffman.[430]

Nevertheless, when a post-closing issue arose in the Old Madison Pike transaction and Michael Shiffman asked Baswell-Guthrie whether plaintiffs should

---

[429] Doc. no. 144-9 (Old Madison Pike Closing Affidavit), at ECF 3.

[430] Doc. no. 159-43 (Baswell-Guthrie Opinion Letter). That letter stated that Baswell-Guthrie had "acted as counsel for the above-referenced Borrower, Quality Circle L.L.C.[,] and [that] Tom O'Shea, Anne O'Shea, and Kate Donahue (each, a 'Guarantor,' and collectively, the 'Guarantors') are represented by separate legal counsel, Michael Shiffman . . . ."

150

retain Alabama counsel to represent them, she told Shiffman that it would not be necessary.[431]  She stated that, in the event a dispute arose between plaintiffs and Scott McDermott, she would have to refrain from representing any of the them, because she then would have a conflict of interests.[432]  Those two statements imply that Cheryl Baswell-Guthrie was plaintiffs' Alabama counsel, in addition to representing Scott McDermott and 7027 Old Madison Pike, L.L.C.  Additionally, it was Baswell-Guthrie who communicated with the lending institution before and after the Quality Circle transaction regarding plaintiffs' desire to reconfigure the loan and title to the property.  Thus, while the written materials in the record strongly suggest that no attorney-client relationship existed between plaintiffs and Cheryl Baswell-Guthrie, Baswell-Guthrie's own actions and statements suggest otherwise.

In short, there is at least a genuine issue of material fact concerning the existence of an attorney-client relationship.  The court will therefore assume, in the light most favorable to the non-moving party, *i.e.*, the plaintiffs, that an attorney-client relationship existed between Ms. Baswell-Guthrie and the plaintiffs.

**B**.  **The Old Madison Pike Acquisition**

    **1**.  **Expert testimony on the standard of care, and the "common knowledge and experience" exception**

---

[431] 2 Plaintiffs' Facts ¶ 49.

[432] Doc. no. 159-49 (Email of Cheryl Baswell-Guthrie Regarding Conflicts of Interest).

The Baswell-Guthrie Defendants contend that plaintiffs' claim under the Alabama Legal Services Liability Act must be dismissed, because plaintiffs have not provided expert testimony regarding Baswell-Guthrie's actions. Indeed, plaintiffs' expert witness, Joe Vaulx Crockett, did not offer any opinion regarding Cheryl Baswell-Guthrie's compliance with the applicable standard of care.[433] In contrast, the Baswell-Guthrie Defendants offered an expert witness, Gene Gray, who testified that Baswell-Guthrie complied with the applicable standard of care.[434]

As discussed in Part IX(B) of this opinion, an Alabama Legal Services Liability Act plaintiff typically must present expert testimony that the defendant-attorney violated the standard of care. *See, e.g., Tonsmeire v. AmSouth Bank*, 659 So. 2d 601, 605 (Ala. 1995). Even so, the Alabama Supreme Court has recognized an exception to that requirement "where a legal-service provider's want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it." *Valentine v. Watters*, 896 So. 2d 385, 394 (Ala. 2004). In *Valentine*, the Alabama Supreme Court held that the defendant's alleged transgressions — missing a filing deadline and misrepresenting his experience to the plaintiff — were within that "common knowledge and experience" exception. *Id.* at

---

[433] Doc. no. 156-23 (Joe Vaulx Crockett Dep., May 9, 2011), at 21, 185-86.

[434] *See* doc. no. 141-39 (Gene Gray Dep., May 16, 2011), at 82-83.

394-95.  Furthermore, when determining whether expert testimony is necessary, a trial court should ask whether the attorney's actions "involved the exercise of professional judgment."  *See Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 684 (Ala. 2009).

Plaintiffs San Francisco Residence Club, Inc., KKA CAS, L.L.C., and TAK Tech Point, L.L.C., allege that Baswell-Guthrie altered the Old Madison Pike tenancy in common agreement, adding the "good cause" condition, *after* they had signed, dated, and notarized the signature pages.  As plaintiffs state in their summary judgment response brief, a layman "could easily grasp that an attorney should not secretly modify a previously signed document in a manner that harms her client."[435]

The Baswell-Guthrie Defendants argue that plaintiffs have failed to produce sufficient evidence to demonstrate that Cheryl Baswell-Guthrie is the one who added the "good cause" condition.  First, they note that the individual plaintiffs did not read the agreement before executing the signature pages, thereby suggesting that the "good cause" condition *may* have been in the agreement before plaintiffs executed the signature pages. Second, the Baswell-Guthrie Defendants also suggest that plaintiffs may have executed the signature pages on a later date (*i.e.*, backdated the agreement).

---

[435] Doc. no. 157 (Response in Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs), at 19.

Finally, the Baswell-Guthrie Defendants note that the tenancy in common agreement that plaintiffs Kate Donahue, the O'Shea Trust, and KKA CAS, L.L.C. executed for the Quality Circle property also contained "good cause" language.

When viewed in the light most favorable to plaintiffs — the parties opposing summary judgment — the record establishes that Michael Shiffman and Jeffrey Weiss approved a version of the tenancy in common agreement that did not contain the "good cause" condition on November 30, 2007.  The evidence also suggests that plaintiffs executed and notarized the signature page of that agreement on the same date, November 30, 2007, and the first version of the agreement containing the "good cause" condition appeared on December 3rd.  That version was attached to an email transmitted by Cheryl Baswell-Guthrie to Thomas O'Shea, Anne O'Shea, and Kevin Donahue, but not to Shiffman or Weiss — and the omission of copies to the California attorneys occurred despite the fact that Baswell-Guthrie had been corresponding with Shiffman and Weiss earlier on that same day.[436]

The Quality Circle tenancy in common agreement was circulated in the same series of emails as the Old Madison Pike tenancy-in-common agreement.  It was executed in the same manner, at the same time.  The Baswell-Guthrie Defendants have offered no explanation as to how the presence of the "good cause" condition in

---

[436] Doc. no. 159-39 (Baswell-Guthrie Email and Attachments).

the Quality Circle tenancy in common actually affects the manner in which the revisions of the Old Madison Pike tenancy in common agreement must be interpreted.

Therefore, the court may reasonably infer that the "good cause" condition was added only after plaintiffs had signed and faxed the signature pages to Baswell-Guthrie, but before Baswell-Guthrie emailed complete copies of the executed agreement to plaintiffs. Thus, the inference reasonably can be drawn that Cheryl Baswell-Guthrie is the person who added the objectionable condition. No expert testimony is necessary to understand that such conduct would violate an attorney's duty to her clients. The decision to alter an agreement after it has been signed is certainly not one that requires the exercise of "professional judgment."

In conclusion, summary judgment cannot be entered in favor of the Baswell-Guthrie Defendants on the claim of plaintiffs San Francisco Residence Club, KKA CAS, L.L.C., and TAK Tech Point, L.L.C. brought under the Alabama Legal Services Liability Act, on the ground that plaintiffs failed to produce expert testimony establishing that Cheryl Baswell-Guthrie's unilateral addition of the "good cause" condition to the parties' tenancy in common agreement constituted a breach of the applicable standard of care. This is so because (1) construing the facts in the light most favorable to the non-moving party, Baswell-Guthrie added the "good cause" condition, and because (2) that addition constituted obvious attorney misconduct that

does not require expert testimony to establish a breach of the applicable standard of care.  Thus, the Baswell-Guthrie Defendants' motion for summary judgment on Count 3's ALSLA claim arising out of Baswell-Guthrie's insertion of the "good cause" condition into the Old Madison Pike agreement is due to be denied.

### 2.   Damages

The Baswell-Guthrie Defendants argue that, even if there was a breach of the standard of care, the insertion of the "good cause" condition into the Old Madison Pike tenancy in common agreement did not cause any damage to plaintiffs.  They argue that Scott McDermott did not rely on the "good cause" condition in either litigation or the arbitration proceedings with plaintiffs.  They point to the fact that McDermott also challenged his termination as manager of Quality Circle, L.L.C., under the terms of an operating agreement that did not contain a "good cause" condition.  McDermott's deposition testimony refutes those arguments.

The Baswell-Guthrie Defendants state that "none of Mr. McDermott's counterclaims in the arbitration reference the 'good cause' language" in the Old Madison Pike tenancy in common agreement.[437]  At the outset of his deposition in the arbitration proceeding, however, Scott McDermott testified that the basis of his claim

---

[437] Doc. no. 166, at (Reply in Support of Summary Judgment, filed by Baswell-Guthrie Defendants), at 18.

was the "good cause" condition in the Old Madison Pike tenancy in common agreement.[438]   Much of that deposition is devoted to questioning McDermott about the inclusion of the "good cause" condition, and why he did not believe that plaintiffs had "good cause" to terminate him as manager of the Old Madison Pike property. Thus, it is clear that the inclusion of the "good cause" provision served as the basis for McDermott's claim against plaintiffs arising from his termination as manager of the Old Madison Pike property.

McDermott also was terminated as manager of Quality Circle, L.L.C.   The operating agreement for that company did not include a "good cause" condition, yet McDermott still asserted a claim against plaintiffs based on his termination.   The Baswell-Guthrie Defendants argue that McDermott's claim based on *that* termination demonstrates that he did not rely on the "good cause" condition in bringing his claim based on his termination from Old Madison Pike.   Of course, that argument is a *non sequitur*, as McDermott's inability to rely on a nonexistent "good cause" condition in the Quality Circle agreement has no bearing on his *actual* reliance on the *existing* "good cause" condition in the Old Madison Pike Agreement.   Defendants' argument overlooks a nuance in McDermott's claim.   McDermott alleged that San Francisco

---

[438] Doc. no. 159-18 (Scott McDermott Dep., Oct. 1, 2010), at 11 (stating that the tenancy-in-common agreement required his termination "to be with good cause and that [he] dispute[d] that there was good cause") (alterations supplied).

Residence Club, Inc., did not have the authority to vote for his termination, because it was not a member of Quality Circle, L.L.C.[439]  In fact, San Francisco Residence Club, Inc., was listed as a member in the operating agreement, but did not contribute any funds to the limited liability company.   In asserting his claim, therefore, McDermott apparently focused on the persons or entities who (or which) provided the funding for the limited liability company, rather than the parties who executed the operating agreement to become members of the company.

The Baswell-Guthrie Defendants attempt to conflate McDermott's two claims against plaintiffs to downplay the significance of the "good cause" condition in the Old Madison Pike tenancy in common agreement.  The Baswell-Guthrie Defendants argue that McDermott's two claims were based on an identical theory, even though only one of the governing documents contained a "good cause" condition.  In other words, they argue that the presence or absence of a "good cause" condition had no impact on McDermott's decision to challenge his terminations.  But McDermott's two claims were based on a two different theories:  *i.e.*, he claimed that there was not "good cause" to terminate him as manager of the Old Madison Pike property, and he claimed there was not a sufficient membership vote to terminate him as manager of Quality Circle, L.L.C.  It is clear that he did rely on the "good cause" condition in

---

[439] *Id.* at 99.

158

contesting his termination as manager of the Old Madison Pike property, and therefore damages exist in regards to Count III's ALSLA claim arising out of the Old Madison Pike property.

## C.   The Quality Circle Acquisition

Plaintiffs Kate Donahue and the O'Shea Trust allege that Cheryl Baswell-Guthrie is liable under the Alabama Legal Services Liability Act for her conduct in connection with the Quality Circle acquisition. In their Second Amended Complaint, plaintiffs base their claim upon Ms. Guthrie's unilateral insertion of a "good cause" condition in the tenancy in common agreement for that property, and, for her failure to close the transaction in compliance with Section 1031.[440]  In their brief, however, plaintiffs make a different argument: *i.e.*, they contend that Baswell-Guthrie misled them through her communications with Michael Shiffman, ultimately causing the transaction to close with title vested in Quality Circle, L.L.C.  The Baswell-Guthrie Defendants argue that plaintiffs' misrepresentation theory is an improper attempt to assert a new claim in a response brief.  Federal courts, including the two Eleventh Circuit decisions discussed in the following sub-sections, have held that a plaintiff may not introduce a new claim or theory — one not found in the complaint — in response to a motion for summary judgment.

---

[440] Doc. no. 65 (Second Amended Complaint) ¶¶ 179-81.

1.    ***Gilmour v. Gates, McDonald & Co.***, 382 F.3d 1312 (11th Cir. 2004)

The "central issue" in *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004), was "whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Id.* at 1313. The case arose when Terry Gilmour volunteered to join the Red Cross relief effort in New Jersey in the aftermath of the September 11, 2001 terrorist attacks. In the course of her volunteer work, Gilmour contracted a respiratory illness. *Id.* at 1314. Gilmour had only temporary health insurance benefits of her own, but was eligible for limited insurance coverage offered by the Red Cross to those who suffer illness or injury in the course of performing volunteer work for that organization. *Id.* Gilmour filed forms with the insurer that handled the Red Cross policy shortly after she became ill, but did not immediately file an insurance claim. *Id.* When her own insurance coverage expired, she filed a claim with the Red Cross insurer. *Id.* The insurer denied her claim, because it could not confirm that her illness was connected to her volunteer work. *Id.* Gilmour sued the Red Cross and received a settlement in the amount of the coverage available under the limited insurance policy. *Id.*

Gilmour then brought suit against the insurer, asserting numerous tort claims. *Id.* The insurer moved for summary judgment on all claims. *Id.* In her brief filed in opposition to summary judgment, Gilmour abandoned three of her claims and

attempted to assert a new claim, alleging that the insurer breached a duty it owed her

as a third-party beneficiary of the contract between the Red Cross and the insurer.  *Id.*

The district court granted summary judgment on the claims asserted in Gilmour's

complaint, but did not address her third-party beneficiary claim.  *Id.*  Gilmour

appealed.

The Eleventh Circuit held that Gilmour could not add a new claim in response

to a summary judgment motion.  The Court stated that the "liberal pleading standard"

mandated by Federal Rule of Civil Procedure 8

> does not afford plaintiffs with an opportunity to raise new claims at the
> summary judgment stage.  Indeed, the "simplified notice pleading
> standard relies on liberal discovery rules and summary judgment
> motions to define disputed facts and issues and to dispose of
> unmeritorious claims."  [*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,
> 512 (2002).]  Efficiency and judicial economy require that the liberal
> pleading standards under *Swierkiewicz* and Rule 8(a) are inapplicable
> after discovery has commenced.  At the summary judgment stage, the
> proper procedure for plaintiffs to assert a new claim is to amend the
> complaint in accordance with Fed. R. Civ. P. 15(a).  *A plaintiff may not
> amend her complaint through argument in a brief opposing summary
> judgment*.  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th
> Cir.1996).

*Id.* at 1314-15 (emphasis and alteration supplied).[441]  *Cf. Roberts v. Jones*, No.

CIV–11–143–M, 2012 WL 1072218, at *1 n.2 (W.D. Okla. Feb. 29, 2012) ("Mr.

---

[441] *Nota bene* that *Gilmour* was decided before the Supreme Court decided *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), effectively promulgating a stricter pleading standard than that of *Swierkiewicz*.

161

Roberts, [*pro se,*] has already amended his complaint twice . . . .  Thus, the court

should decline to consider the new claim as a request to amend.") (alteration

supplied).

> **2**.      ***Davis v. Coca-Cola Bottling Co. Consol.***, 516 F.3d 955 (11th Cir. 2008)

Four years after its decision in *Gilmour*, the Eleventh Circuit ruled on another

case involving an attempt to assert claims that had not been pled in the complaint in

response to a defendant's motion for summary judgment.   *Davis v. Coca-Cola*

*Bottling Company Consolidated*, 516 F.3d 955 (11th Cir. 2008), was an employment

discrimination suit brought by nine African-American employees of the Mobile,

Alabama Coca-Cola Bottling Company.   *Id.* at 962.   The district court granted

summary judgment as to all of the plaintiffs' claims, and they appealed.   *Id.*   On

appeal, among other arguments, they "complain[ed] that the [district] court

overlooked several hiring claims that were not explicitly set out in their complaint but

were called to the court's attention" in the plaintiffs' brief filed in opposition to

summary judgment.   *Id.* (alterations supplied).

The plaintiffs' complaint had alleged that the company discriminated against

them when making hiring decisions for supervisory positions.   The complaint

identified specific instances in which white candidates had been hired for positions

desired by one or more of the black plaintiffs.   *See id.* at 971 n.35 (listing the

individual plaintiffs and claims).  The complaint alleged that the hiring of two white employees for supervisory positions, David Presnall and Paul Schum, had been the product of race discrimination against one of the plaintiffs, Terry Jackson.  *Id.*

In response to the company's motion for summary judgment, the plaintiffs argued that all nine of them — not just Terry Jackson, as the complaint had alleged — suffered race discrimination as a result of the promotions of Presnall and Schum into supervisory positions.  *Id.* at 974.  They based that argument on the general allegation in the complaint that they were "'denied promotions . . . and treated differently than similarly situated white employees solely because of [] race.'"  *Id.* at 974 (alteration and omission in original).[442]

The plaintiffs argued that the general statement in their complaint was sufficient to encompass the specific claims they later attempted to assert in opposition to the defendants' motion for summary judgment, because "as alleged in their complaint, they could not cite discriminatory hirings of which they were unaware at the time the complaint was filed."  *Id.*  The Eleventh Circuit rejected that argument

> *because plaintiffs possessed information about the Presnall and Schum hirings before they filed their complaint.*  The complaint cites those hirings but only in the context of Jackson's claims.  If, as the remaining

---

[442] The Eleventh Circuit stated that such an allegation "epitomizes speculation and therefore does not amount to a short and plain statement of their claim under Rule 8(a)."  *Id.* at 974 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

plaintiffs now contend, they would have applied for those supervisory positions had they known about them, the complaint should have alleged that and claimed that the hirings were discriminatory as to them.  *It is clear*, however, *that no plaintiff other than Jackson brought claims based on the Presnall and Schum hirings.*

*Id.* at 975 (emphasis supplied, footnote omitted).[443]

### 3.    Application

In that section of the Second Amended Complaint outlining the facts supporting each of plaintiffs' claims, they allege that *Scott McDermott* made misrepresentations regarding the status of the Quality Circle transaction in the weeks leading up to the closing of that acquisition by telling plaintiffs that title to the property would be vested in them as tenants in common.[444]  Plaintiffs also allege that their California attorney, Michael Shiffman, emailed Cheryl Baswell-Guthrie, telling her that the transaction needed to close with title vested in plaintiffs as tenants in common.[445]  Baswell-Guthrie replied that the transaction would be closed in that

---

[443] In the omitted footnote, the Eleventh Circuit noted that Jackson's claims stemming from the Presnall and Schum promotions were not the only specifically alleged hiring claims in the complaint.  Three other plaintiffs also asserted specific claims on the basis of other hirings.  *Id.* at 975 n.45.  In other words, they had asserted the exact same type of claims, based on different factual events.  The fact that they had already alleged hiring claims did not allow them to incorporate other, unpled hiring claims into their suit.  *Cf. Cruz v. Advance Stores Co., Inc.*, ____ F. Supp. 2d ____, No. 11–60924–CIV, 2012 WL 423342, at *3 (S.D. Fla. Feb. 10, 2012) (holding that a plaintiff bringing a negligent entrustment claim may not "raise brand new theories of negligence for the first time in his response brief" where the new theories involved the same underlying facts as those pled in the complaint).

[444] Doc. no. 65 (Second Amended Complaint) ¶ 115.

[445] *Id.* ¶ 111.

manner.[446]  Finally, plaintiffs allege that Baswell-Guthrie told Shiffman that "counsel for the lender foresaw no difficulty" in the borrowing group for the Quality Circle transaction being organized as a tenancy in common.[447]  Plaintiffs did not specifically allege that Baswell-Guthrie knew either of those statements to be false at the time she made them.

Count 3 of the Second Amended Complaint, which presents plaintiffs' claim under the Alabama Legal Services Liability Act, contains two allegations against the Baswell-Guthrie Defendants with regard to the Quality Circle property acquisition. First, plaintiffs allege that Cheryl Baswell-Guthrie modified the tenancy in common agreement to add a "good cause" condition *after* plaintiffs had executed the signature page of the agreement.[448]  That allegation has been rendered moot through discovery, as the record shows that title to the Quality Circle property was vested in Quality Circle, L.L.C. and, thus, the Quality Circle tenancy in common agreement did not govern the management of the property.  Accordingly, this court will omit the allegation that Baswell-Guthrie modified the Quality Circle tenancy in common agreement from the remainder of this discussion.

Next, plaintiffs alleged that the Baswell-Guthrie Defendants owed plaintiffs

---

[446] *Id.* ¶ 112.

[447] *Id.* ¶ 115.

[448] *Id.* ¶ 179.

"the duty to take such actions faithfully as were necessary to effectuate their § 1031 exchanges" and that those defendants "breached that duty by failing to ensure that the title to the Quality Circle Transaction was properly documented and filed."[449] Plaintiffs' complaint did not allege, however, that the failure to close the transaction properly was the result of any misrepresentation.

In their brief, plaintiffs make only passing mention of the fact that Baswell-Guthrie "failed to ensure that the transaction properly closed."[450]  They devote the bulk of their argument to a theory that was not actually asserted in their Second Amended Complaint as a ground for the Alabama Legal Services Liability Act claim. Plaintiffs now argue that Baswell-Guthrie misrepresented the status of the transaction to Michael Shiffman by repeatedly telling him that it was proceeding "according to plan."[451]  They also argue that, when Shiffman alerted Baswell-Guthrie of the problem with the structure of the transaction, she made further misrepresentations.  She told Shiffman that the lending institution would approve a tenancy in common arrangement within two weeks of closing, that she would obtain a deed vesting title to the property in the investors (including plaintiffs Kate Donahue and the Trust of

---

[449] *Id.* ¶¶ 181-82.

[450] Doc. no. 157 (Response in Opposition to Motion for Summary Judgment of Baswell-Guthrie Defendants, filed by Plaintiffs), at 32.

[451] *See id.* (citing Baswell-Guthrie Facts ¶ 53).

Thomas and Anne O'Shea) as tenants-in-common, and that she would file that deed in the Probate Records once title had been transferred.[452]

Unlike the plaintiff in *Gilmour*, plaintiffs do not assert an *entirely* new claim in their responsive brief. Rather, they present a new argument in support of the Alabama Legal Services Liability Act claim that was present in their Second Amended Complaint. Even so, the reasoning of *Davis* applies and bars them from raising that new theory at this stage of the proceedings. In *Davis*, the plaintiffs were aware of the promotions of Presnall and Schum, as evidenced by the fact that one of them, Terry Jackson, asserted claims on the basis of those promotions. The Eleventh Circuit held that, armed with that knowledge, the other eight plaintiffs could not rely on their blanket assertion of discriminatory hiring practices to maintain claims on the bases of the Presnall and Schum hirings. *Davis*, 516 F.3d at 975.

Here, plaintiffs alleged that *McDermott* misled them about the status of the Quality Circle transaction, and they alleged that Baswell-Guthrie made communications to them that were, in fact, untrue. Even so, they made no mention of "misrepresentations" in framing their Alabama Legal Services Liability Act claim against Baswell-Guthrie.[453] Instead, they simply alleged that she failed to ensure that

---

[452] *Id.*

[453] Nor did plaintiffs mention misrepresentations in any of the other counts that named the Baswell-Guthrie Defendants.

the Quality Circle transaction closed in compliance with Section 1031.  Count 3 made

no mention of any statements Baswell-Guthrie made, misleading or otherwise.  In

contrast, in asserting their claim against the McDermott Defendants for breach of

fiduciary duty, plaintiffs stated that, "[d]uring November and December of 2007,

McDermott and Chapman made material misrepresentations to plaintiffs concerning

McDermott's efforts to assure that Quality Circle would comply with § 1031."[454]  As

noted above, plaintiffs did not allege in their Second Amended Complaint that

Baswell-Guthrie *knowingly* made false statements to Shiffman, an allegation they did

make against McDermott.

The factual allegations in the Second Amended Complaint and the record

produced through discovery clearly indicate that plaintiffs knew that the transaction

would not comply with Section 1031 at closing.  Yet, despite the facts known to the

plaintiffs at the time they filed the Second Amended Complaint, they allege that

Cheryl Baswell-Guthrie violated the Alabama Legal Services Liability Act by failing

to close the Quality Circle transaction in compliance with the requirements of Section

1031.  They did not assert that their claim stems from any *statements* she made in the

weeks leading up to the closing, nor did they explicitly allege that she knew any of

those statements to be false.   Yet, now they rely almost exclusively on that

---

[454] Doc. no. 65 (Second Amended Complaint) ¶ 217.

misrepresentation theory in opposing the motion for summary judgment.  For that reason, their misrepresentation theory is comparable to the new claims asserted in *Davis*.  Summary judgment is due to be granted on plaintiffs' Alabama Legal Services Liability Act claim to the extent it is grounded in the Quality Circle transaction.

**D**.     **Escrow Liability of One Source Title & Escrow L.L.C. (Count 11)**

Plaintiffs alleged that One Source Title & Escrow L.L.C., Baswell-Guthrie's title company, violated duties it owed them as an "escrow agent" by "modifying, or permitting to be modified," the tenancy in common agreements for the Old Madison Pike and Quality Circle properties.[455]  As discussed in Part VII of this opinion, *supra*, all of plaintiffs' claims against the Baswell-Guthrie Defendants must be brought under the Alabama Legal Services Liability Act and, in fact, the allegations underlying the "escrow agent" claim are identical to those underlying the Alabama Legal Services Liability Act claim.

Moreover, even if plaintiffs could bring a separate claim on the basis of the duties of an escrow agent, such a claim would fail.  In Alabama, the duties of an escrow agent are defined by, and limited to, the terms of the escrow agreement. *Gurley v. Bank of Huntsville*, 349 So. 2d 43, 45 (Ala. 1977).  Plaintiffs have not identified an "escrow agreement" between themselves and One Source Title &

---

[455] *Id.* ¶ 287.

169

Escrow L.L.C.  The closing affidavit for the Old Madison Pike transaction, which identified One Source Title & Escrow L.L.C. as the "title agent," did not list any duties that company owed plaintiffs as an "escrow agent."[456]  The Quality Circle purchase agreement listed "TICOR" as the "escrow agent," and was not executed by any of the Baswell-Guthrie Defendants.[457]  Without any escrow agreement, plaintiffs cannot maintain their "escrow agent" claim.  Thus, on the claim in Count 11 against One Source Title & Escrow L.L.C., summary judgment in favor of One Source is due to be granted.

## XI.  ANALYSIS OF COUNTERCLAIMS ASSERTED BY THE BASWELL-GUTHRIE DEFENDANTS

The Baswell-Guthrie Defendants filed a two-count counterclaim.[458]  The first count sounds in fraud, and the second alleges breach of contract.[459]  Plaintiffs moved to dismiss both for failure to state claims upon which relief can be granted.[460]  *See* Fed. R. Civ. P. 12(b)(6).  The Baswell-Guthrie Defendants responded by filing a motion for partial summary judgment.[461]  Upon consideration, and for the reasons

---

[456] *See generally* doc. no. 141-22 (Old Madison Pike Closing Affidavit).

[457] Doc. no. 141-30 (Quality Circle Purchase Agreement) ¶ 20.

[458] Doc. no. 80 (Counterclaim and Crossclaim).  The Baswell-Guthrie Defendants call their filing a "Counterclaim and Crossclaim," but do not identify who the "crossclaim defendants" are, and assert claims against plaintiffs only.

[459] *Id.* ¶¶ 5-11 (alleging fraud); *id.* ¶¶ 12-16 (alleging breach of contract).

[460] *See* doc. no. 84 (Motion to Dismiss Counterclaim).

[461] *See* doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim).

stated below, this court concludes that the motion for partial summary judgment is due to be denied, and the motion to dismiss granted.  The motion for partial summary judgment will be addressed first.

## A.   Motion for Partial Summary Judgment:  Fraud Counterclaim

The facts relied upon by the parties when briefing the motions related to the counterclaim are the same as those underlying their arguments on the summary judgment motions discussed in Parts VI and X of this opinion, *supra*.  In asserting their counterclaim based upon those facts, the Baswell-Guthrie Defendants have produced what plaintiffs aptly call "an exotic jurisprudential specimen."[462]

Count 1 of the counterclaim alleges that plaintiffs' California attorneys, Michael Shiffman and Jeffrey Weiss, committed fraud against the Baswell-Guthrie Defendants, and that such fraud can be imputed to the plaintiffs, because Shiffman and Weiss were plaintiffs' agents.  The substance of the Baswell-Guthrie Defendants' allegation is that:

> (1)   Shiffman and Weiss were responsible for drafting the tenancy in common agreements so that the acquisitions of the Old Madison Pike and Quality Circle properties would comply with the requirements of Section 1031;
>
> (2)   The Baswell-Guthrie Defendants "were dependent upon"

---

[462] Doc. no. 158 (Response Brief in Opposition to Motion for Partial Summary Judgment on Counterclaim), at 31.

Shiffman and Weiss to draft those agreements properly;[463]

(3)    Shiffman and Weiss, both of whom were retained and paid by plaintiffs, were plaintiffs' agents;

(4)    As plaintiffs' agents, Shiffman and Weiss had an obligation to properly prepare the tenancy in common agreements in a manner that would comply with the requirements of Section 1031, and to provide tax advice *to plaintiffs*;

(5)    The Baswell-Guthrie Defendants "relied upon the documents prepared by Shiffman and Weiss, as agents of the Plaintiffs, and depended on Shiffman and Weiss, as agents of the Plaintiffs, to provide appropriate tax advice to the Plaintiffs to protect the Plaintiffs' interest concerning the tax consequences of this transaction";[464]

(6)    The Baswell-Guthrie Defendants relied upon the advice and direction of Shiffman and Weiss in closing the transactions;[465]

(7)    Shiffman and Weiss made (unspecified) false representations to the Baswell-Guthrie Defendants; and

(8)    The (unspecified) false representations made by Shiffman and Weiss led to plaintiffs filing suit against the Baswell-Guthrie Defendants.[466]

The Baswell-Guthrie Defendants provide a mere two pages of legal argument in support of their motion for summary judgment on the foregoing fraud claim.[467] The

---

[463] Doc. no. 80 (Counterclaim and Crossclaim) ¶ 7.

[464] *Id.* ¶ 9.

[465] *Id.* ¶ 10.

[466] *Id.* ¶ 11.

[467] Doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim), at 17-18.

first page consists of a recitation of facts that purportedly support the allegation that

Shiffman and Weiss made (still unspecified) false representations to Cheryl Baswell-

Guthrie; and, the second page is devoted to arguing that plaintiffs can be held liable

for the actions of their agents.  The "facts" set forth in support of the fraud claim are

that:

(1)    Shiffman and Weiss acted as agents of plaintiffs;

(2)    Weiss was responsible for drafting the tenancy in common agreements, but he did not inform plaintiffs that such agreements were necessary until just days before the scheduled closing of each acquisition;[468]

(3)    Weiss was responsible for organizing "KKA CAS, L.L.C." and "TAK Tech Point, L.L.C." in Alabama;[469]

(4)    The Baswell-Guthrie Defendants represented only the limited liability companies — *i.e.*, Quality Circle, L.L.C., and 7027 Old Madison Pike, L.L.C. — and *not* the individual plaintiffs;

(5)    Shiffman and Weiss instructed Cheryl Baswell-Guthrie on the percentage of ownership interest each investor should hold as a tenant in common of the title to the Old Madison Pike property, and as members of Quality Circle, L.L.C.;

(6)    The Baswell-Guthrie Defendants relied on Shiffman and Weiss

---

[468] This "fact" is not only internally contradictory (how could Weiss be responsible for drafting the agreements if plaintiffs did not know they were needed?), but contradicted by other evidence in the record.  That is, plaintiffs were informed that they needed to hold the property as tenants in common at least as early as their November 2007 meeting with Shiffman, Weiss, and McDermott.  *See* Part VI(A), *supra*.

[469] It is undisputed that *Baswell-Guthrie*, not Weiss, organized those limited liability companies.  *See* Part VI(A), *supra*.

in closing the transactions; and

(7)    Plaintiffs sued the Baswell-Guthrie Defendants, based in part on the actions taken by the Baswell-Guthrie Defendants' in reliance on unspecified "misrepresentations" by Shiffman and Weiss.[470]

Alabama law is clear on the basic elements of a *prima facie* fraud claim:  *i.e.*, a plaintiff must demonstrate "(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence."  *Allstate Insurance Co. v. Eskridge,* 823 So. 2d 1254, 1258 (Ala. 2001) (quoting *Brushwitz v. Ezell*, 757 So. 2d 423, 429 (Ala. 2000)).[471]  After reciting the "facts" recounted above, the Baswell-Guthrie Defendants state in a conclusory fashion that plaintiffs' conduct "clearly constitutes fraud."[472] That assertion is not convincing.   The Baswell-Guthrie Defendants have not identified a single statement that either Shiffman or Weiss allegedly made, either to plaintiffs or to Cheryl Baswell-Guthrie, let alone a statement that was a *misrepresentation of a material fact*.  Not only does that omission — *i.e.*, failing to allege the factual basis for an element of the claim — warrant denying the motion for partial summary judgment, it also justifies granting the Plaintiffs' motion to dismiss

---

[470] Doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim), at 17-18.

[471] The parties are in agreement that Alabama law governs the counterclaim.

[472] Doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim), at 19.

the fraud counterclaim. *See* Part XI(C)(2), *infra*.

Without actually articulating it in their briefs, the Baswell-Guthrie Defendants seem to imply that Shiffman and Weiss made "misrepresentations" to Cheryl Baswell-Guthrie (and possibly plaintiffs as well) by *not instructing* Ms. Baswell-Guthrie to structure the Quality Circle transaction as a purchase by tenants in common and, thereby, allowing her to close the acquisition with title vested in a limited liability company. Such a state of facts (if they be the "facts") would not amount to an affirmative "misrepresentation" as the Baswell-Guthrie Defendants seem to imply, but instead another species of "fraud" — one that traditionally has been referred to as either "fraudulent suppression of a material fact," or "suppression of truth,"[473] or more recently, "fraudulent concealment."[474] The *prima facie* elements of such a tort are: (1) the defendant had a duty to disclose a material fact to the plaintiff; (2) the defendant failed to disclose the material fact to (or withheld, or hid, the material fact from) the plaintiff; (3) the defendant's failure to disclose (or concealment of) the material fact induced the plaintiff to act (or to refrain from acting); and (4) the plaintiff suffered damages as a proximate result of the action (or inaction) induced by

---

[473] *See*, *e.g.*, 1 *Alabama Pattern Jury Instructions – Civil* § 18.05 ("Suppression of Truth"), at 482 (2d ed. 1993).

[474] *See id*. at 213 (Supp. 2011).

175

the defendant's failure to disclose (or concealment of) the material fact.[475]   In addition, the defendant "must know the fact is material or there must be facts that infer that the defendant knew the suppressed fact was material."[476]

Regardless of whether the Baswell-Guthrie Defendants' argument is viewed as an affirmative "misrepresentation," or as "suppression of a material fact" (*i.e.*, the need for Ms. Baswell-Guthrie to structure the Quality Circle transaction as a tenancy in common), the counterclaim still fails because the Baswell-Guthrie Defendants have adduced no proof of reasonable reliance on the part of Cheryl Baswell-Guthrie.  Ms. Baswell-Guthrie was an experienced real estate attorney.  In fact, she had conducted more like-kind exchanges than any other person involved in this action, including Shiffman and Weiss.[477]   She knew (or should have known) as well as Shiffman and Weiss of the need to structure the Quality Circle transaction as a tenancy in common, rather than to close on the acquisition in a manner that vested title in a limited liability company.  For her to now say that she relied upon the failure of Shiffman and Weiss to *instruct her* to structure the Quality Circle transaction as a tenancy in common is inherently *not* reasonable.

---

[475] *See*, *e.g.*, Janelle Mims Marsh, *Alabama Law of Damages* § 36:32, at 911 & n.37 (6th ed. 2012).

[476] *Id*. at 912 (citing *Speigner v. Howard*, 502 So. 2d 367, 371 (Ala. 1987)).

[477] *See* Part III(C), *supra*.

Finally, it is worthwhile to highlight the logical gymnastics necessary to conceive of the fraud counterclaim in the first place.  The contorted nature of the claim is magnified when the alleged damages are examined.  The Baswell-Guthrie Defendants claim damages in the form of the expense of defending this lawsuit. That is:  (1) Shiffman and Weiss were plaintiffs' agents; (2) Shiffman and Weiss made (unspecified) misrepresentations to Baswell-Guthrie; (3) Baswell-Guthrie relied on those (unspecified) misrepresentations; (4) her reliance led to unfavorable consequences *for plaintiffs*; (5) as a result, plaintiffs sued Baswell-Guthrie; (6) therefore, plaintiffs should have to pay Baswell-Guthrie for the costs of defending the suit in which they seek to recover damages from her.  In other words, plaintiffs should have to pay the Baswell-Guthrie Defendants because plaintiffs' agents harmed plaintiffs.

As plaintiffs note in their summary judgment response brief, the Baswell-Guthrie Defendants' entire claim depends upon Shiffman and Weiss being plaintiffs' agents; there is no allegation that plaintiffs themselves made misrepresentations of material fact.  Yet, "the allegedly tortious activities of California Counsel were detrimental to Plaintiffs's interests, which logically forecloses the possibility that those activities were somehow authorized by Plaintiffs."[478]  Perhaps realizing the

---

[478] Doc. no. 158  (Response Brief in Opposition to Motion for Partial Summary Judgment on

futility of pursuing the fraud counterclaim, the Baswell-Guthrie Defendants did not even mention it in their reply brief.

To review, because (1) there is no evidence of any misrepresentations by plaintiffs or their agents, and, (2) even if such misrepresentations existed, it would have been unreasonable as a matter of law for Baswell-Guthrie (the person in this action most experienced with like-kind exchanges) to have relied on them regarding how to structure the transactions at issue, the Baswell-Guthrie Defendants' motion for partial summary judgment on their fraud counterclaim is due to be denied.

**B**.    **Motion for Partial Summary Judgment: Breach of Contract Counterclaim**

The second count of the counterclaim is based on plaintiffs' alleged breach of their contractual obligations under the closing affidavit executed in conjunction with the acquisition of the Old Madison Pike property.[479]   Plaintiffs San Francisco Residence Club, Inc., KKA CAS, L.L.C., and TAK Tech Point, L.L.C. executed the closing affidavit on December 4, 2007, several days after the transaction closed on November 30th.[480]   The relevant part of that affidavit reads as follows:

> Purchasers and Sellers hereby acknowledge that the following disclosure was made concerning the closing of subject transaction:  . . . the law

---

Counterclaim), at 30.

[479] The Baswell-Guthrie Defendants also quote from the Quality Circle closing affidavit in their brief, but their counterclaim addresses only the Old Madison Pike transaction.

[480]Doc. no. 141-22 (Old Madison Pike Closing Affidavit), at ECF 7, 9, 10.

178

firm of Baswell-Guthrie, P.C., represents 7027 Old Madison Pike, LLC (the entity) and not the individual members of the entity. . . . There may exist a potential conflict of interest between the Purchaser(s), Borrower(s), the Lender, and/or the Title Agent in consummating this transaction. . . . The parties acknowledge they have not received nor relied on any legal advice from the Title Agent related to this transaction, but only from their respective legal counsel, and hereby *fully release and waive any and all claims they may have against the Title Agent, its agent's affiliates and/or assigns.*[481]

The "Title Agent" was defendant One Source Title & Escrow, L.L.C., and defendant Baswell-Guthrie, P.C., was listed as an affiliate of that company.  *None of the Baswell-Guthrie Defendants were signatories to the closing affidavit.*  The Baswell-Guthrie Defendants allege that the institution of this lawsuit "is a clear violation of the release language set forth in [the Closing Affidavit] and constitutes breach of contract."[482]

The plaintiff in a breach of contract action must establish four elements: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 658 (Ala. 2002) (quoting *Southern Medical Hospital Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)).

---

[481] *Id.* (emphasis supplied).

[482] Doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim), at 22 (alteration supplied).

179

A provision waiving liability is typically enforceable.  *See, e.g., Dunlap v. Regions Financial Corp.*, 983 So. 2d 374, 378 (Ala. 2007) ("[A]bsent fraud, a release, supported by valuable consideration and unambiguous in meaning, will be given effect according to the intention of the parties from what appears in the four corners of the document itself; and parol evidence is not admissible to impeach or vary its terms.") (quoting *Wayne J. Griffin Electric, Inc. v. Dunn Construction Co.*, 622 So. 2d 314, 317 (Ala. 1994)).

Plaintiffs advance three arguments in opposition to the breach of contract counterclaim.  *First*, they argue that they received no "valuable consideration" for executing the release, as the closing affidavit was executed several days *after* the transaction closed.[483]  *Second*, they argue that the Baswell-Guthrie Defendants were neither parties to nor signatories of the affidavit and, thus, cannot demonstrate their own performance under the contract.[484]  *Finally*, plaintiffs allege that Cheryl Baswell-Guthrie modified the terms of the Old Madison Pike tenancy in common agreement *after* plaintiffs had executed the signature pages of that document.[485]  Thus, as discussed in Part X(B), *supra*, plaintiffs' claim is for Baswell-Guthrie's intentional insertion of the "good cause" condition.  Under Alabama law, a release of wanton or

---

[483] *See* doc. no. 158, at 33.

[484] *Id.*

[485] *Id.*

intentional misconduct is not enforceable, because it is contrary to public policy. *Cf.*
*Barnes v. Birmingham International Raceway, Inc.*, 551 So. 2d 929, 933 (Ala. 1989)
("We are persuaded, and now hold, that pre-race releases, although valid and
consistent with public policy as to negligent conduct, are invalid and contrary to
public policy as to wanton or willful conduct.").

The Baswell-Guthrie Defendants' reply brief does not address any of those
arguments, but instead devotes only *one page* of legal "argument" to distinguishing
a case plaintiffs had cited for the proposition that a covenant not to sue, rather than
a mere release, would be required to sustain the counterclaim.[486]  The court need not
address that issue, or either of the first two arguments advanced by plaintiffs, because
the holding in the *Barnes* case cited in the preceding paragraph clearly dictates that
the release is not enforceable under the circumstances presented in this case.
Plaintiffs allege that Cheryl Baswell-Guthrie surreptitiously inserted language into
the Old Madison Pike tenancy in common agreement after they executed the signature
pages of that document. That clearly is an allegation of wanton or willful conduct on
the part of Ms. Baswell-Guthrie, and the waiver is invalid as to such claims.
Accordingly, the Baswell-Guthrie Defendants' motion for partial summary judgment
on their breach of contract counterclaim is due to be denied.

---

[486] *See* doc. no. 163, at 5-6.

C.   **Motion to Dismiss the Counterclaim**

On the other hand, plaintiffs' motion to dismiss the counterclaim for failure to state a claim upon which relief can be granted is due to be granted.

1.   **Standard of review**

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  That rule must be read in conjunction with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  [*Twombly*, 550 U.S., at 555].  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id*., at 557.

> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face."  *Id*., at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*., at 556.  The plausibility standard is not akin to a "probability requirement," but it

asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

. . . [T]he tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. [Moreover], only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

[Thus,] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis and alterations added).

When ruling upon a motion to dismiss, the court must assume that all well-

pleaded facts alleged in the plaintiff's complaint are true. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1994) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); *Marsh v. Butler County*, 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*) (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true").

The pleading standard is heightened in cases involving fraud or mistake. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 n.25 (4th Cir. 1997) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997)).

**2**.   **Discussion**

The Baswell-Guthrie Defendants have failed to identify a single statement by Shiffman or Weiss that constitutes a *misrepresentation* of a *material fact*, even following discovery. The Baswell-Guthrie Defendants note that, "under Rule 9(b), it

184

is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."[487]   That statement, rather than supporting the Baswell-Guthrie Defendants' fraud claim, actually underscores their failure to sufficiently plead it; they have not pled the "who, what, when, where, and how" of *any* "allegedly false statements."

The Baswell-Guthrie Defendants requested leave of the court to amend their pleading, should the court determine that they fail to state a claim.  Federal Rule of Civil Procedure 15 states that a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2) (alteration supplied). "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citing *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001)).  The court may disallow amendment, however, "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Id.*  Here, amendment would be futile.  The

---

[487] Doc. no. 86 (Brief in Opposition to Motion to Dismiss Counterclaim), at 5 (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)).

185

parties have completed discovery in this case.  As previously discussed, even with the benefit of discovery, the Baswell-Guthrie Defendants *still* fail to identify any false statements.  Thus, the fraud counterclaim is due to be dismissed.

The breach of contract counterclaim fares no better against plaintiffs' motion to dismiss.  As stated in the summary judgment discussion in Part XI(B) of this opinion, *supra*, that counterclaim relates only to the Old Madison Pike transaction. As mentioned above, the elements of a contract are:  "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."  *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 658 (Ala. 2002).  In support of plaintiffs' motion to dismiss the breach of contract counterclaim, the plaintiffs note that the Baswell-Guthrie Defendants make no allegation that they (the Baswell-Guthrie Defendants) were parties to a binding contract, or that they performed under the contract.[488]

In response, the Baswell-Guthrie Defendants merely reassert that paragraphs thirteen through sixteen of the counterclaim do state a breach of contract claim.[489] Those paragraphs of the counterclaim — in addition to quoting the release language from the Old Madison Pike Closing Affadavit, which is appended to the counterclaim

---

[488] *See* doc. no. 85 (Plaintiffs' Motion to Dismiss Counterclaim), at ECF 6.

[489] *See* doc. no. 86 (Baswell-Guthrie Defendants' Reponse to Motion to Dismiss), at ECF 7.

complaint — do allege that plaintiffs failed to perform *a* contract (*i.e.*, the release), and that plaintiffs' lawsuit constitutes a breach of that contract.[490]

Unfortunately, the Baswell-Guthrie Defendants utterly fail to allege the first and second elements of a breach of contract claim. The counterclaim complaint is devoid of any allegations of the breach of a contract *to which the Baswell-Guthrie Defendants are a party*. While the quoted language does refer to Ms. Baswell-Gutherie, One Source Title & Escrow L.L.C., and Baswell-Guthrie, P.C., at no point is it alleged that those individuals or entities have standing to enforce the quoted contract (*i.e.*, that they are in privity). Even after this was pointed out by the plaintiffs in their motion to dismiss, the Baswell-Guthrie Defendants failed to address the issue in response. Instead, they cited only "the existence of *a* contract [and that] Plaintiffs' [sic] breached *this* contract[.]"[491] That is all well and good, but it does not address how that contract would bind the parties in the action, which of course is a required element of a breach of contract claim.

Moreover, perhaps because they do not allege that the contract at issue is one to which they are a party, the Baswell-Guthrie Defendants make no representations about their performance under the contract. It is hard to image how they could. The

---

[490] *See* doc. no 80 (Baswell-Guthrie Defendants' Counterclaim) ¶¶ 13-16.

[491] *See* doc. no. 86 (Baswell-Guthrie Defendants' Reponse to Motion to Dismiss), at ECF 7 (emphasis supplied).

187

very document upon which they rely, and which they appended to their counterclaim complaint — *i.e.*, the closing affidavit — contains six signature pages, *none of which are endorsed by the any of the Baswell-Guthrie Defendants*.[492]  Thus, dismissal of the breach of contract counterclaim is appropriate

The Baswell-Guthrie Defendants also requested leave to amend this count of their counterclaim, if necessary.  Once again, amendment would be futile. Presumably, the Baswell-Guthrie Defendants would amend the pleading to allege a breach of the Quality Circle closing affidavit, as evidenced by their discussion of that affidavit in their summary judgment brief.  But none of the plaintiffs executed the Quality Circle closing affidavit.[493]  Scott McDermott executed that agreement on behalf of Quality Circle, L.L.C.[494] The Baswell-Guthrie Defendants acknowledge that fact, but argue that, because Kate Donahue, Thomas O'Shea, and San Francisco Residence Club, Inc. executed an operating agreement as members of Quality Circle, L.L.C., the terms of the closing affidavit bar them from bringing claims against the Baswell-Guthrie Defendants.[495]  That argument is not convincing.  The documents those plaintiffs executed as members of Quality Circle, L.L.C. gave McDermott the

---

[492] *See* doc. no. 80 (Baswell-Guthrie Defendants' Counterclaim), "Ex. 1," at ECF 12-17.

[493] *See* doc. no. 144-8 (Quality Circle Closing Affidavit).

[494] *Id.* at ECF 6.

[495] *See* doc. no. 140 (Motion for Partial Summary Judgment on Counterclaim), at 21.

power to act on behalf of the entity, Quality Circle, L.L.C.; the documents did not affect plaintiffs' individual rights to assert claims against the Baswell-Guthrie Defendants.

Even if the Baswell-Guthrie Defendant's breach of contract counterclaim were amended to include the Quality Circle closing affidavit, dismissal still would be proper. Therefore, amendment would be futile, and the counterclaim is due to be dismissed in its entirety.

## XII. MISCELLANEOUS MOTIONS

Finally, there are five discovery-related motions pending. The first is a motion to compel discovery, filed by plaintiffs, in which they request the court to order the Baswell-Guthrie Defendants to produce materials that those defendants aver to be privileged.[496] The other four motions were filed by the Baswell-Guthrie Defendants: a motion to strike plaintiffs' second evidentiary supplement to plaintiffs' motion to compel;[497] a motion to quash a subpoena served upon the law firm of Maples & Ray, P.C;[498] a motion to compel, requesting the court to order plaintiffs to produce materials that plaintiffs aver to be privileged;[499] and, a motion to strike, requesting the court to

---

[496] Doc. no. 122 (Motion to Compel Discovery).

[497] Doc. no. 184 (Motion to Strike Second Evidentiary Supplement).

[498] Doc. no. 126 (Motion to Quash Subpoena).

[499] Doc. no. 128 (Motion to Compel Discovery). The Wilmer & Lee Defendants joined the Baswell-Guthrie Defendants in filing that motion. All claims against the Wilmer & Lee Defendants

189

strike several documents plaintiffs submitted in opposition to summary judgment.[500]

Each motion is addressed in the following subsections.

## A.    Plaintiffs' Motion to Compel

Plaintiffs' motion to compel stems from Cheryl Baswell-Guthrie's refusal to answer certain questions in her deposition, and the refusal of the Baswell-Guthrie Defendants to produce certain documents, on the ground that the disclosure of such information to plaintiffs would violate the attorney-client privilege.  The assertion of the privilege was based on Baswell-Guthrie's former representation of Scott McDermott and 7027 Old Madison Pike, L.L.C.[501]  In the motion, plaintiffs argue that McDermott had waived the privilege, both on behalf of himself and the limited liability companies, in the course of a deposition taken in arbitration proceedings.[502] They assert that once waived, the privilege cannot be reasserted:  *i.e.*, McDermott's waiver in the arbitration forum served as a waiver of the privilege in *all* litigation.  The Baswell-Guthrie Defendants argue that McDermott's waiver was limited to the arbitration only, and that he did not appear to have the authority to waive the privilege

---

are due to be dismissed, however, thus mooting the motion to strike as to those defendants.

[500] Doc. no. 164 (Motion to Strike Evidentiary Material).

[501] Baswell-Guthrie also asserted the privilege on behalf of Quality Circle, L.L.C. but, because the claim stemming from the Quality Circle acquisition has been dismissed, *see* Part X(C)(3), the court will not discuss Quality Circle, L.L.C. in this part of the opinion.

[502] *See* doc. no. 159-18 (Scott McDermott Dep., October 1, 2010), at 84-87.

on behalf of the limited liability companies.

The Baswell-Guthrie Defendants do not dispute that McDermott waived the attorney-client privilege with regard to himself.[503]   Any argument that the waiver applied only to the arbitration proceeding (and not to this action) runs contrary to the well-settled principle that, once the attorney-client privilege is waived for a particular communication, it cannot later be asserted with regard to the same communication. *See, e.g.*, *Hamilton v. Hamilton Steel Corp.*, 409 So. 2d 1111, 1114 (Fla. Dist. Ct. App. 1982) ("It is black letter law that once the privilege is waived, and the horse is out of the barn, it cannot be reinvoked.").   Thus, there is no question that McDermott's waiver of the attorney-client privilege, with regard to himself, extends to the present action.

Even so, the Baswell-Guthrie Defendants deny that McDermott's waiver of the privilege with regard to himself extends to privileged communications between Cheryl Baswell-Guthrie and two limited liability companies for which McDermott was manager:  *i.e.*, 7027 Old Madison Pike, L.L.C., and Quality Circle, L.L.C.   In testifying that he waived the privilege, McDermott did not clearly state that he was waiving the privilege on behalf of those entities.[504]   Thus, the Baswell-Guthrie

---

[503] *See* doc. no. 129 (Response in Opposition to Motion to Compel) ¶3 (admitting the facts alleged in Paragraphs 1-10 in plaintiffs' motion, which in turn quote and cite instances of waiver).

[504] *See* doc. no. 159-18 (Scott McDermott Dep., Oct. 1, 2010), at 84-87.

Defendants argued in response to plaintiffs' motion to compel that they "were unable to discern" whether McDermott intended to waive the privilege on behalf of the limited liability companies, as well as himself.[505]

In addition to the evidence submitted in support of the motion to compel, plaintiffs filed two evidentiary supplements.  The first contained an excerpt from the deposition of Cheryl Baswell-Guthrie taken in a state court proceeding.[506]  In that case, Scott McDermott and 7027 Old Madison Pike, L.L.C. were represented by the same attorney, Joesph Cloud.[507]  Before the attorneys began questioning Baswell-Guthrie, Cloud indicated that his clients waived the attorney-client privilege with regard to communications with Baswell-Guthrie.  Specifically, he stated:

> It is important, as I understand it, that Ms. Baswell-Guthrie be able to testify, and she has to testify about the confidential information obtained from her clients.  To that extent, we [*i.e.*, Scott McDermott and the entity for which he was "manager," 7027 Old Madison Pike, L.L.C., and Joe Cloud as the attorney for both] understand and waive it [*i.e.*, the attorney-client privilege].
>
> We are clearly here to gain information from her.
>
> . . .

---

[505] Doc. no. 129 (Response in Opposition to Motion to Compel) ¶ 13.

[506] Doc. no. 133 (Plaintiffs' First Supplemental Evidentiary Submission).

[507] Doc. no. 133-2 (Cheryl Baswell-Guthrie Dep., Jan. 13, 2011), at 9-10 (MR. CLOUD:  I represent Jeri Holden. . . . I represent Scott McDermott.  I represent Roy Claytor.  I represent [7027] Old Madison Pike, LLC.") (alteration supplied).

[S]he has a right to testify. . . . [T]he privilege is waived to allow her to testify.[508]

Both Cloud and Daniel Burnick, who represented Baswell-Guthrie at the deposition, acknowledged that the waiver of the attorney-client privilege in one proceeding resulted in its waiver for all proceedings.[509]

The Baswell-Guthrie Defendants argue, nevertheless, that those waivers were invalid because "the privilege is held by the client and can only be waived by the client."[510]  In other words, they argue that neither the client (McDermott and 7027 Old Madison Pike, L.L.C.), nor the former client's present attorney (Cloud), can waive the privilege as to a conversation with the client's former attorney (Baswell-Guthrie) through a statement by his present attorney.

"It is a 'bedrock principle that the attorney-client privilege is the client's and his alone.  If the client wishes to waive it, the attorney may not assert it, either for the client's or his own benefit.'"  *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990) (quoting *United States v. Juarez*, 573 F.2d 267, 276 (5th Cir. 1978)).  Thus, argue the Baswell-Guthrie Defendants, Cloud could not have waived the privilege on behalf of his client, 7027 Old Madison Pike, L.L.C.  That argument is a red herring

---

[508] *Id.*

[509] *Id.* 10-11.

[510] Doc. no. 129 (Response in Opposition to Motion to Compel) ¶ 21.

193

that turns the rule on its head.

The principle that the client, and not the attorney, owns the privilege, means that McDermott and 7027 Old Madison Pike, L.L.C. had the right to waive the privilege, and that waiver may be effected through their attorney, *i.e.*, their agent.

> The attorney currently representing the client may invoke the privilege on the client's behalf even though the attorney may not have been counsel at the time the communication was made. If the former and present attorneys differ in their view of the client's position, the current attorney's position should be followed. This makes sense since *the current attorney now speaks for the client*.

3 *Weinstein's Federal Evidence* § 503.20[3], at 63-64 (2d ed. 2012) (emphasis supplied). The converse is also true; the current counsel may waive the privilege if the former attorney attempts to assert it. *See United States v. De Lillo*, 448 F. Supp. 840, 842 (E.D. N.Y. 1978) (ruling that the privilege had been waived where there was "a claim of privilege advanced in court by the former attorney, but met by a letter from the present attorneys indicating no desire on the part of the present board of trustees to assert the privilege").

The interpretation offered by the Baswell-Guthrie Defendants runs contrary to that rule: it would allow the former attorney (Baswell-Guthrie) to continue to assert the privilege when the client (McDermott and 7027 Old Madison Pike, L.L.C.) and their successor attorney (Joseph Cloud) have stated a desire to waive the privilege,

simply because that statement was made by a *different* attorney who was subsequently retained by the client.  The outcome is directly at odds with the "bedrock principle" that the client, not the attorney, owns the privilege.

In summary, the Baswell-Guthrie Defendants' arguments regarding the validity of the waiver of the attorney-client privilege by McDermott and 7027 Old Madison Pike, L.L.C. represent an exercise in misdirection.  The rule that the client, and not the attorney, owns the privilege means that *Baswell-Guthrie* does not own the privilege. That rule certainly does *not* allow her, as the former attorney of the client, to continue to assert the privilege because her former client waived it through the actions of its new attorney.

Thus, the Baswell-Guthrie Defendants cannot continue to rely on the privilege in refusing to comply with plaintiffs' discovery requests.  Accordingly, plaintiffs' motion to compel is due to be granted.  The Baswell-Guthrie Defendants' motion to strike plaintiffs' second evidentiary supplement is due to be denied as moot.  The court recognizes that the whereabouts of Cheryl Baswell-Guthrie are currently unknown. Nevertheless, the Baswell-Guthrie Defendants will be ordered to provide plaintiffs with all documentary evidence heretofore withheld on the basis of the privilege, and will not be permitted to assert the privilege during trial.

**B.    The Baswell-Guthrie Defendants' Motion to Quash Subpoena**

The Baswell-Guthrie Defendants filed a motion to quash a subpoena that ordered the law firm of Maples & Ray, P.C., to produce deposition transcripts from state court proceedings.[511]  When the Baswell-Guthrie Defendants filed their motion to quash the subpoena, they stated that the parties expected it to be resolved without court intervention.[512]  They proposed that the subpoena be modified, so that it would call for the production of only the first forty transcript pages of Baswell-Guthrie's deposition taken in the state court proceedings.[513]  In response, plaintiffs stated that the parties had agreed to proceed according to the Baswell-Guthrie Defendants' proposed alternative.[514]  Approximately two weeks after filing that response, plaintiffs filed their first evidentiary supplement in support of their motion to compel.[515]  That evidentiary submission included the first forty pages of the deposition.[516]  Thus, it is clear that the parties have resolved the issues implicated in the motion to quash, and that motion is due to be denied as moot.

## C.   Defendants' Joint Motion to Compel

The Baswell-Guthrie Defendants and the Wilmer & Lee Defendants jointly filed

---

[511] Doc. no. 126 (Motion to Quash Subpoena) ¶ 4.

[512] *Id.* ¶ 1.

[513] *Id.* ¶ 28.

[514] Doc. no. 131 (Response to Motion to Quash) ¶ 10.

[515] Doc. no. 133 (Plaintiffs' First Supplemental Evidentiary Submission).

[516] Doc. no. 133-2 (Cheryl Baswell-Guthrie Dep., Jan. 13, 2011).

a motion to compel production of two types of information.[517]  First, they request that the court order plaintiffs to produce all communications with their California attorneys, Michael Shiffman and Jeffrey Weiss, and with Alabama attorney Charles Ray.  (Defendants also request leave to "re-depose Mr. Shiffman, Mr. Weiss, and Plaintiffs for the limited purpose" of questioning those individuals about attorney-client communications after December 31, 2007.[518])  Plaintiffs have, thus far, refused to provide such information on the basis of the attorney-client privilege.  Second, defendants request that plaintiffs be required to produce all documents related to the attorneys' fees they seek to recover in this action, regardless of whether such fees stem from their dispute with McDermott or the actual prosecution of the case.

### 1.    Attorney communications

The Baswell-Guthrie Defendants and Wilmer & Lee Defendants first seek production of communications between plaintiffs and their California attorneys and Charles Ray.  In responding to defendants' original requests for production, plaintiffs produced email communications between themselves and the California attorneys occurring before the end of 2007.[519]  They likewise testified about conversations they

---

[517] Doc. no. 128 (Defendants' Joint Motion to Compel).

[518] *Id.* at 2.

[519] *See* doc. no. 128 ¶ 14.

197

had with the California attorneys during that year,[520] and the California attorneys testified regarding those conversations as well.   For all communications and conversations from January 1, 2008 forward, however, plaintiffs have asserted the attorney-client privilege.[521]   Defendants argue that plaintiffs' waiver of the privilege for communications made in 2007 requires them to disclose communications made in 2008 and afterward.[522]

### a.    Factual background

All of the transactions at issue in this case occurred in 2007, with the final transaction, the acquisition of the Quality Circle property, closing on December 4, 2007.  The final deed recorded in the Probate Records of Madison County, Alabama, for the Old Madison Pike property, was filed on December 31, 2007.[523]  Throughout the last two months of 2007, plaintiffs and their California attorneys, Michael Shiffman and Jeffrey Weiss, communicated regarding the transactions.  In the spring of 2008, plaintiffs discovered the "good cause" language in the Old Madison Pike tenancy in common agreement.  In the course of trying to determine who had inserted

---

[520] *See, e.g.*, doc. nos. 128-1 (Anne O'Shea Dep., Nov. 10, 2010), at 39, 41-42, 56; 128-2 (Thomas O'Shea Dep., Sept. 28-29, 2010), at 128; 128-3 (Kate Donahue Dep., Nov. 18, 2010), at 30, 46-49.

[521] *See* doc. nos. 128-10 (Michael Shiffman Dep., Nov. 16, 2010), at 15; 128-11 (Jeffrey Weiss Dep., Nov. 17, 2010), at 13.

[522] *See* doc. no. 128 (Defendants' Motion to Compel) ¶¶ 60-65.

[523] *See* Part VI(B), *supra*.

that language, Thomas O'Shea asked Shiffman whether he had added the language. Shiffman said that he had not.[524]   Shiffman and Weiss assisted plaintiffs in their attempts made in 2008 to "correct" the problems with the transactions at issue here.

Part of plaintiffs' efforts to "correct" the transactions included retaining, on the advice of Shiffman, Alabama attorney Charles Ray.   During 2008, plaintiffs commenced several actions, both in the Northern District of Alabama and in Alabama state court, against various parties, including some of the McDermott Defendants.[525] Ray represented plaintiffs in each of those cases.   The Baswell-Guthrie Defendants initiated an action against several former clients, including McDermott and Quality Circle, L.L.C.[526]   They also brought an action against Shiffman, Weiss, and Ray.[527]   In addition to being a defendant in the latter case, Ray represented Quality Circle, L.L.C. in the former.

Shiffman has advised plaintiffs with regard to their settlement and arbitration with McDermott and in the ongoing litigation.   Ray was one of several attorneys representing plaintiffs in the arbitration and, after the filing of the motion to compel, became one of plaintiffs' attorneys of record in this action.[528]   Plaintiffs have waived

---

[524] Doc. no. 139-9 (Thomas O'Shea Dep., Sept. 29, 2010), at 504-05.

[525] *See* note 2, *supra*.

[526] *See* doc. no. 132 (Plaintiffs' Response to Motion to Compel) ¶ 14.

[527] *Id.* ¶ 15.

[528] Doc. no. 168 (Notice of Appearance of Charles Ray).

199

their attorney-client privilege with regard to communications with Shiffman during 2007,[529] but argue that the waiver does not apply to privileged communications made in 2008 or later, which, they assure us, were made for the purposes of this litigation, and are not germane to the underlying transactions.[530]

### b.   Waiver of the attorney-client privilege

Federal Rule of Evidence 501 provides that, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  In Alabama, the attorney-client privilege is defined by the familiar three elements:  (1) the communication must be confidential; (2) the communication must be "made for the purpose of facilitating the rendition of professional legal services to the client"; and (3) the communication must be made between specific people, usually the client and the attorney.  Ala. R. Evid. 502(b).  The parties do not dispute that Alabama law governs the existence of the privilege, or that the communications at issue are within the privilege.  What they do dispute is: (a) whether plaintiffs have waived that privilege as to *all* communications between themselves, Shiffman, Weiss, and Ray by waiving it as to *some* of those communications; and (b) the law that governs that question.

---

[529] *See*, *e.g.*, doc. no. 132 (Plaintiffs' Response to Motion to Compel) ¶ 19.

[530] *Id.* at 11-13.

Defendants rely on Federal Rule of Evidence 501 (and through it, the Alabama Rules of Evidence), and argue that Alabama evidence law governs the question of waiver.[531]  Plaintiffs counter that Federal Rule of Evidence 502 defines the contours of the privilege and waiver thereof.[532]

When enacting the Federal Rules of Evidence, Congress chose not to delineate specific privileges, or define their scope.  Instead, Article V of the Rules originally contained only one provision, *i.e.*, Rule 501.  That scheme changed, however, in 2008, when Congress passed the bill enacting Rule 502.  The new rule deals with the attorney-client privilege, but maintains the Rules' hands-off approach to privilege matters.  That is, the substantive scope of the attorney-client privilege is still a matter of state law.  The purpose of the new rule was to "resolve[] some longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege or as work product."  Fed. R. Evid. 502 advisory committee's note.

Rule 502 states that, "notwithstanding Rule 501, this rule applies even if state law provides the rule of decision."  Fed. R. Evid. 502(f).  Thus, plaintiffs are correct in arguing that Rule 502, rather than Alabama law, governs the resolution of the

---

[531] Doc. no. 128 ¶¶ 55-56.

[532] Doc. no. 132, at 10-11.

question of whether waiver of the attorney-client privilege has occured.  The Rule provides that the waiver of the attorney-client privilege "extends to an undisclosed communication . . . only if (1) the waiver is intentional; (2) the disclosed and undisclosed communications . . . concern the same subject matter; and (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a)(1)-(3).

### c.    Application of the privilege in this case

Plaintiffs have unquestionably made an intentional waiver of the attorney-client privilege with regard to their 2007 communications with Shiffman and Weiss, although no such waiver occurred as to Ray.  Indeed, both plaintiffs and attorneys Shiffman and Weiss provided deposition testimony about those communications.  Thus, the first element set out in Rule 502(a) is satisfied, and the waiver will be extended to other, later communications with those attorneys if the other two elements are met.

The parties dispute whether the disclosed and undisclosed communications concern the same subject matter.  The Baswell-Guthrie Defendants and Wilmer & Lee Defendants (hereafter, the Joint Defendants) do not explicitly address the issue of whether the communications at issue concern the same subject matter, although their omission is understandable for two reasons.  First, they could not be expected to go into great detail on the matter, given that they were not privy to the communications

in dispute. Second, because the Joint Defendants argued that Alabama law, not Rule 502, governs the issue of waiver, their brief's analysis did not directly track the elements of Rule 502.   Nevertheless, the Joint Defendants did direct the court to passages in the record which assist in the "same subject matter" determination. Among other evidence, the Joint Defendants place weight on discussions during the deposition of Michael Shiffrin.[533]

In response, plaintiffs attempt to maintain a distinction between those communications which occurred in 2007 and those which occurred in 2008. The basis for this delineation, they argue, is that: (a) the factual events surrounding the transactions themselves were all concluded by December 31, 2007,[534] while (b) the "efforts to correct [the] problems" with those transactions, and the attorney-client communications therewith, occurred in 2008 or later.[535]

In essence, the plaintiffs assert that communications about the transactions themselves concern a different subject matter than communications about *correcting* those transactions.   That is at least an arguable distinction, even if not an altogether convincing one.   The plaintiffs claim that they "are not seeking to recover for any

---

[533] *See* doc. no. 128 (Defendants' Joint Motion to Compel) ¶¶ 33-36.

[534] See doc. no. 132 (Plaintiffs' Response to Motion to Compel) at 2-3, ¶¶ 1-6.

[535] *Id.* at 3-6, ¶¶ 7-16.

actions taken by the [remaining] Defendants at any time other than in 2007."[536]  While that statement may be true in the literal sense, it is also misleading.  Although their claims against the remaining defendants arise from defendants' conduct in 2007 only, the damages that plaintiffs allegedly incurred as a result of defendants' conduct stem from plaintiffs' later efforts to undo the harm allegedly caused by that conduct.  Thus, there arguably is a connection between the events that occurred in 2007, directly related to the real estate transactions, and communications made in the course of trying to resolve the issues at a later time.

However, resolving that issue is unnecessary.  Given the statements of plaintiffs' counsel during the testimony of Michael Shiffman, the court finds plaintiffs' differentiation of the 2007 communications from the 2008 communications to be arbitrary and artificial.  As discussion on the record during Shiffman's deposition makes clear, the appropriate question is *not* — as the plaintiffs have slyly tried to frame it — whether "2007 communications regarding the transactions themselves" concern the same subject matter as "2008 communications regarding fixing those transactions."  Instead, the relevant inquiry is: Do communications *in 2007* about resolving post-transaction issues involve the same subject matter as communications *in 2008* about resolving post-transaction issues?  The answer to that question can only

---

[536] *Id.* at 12.

be an emphatic and unequivocal "yes."

Because statements made during Michael Shiffman's deposition are of central importance, the court finds it helpful to quote from them at length.  At that deposition, plaintiffs were represented by Mr. Gino Bulso, the Baswell-Guthrie Defendants were represented by Ms. Taffi Stewart and Mr. Daniel Burnick, and the Wilmer & Lee Defendants were represented by Mr. Gordon Sproule.  After Mr. Shiffman, in response to questioning, mentioned that he communicated to plaintiffs that perhaps they should not trust Scott McDermott after he seemed not to be abiding by his word, Ms. Stewart inquired:

> "What time frame are we talking about [when McDermott was not living up to expectations]?
>
> [Shiffman]: Probably the March, April 2008 time frame.
>
> Mr. Bulso: None of the plaintiffs, Mr. Shiffman, have waived any attorney-client privilege with regard to communications after December 31st of 2007, so just bear that in mind as you respond to Ms. Stewart's questions."[537]

Mr. Shiffman acknowledged that admonition, but opposing counsel soon pressed the issue:

> "Ms. Stewart: . . . [W]hat's the period of time when you all waived the privilege, or what's your position as to when you waived the privilege, Gino, communications that occurred prior to when?

---

[537] Doc. no. 128-10 (Michael Shiffman Dep., Nov. 16, 2010), at 51 (alterations supplied).

Mr. Bulso: The plaintiffs are not asserting privilege with regards to communications that occurred prior to December 31, 2007 with regard to the Tech Point [a/k/a Old Madison Pike] and Quality Circle transactions, the closing of those transactions, *and the post closing matters related to those transactions*."[538]

Mr. Bulso's latter comment — "the post closing matters related to those transactions"

— would quickly come back to haunt him.

"Mr. Sproule: Just out of curiosity, is there anything special, Gino, about the December 31, 2007 cutoff other than that's what you all are claiming?

Mr. Bulso: . . . [T]he intent is *not* to assert [*i.e.*, waive] the privilege with regard to the closing of these transactions or Mr. Shiffman's or Mr. Weiss' role in the closing or *the post closing clean-up matter that occurred in December* [2007].

Mr. Sproule: I just didn't know if December 31 was specific or that's just a nice easy way to cut it off at the end of the year.

Mr. Bulso: I think it's a chronological matter.  The closings that occurred and *the post closing clean-up matters that occurred by December 31, 2007.*  There's a rhyme and reason to that date and that's it.

Ms. Stewart: When you say ["]post closing clean-up matters,["] what do you mean by that? . . . What is it [t]hat you're referring to as post closing clean-up matters for Quality Circle and Tech Point?

Mr. Bulso: *Whatever* occurred *prior to December 31 of 2007.*

Mr. Burnick: My understanding is there were post closing clean-up matters on all the properties after January 1st, 2008 as well. [If that is correct,] what's the specific objection as to the distinction between the post closing clean-up matters prior to January 1st, 2008 and post January

---

[538] *Id.* at 51-52 (emphasis and alteration supplied).

1st, 2008?"[539]

At that point, perhaps sensing he had already said too much, Mr. Bulso clammed up:

> "Mr. Bulso: Let's -- if we could continue with the deposition, we can debate the issue off the record or in correspondence or whatever.

> Mr. Burnick: I want it on the record, because I think it's been waived. . . . I've not heard a reason for it not being waived after January 1 if it deals with the same transactions and the same post closing and clean-up issues[.]"[540]

The implication of Mr. Burnick's comment is essentially correct: there is no good reason why "post closing clean-up matters" in 2007 relating to the Quality Circle and Tech Point (a/k/a Old Madison Pike) transactions should be distinguished from exactly the same undertakings in 2008. The only distinction is one tick of the clock at midnight on New Year's Eve. Despite plaintiffs' attempts to maintain the 2007/2008 distinction, Mr. Bulso made it unambiguously clear that plaintiffs waived attorney-client privilege for (a) any communications regarding the Old Madison Pike and Quality Circle transactions up to the closing thereof, and (b) "post closing clean-up matters" that occurred in 2007. Yet because the December 31, 2007 cutoff date is devoid of substantive relevance, the latter waiver amounts to a waiver of *all* post closing clean-up matters as to those transactions. Consequently, plaintiffs waived the

---

[539] *Id.* at 54.

[540] *Id.*

attorney-client privilege as to communications regarding Old Madison Pike and Quality Circle transactions.  That waiver applies both to communications regarding structuring and executing the respective transactions, and to post-closing communications regarding efforts to correct perceived errors in the transactions, irrespective of the date on which those communications took place.

The only factor left to consider under Rule 502 is whether the disclosed and undisclosed communications ought in fairness be considered together.  The court has no difficulty finding that the fairness element of waiver is satisfied.  For one, plaintiffs' efforts to maintain a 2007/2008 distinction in the face of Mr. Bulso's statements can be charitably described as dubious.  Moreover, it would be palpably unfair to permit the plaintiffs to selectively waive some communications on the same subject matter while closely guarding others.  Plaintiffs cannot be allowed to abuse the attorney-client privilege simply by hiding behind the coincidences of the Gregorian calendar.

Therefore, the motion to compel is due to be granted.  The court will order the temporary and limited reopening of discovery.  The plaintiffs will be ordered to produce within thirty days any correspondence or documents between themselves and California attorneys Shiffman and Weiss which bear upon post closing correction of the Old Madison Pike and Quality Circle transactions.   The Baswell-Guthrie

208

Defendants[541] are given leave to re-depose Messrs. Shiffman and Weiss on matters relating to the post closing clean-up.  Such depositions are to be completed within sixty days of the entry of this order.  At trial and in accordance with the court's ruling on the Joint Defendants' motion to compel, the plaintiffs will be barred from asserting the attorney-client privilege regarding the aforementioned matters.

## 2.    Attorneys' Fees

Defendants also seek the production of two distinct types of attorneys' fee information.  First, they request information regarding the fees and expenses plaintiffs claim to have incurred during litigation, arbitration, and eventual settlement with McDermott.  Next, they request information regarding plaintiffs' attorneys' fees in prosecuting this action.

As plaintiffs point out in their responsive brief, defendants clearly are not entitled to discovery on the latter type of information.  The fees and expenses related to litigation are not relevant until *after* the conclusion of litigation on the merits.  The Uniform Initial Order, which governs all proceedings, promulgates a specific procedure for attorneys' fee discovery in fee-shifting cases.[542]  Under the terms of that

---

[541] Recall that, although the motion to compel was filed jointly and therefore included the Wilmer & Lee Defendants, all claims against them are due to be dismissed.  Thus, the Wilmer & Lee Defendants cannot be given leave to continue discovery, as there is no discovery for them to continue.

[542] It appears that, through clerical error, the Uniform Initial Order was never entered in this case.  However, that order is included on the court's website, where the Local Rules are also found.

order, a party is not required to provide the details of its attorneys' fee claim until such time as the claim is actually made. Because fee shifting is the province of the court, and only comes into play after the merits have been decided, there is no reason for plaintiffs to disclose information concerning the details of their attorneys' fees related to this litigation at this time.

Such is not the case with the other attorneys' fees at issue: *i.e.*, those relating to the plaintiffs' prosecution of their claims against Mr. McDermott in the arbital forum. Plaintiffs do not dispute defendants' assertion that they must produce documentation in support of the attorneys' fees and other expenses they incurred in "correcting" the transactions made the basis of this case: *i.e.*, costs associated with reforming title to the properties, and litigating, arbitrating, and settling with McDermott.[543] The Baswell-Guthrie Defendants filed their motion to compel on May 16, 2011, the final day of discovery.[544] The arbitration between plaintiffs and McDermott came to a close on May 17, 2011.[545] Plaintiffs filed their response to the motion to compel on May 26,

---

Moreover, the remaining defendants specifically referenced that order in filing an earlier motion. *See* doc. no. 162 (Motion for Leave to File Excess Pages), at 1 ("Come now the remaining Defendants, by and through counsel, and respectfully request that this Court grant them leave to exceed the page limit set forth in the Uniform Initial Order in their replies in Support of Motions for Summary Judgment."). Thus, defendants can claim no prejudice on the basis of the failure to enter the Uniform Initial Order in the record.

[543] *See* doc. no. 132 (Plaintiffs' Response to Motion to Compel), at 15-16.

[544] Doc. no. 128 (Motion to Compel Discovery).

[545] *See* doc. no. 130 (Notice of Completion of Arbitration).

2011.[546]  In their response, they indicated that the information sought with regard to "correcting" the transactions would "be promptly disclosed and supported."[547]  No party has since filed any documentation with the court indicating whether plaintiffs followed through on that promise.  Therefore, the court will assume that plaintiffs have not produced such documentation, and the motion to compel will be granted in part.

**D.     The Baswell-Guthrie Defendants' Motion to Strike**

The Baswell-Guthrie Defendants moved to strike six exhibits plaintiffs submitted in opposition to summary judgment.[548]  Those exhibits are:

Exhibit 13:  Corrective Statutory Warranty Deed for Quality Circle;[549]

Exhibit 15:  Scott McDermott's Opposition to Motion for Preliminary Injunction in Civil Action No. 08-1573-IPJ-NE;[550]

Exhibit 16:  Correspondence from Stephen Leara to Charles Ray;[551]

Exhibit 17:  Scott McDermott's Supplemental Motion to Dismiss in Civil Action No. 08-1573-IPJ-NE;[552]

---

[546] *See* doc. no. 132 (Plaintiffs' Response to Motion to Compel).

[547] *Id.* at 16.

[548] The Baswell-Guthrie Defendants listed five exhibits in the their motion to strike, and implicitly moved to strike two more in their reply brief regarding their motion for summary judgment on their counterclaim.

[549] Doc. no. 159-13.

[550] Doc. no. 159-15.

[551] Doc. no. 159-16.

[552] Doc. no. 159-17.

Exhibit 18:  Scott   McDermott's   Deposition   in   the   Arbitration
Proceeding;[553]

Exhibit 19:  Scott McDermott's Demand for Arbitration, filed in Civil
Action No. 08-1573-IPJ-NE;[554]

Exhibit 50:  Plaintiffs' Settlement Agreement with Scott McDermott.[555]

The basis of the motion to strike was that plaintiffs had not produced or otherwise
disclosed those documents during discovery.[556]

The Baswell-Guthrie Defendants state that each of the documents listed above
should have been produced in response to their requests for production.  In response
to the Baswell-Guthrie Defendants' request that plaintiffs produce documents related
to their dispute with McDermott, plaintiffs stated several objections.  Among those
objections was that the request "seemingly call[ed] for publicly available documents
filed in litigation between themselves and Mr. McDermott, which documents are
equally available to Defendant."[557]  Subject to that objection, plaintiffs stated that they
would "produce discoverable documents within the scope of Rule 26(b) that related
to the underlying dispute with Mr. McDermott and his termination as the manager of

---

[553] Doc. no. 159-18.

[554] Doc. no. 159-19.

[555] Doc. no. 159-50.

[556] Doc. no. 164 ¶¶ 5-11.

[557] Doc. no. 169-6 (Plaintiffs' Responses and Objections to Requests for Production), at 9-10.

[the Old Madison Pike property]."[558]

In response to defendants' motion to strike, plaintiffs submitted emails demonstrating that Exhibits 18 and 50 were provided to defendants on December 9, 2010 and March 3, 2011, respectively.[559] Exhibit 13, the warranty deed, is specifically referenced in Exhibit 50, the settlement.[560] The warranty deed is also a public record. Exhibits 15, 17, and 19 are public records. When the parties discussed discovery, the Baswell-Guthrie Defendants did not express any disagreement with plaintiffs' objection to producing public records.[561] Additionally, it appears that Cheryl Baswell-Guthrie was involved in the litigation in which those documents were filed. Although she is not listed as counsel of record in that case, she appeared in the courtroom in front of Judge Johnson at least once.[562] Finally, Exhibit 16, the letter, states on its face that Baswell-Guthrie received a copy of it.[563]

Subject to limited exceptions agreed to by the parties, discovery in this case

---

[558] *Id.* at 10 (alteration supplied).

[559] Doc. no. 169-1 (Email Conveying Deposition Transcript); doc. nos. 169-2, 169-3 (Emails Conveying Settlement Agreement).

[560] *See* doc. no. 159-50, at 9-10 (Settlement Agreement Between Plaintiffs and McDermott Defendants).

[561] *Cf.* doc. no. 169-7 (Email and Letter Memorializing Discussions Regarding Discovery).

[562] *See* doc. no. 169-4 (Transcript of Hearing Held in Civil Action No. 08-1573-IPJ-NE), at 3-4.

[563] Doc. no. 159-16 (Correspondence from Stephen Leara to Charles Ray), at 3.

closed on May 16, 2011.[564]

Federal Rule of Civil Procedure 37(c)(1) provides, in pertinent part, that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

A failure to disclose is considered harmless "when there is no prejudice to the party entitled to the disclosure." *Chapple v. State of Alabama*, 174 F.R.D. 698, 701 (M.D. Ala. 1997) (addressing a plaintiff's failure to disclose an expert witness). The court must consider "(1) the importance of the testimony; (2) the reason for the [offering party's] failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness [is] allowed to testify." *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004) (alterations supplied). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

Two of the documents at issue here — *i.e.*, Exhibits 18 and 50 — were provided to the Baswell-Guthrie Defendants before the close of discovery. Thus, they will not be stricken. Another, Exhibit 16, was sent to Baswell-Guthrie as an original recipient.

---

[564] Doc. no. 118 (Amended Scheduling Order).

The remaining documents are all public records, and plaintiffs timely objected to the production of public records.  Both the failure to disclose the public records, and the failure to disclose a document that was sent to Baswell-Guthrie when it was created, clearly are harmless.  Accordingly, the motion to strike is due to be denied in full.

## XIII.  CONCLUSIONS

Given the number of parties, transactions, claims, counts, and motions involved in this case, it will be helpful to briefly restate the dispositions contained within this opinion, as well as their rationales.

### A.    Choice of Law and Counts 4, 11, and 10

Part VII addressed the choice of law issue.  Alabama is a *lex loci delicti* jurisdiction.  Thus, in a tort action, Alabama typically applies the law of the state where the injury occurred.  In this case, the alleged injury is financial.  When the alleged injury is financial, the location where the injury is felt — here, California — is usually determinative.  However, Alabama maintains a public policy exception, whereby foreign law is not applied when its application would contravene the strong public policy of the State.  This court finds that, in regards to the liability of legal-service-providers who are licensed to practice law in Alabama, and who perform their professional services in this state, the Alabama Legal Services Liability Act of 1988 ("ALSLA") constitutes just such a policy, as it is a comprehensive and exclusive

215

system governing all legal actions against legal-service-providers for claims arising out of the provision of their services.  Therefore, Alabama law, not California law, governs the claims alleged in the following Counts of the plaintiffs' complaint.

### 1.    Count 4

Count 4 of the Second Amended Complaint asserts claims against the Wilmer & Lee Defendants and the Baswell-Guthrie Defendants based on common law. However, because the statutory ALSLA supercedes and governs plaintiffs' claims, and because this court further finds that the ALSLA unambiguously bars claims, like those asserted here, against legal-service-providers that are not brought under the ALSLA, the Count 4 claims are due to be dismissed.  Therefore, the motions for summary judgment filed by the Wilmer & Lee Defendants and the Baswell-Guthrie Defendants on Count 4 will be GRANTED,[565] and the claims asserted in Count 4 will be DISMISSED with prejudice.  *See* Part VII(B)(3), *supra*.

### 2.    Count 11

Count 11 of the Second Amended Complaint alleges that the Wilmer & Lee Defendants and One Source Title & Escrow, L.L.C., breached fiduciary duties arising out of their escrow responsibilities in the course of closing various property transactions.  For substantially the same reasons pertaining to the claims alleged in

---

[565] *See* doc. nos. 136 and 137.

Count 4 — that the ALSLA provides the exclusive remedy for such a claim — the motions for summary judgment filed by the Wilmer & Lee Defendants and the Baswell-Guthrie Defendants will be GRANTED,[566] and the claims asserted in Count 11 will be DISMISSED with prejudice.  *See* Part VII(B)(3), *supra*.[567]

### 3.   Count 10

Count 10 of the Second Amended Complaint asserts an "elder abuse" claim based upon a California statute against the Wilmer & Lee Defendants.  At bottom, that count is a legal malpractice claim dressed up in the clothing of a California statutory claim.  Hence, for substantially the same reasons articulated above in regards to the claims asserted in Counts 4 and 11, the Wilmer & Lee Defendants motion for summary judgment on Count 10 will be GRANTED,[568] and plaintiffs' "elder abuse" claim will be DISMISSED with prejudice. *See* Part VII(B)(3), *supra*.

## B.   Remaining Counts

### 1.   Count 2

Count 2 of the Second Amended Complaint alleges that the Wilmer & Lee Defendants violated Alabama's "blue sky laws" by materially aiding in the sale of

---

[566] *Id.*

[567] The claim against One Source Title fails for the additional reason that plaintiffs have not identified the existence of an escrow agreement.  *See* Part X(D), *supra*.

[568] Doc. no. 136.

unregistered securities: *i.e.*, the sale of interests in Corporate Drive, L.L.C. to the O'Shea Trust and Kate Donahue. The parties disagree whether Samuel Givhan (and, by extension, Wilmer & Lee, P.A.) "materially aided" the sale of securities.

Plaintiffs cited no evidence that Givhan's action were anything other than those typically performed within the traditional role of an attorney. *See* Part IX(A)(2), *supra*. Rather than promoting the sale of securities, Givhan's actions constituted legal advice and services regarding the requirements for compliance with Section 1031 on the Corporate Drive transaction. *Id*. The court is not persuaded that an attorney "materially aids" the sale of unregistered securities merely by providing traditional legal services on a real estate transaction which only happens to involve the sale of unregistered securities. Therefore, the Wilmer & Lee Defendants' motion for summary judgment on will be GRANTED,[569] and the claim asserted in Count 2 will be DISMISSED with prejudice. *See* Part IX(A)(2), *supra*.

### 2.    Count 3

Count 3 of the Second Amended Complaint asserts claims against the Wilmer & Lee Defendants and the Baswell-Guthrie Defendants under the Alabama Legal Services Liability Act. Each set of defendants is dealt with separately.

### a.    ALSLA and the Wilmer & Lee Defendants

---

[569] *Id.*

Plaintiffs raise two possible grounds for liability of the Wilmer & Lee Defendants under the ALSLA:  the failure to structure the Moquin Drive, Fountain, and Corporate Drive transactions in accordance with Section 1031, and the retention of Thomas O'Shea's $50,000.  Because the plaintiffs' expert witness, Joseph V. Crockett, is not qualified to testify on the standard of care under the ALSLA, *see* Part IX(B), *supra*,[570] the Wilmer & Lee Defendants' motion for summary judgment on the ALSLA claim arising from the Moquin Drive, Fountain, and Corporate Drive transactions will be GRANTED, and that claim will be DISMISSED with prejudice.

As for Thomas O'Shea's claim for the return of $50,000, the Wilmer & Lee Defendants admit that Mr. O'Shea is entitled to recover those funds.  Although Mr. O'Shea did not file a cross-motion for summary judgment, this court, *sua sponte*, will enter a money judgment in favor of Thomas O'Shea and against Wilmer & Lee, P.A., and Samuel Givhan.  *See* Part IX(C), *supra*.

In summary, all claims asserted in Count 3 against the Wilmer & Lee Defendants are resolved.

### b.    ALSLA and the Baswell-Guthrie Defendants

Plaintiffs allege that the Baswell-Guthrie Defendants are liable under the

---

[570] For the reasons stated in that part of the opinion, the Wilmer & Lee Defendants' motion to exclude Mr. Crockett's testimony, *see* doc. no. 186, will be granted.

219

ALSLA for their actions connected with the Old Madison Pike and Quality Circle acquisitions.   As a threshold matter, and construing the facts in the light most favorable to the non-moving party, the court finds that an attorney-client relationship existed between plaintiffs and Cheryl Baswell-Guthrie.  *See* Part X(A), *supra*.

Addressing the Old Madison Pike transaction, plaintiffs allege that Cheryl Baswell-Guthrie altered the Old Madison Pike tenancy in common agreement *after* plaintiffs had signed, dated, and notarized the signature pages of that agreement by adding the "good cause" prerequisite for terminating the property manger.  For the purposes of summary judgment, and taking the facts in the light most favorable to the non-moving party, this court finds that a genuine issue of material fact exists as to the question of whether Cheryl Baswell-Guthrie is the person who inserted the "good cause" condition after the signature pages of the agreement had been executed by plaintiffs.   Plaintiffs again failed to provide a qualified expert to establish the applicable standard of care under the ALSLA.   Even so, because an *ex post facto* insertion of a clause into a writing by an attorney falls within the "common knowledge and experience" exception, expert testimony is not needed to establish the standard of care.  *See* Part X(B)(1), *supra*.   Additionally, the Baswell-Guthrie Defendants' assertion that the insertion of the "good cause" condition did not result in damages lacks merit.  *See* Part X(B)(2), *supra*.  As a result, the Baswell-Guthrie Defendants'

220

motion for summary judgment on the ALSLA claim arising out of the Old Madison Pike transaction will be DENIED, insofar as the "plaintiffs" referred to in Paragraph 179 of the Second Amended Complaint are limited to the San Francisco Residence Club, Inc., KKA CAS, L.L.C., and TAK Tech Point, L.L.C.: *i.e.*, the entities that invested funds in the Old Madison Pike acquisition.  Hence, the Count 3 ALSLA claim of those three plaintiffs may proceed to trial.  On the other hand, insofar as the "plaintiffs" referenced in Paragraph 179 of Count 3 refer to individuals or entities other than those three previously mentioned, such claims will be DISMISSED with prejudice.  *See* Part VIII(B), *supra*.

The remaining claim in Court 3 against the Baswell-Guthrie Defendants springs from the acquisition of the Quality Circle property.  The Second Amended Complaint offers two theories of liability: (1) Ms. Baswell-Guthrie's unilateral insertion of a "good cause" condition in the tenancy in common agreement for that property; and (2) her failure to close the transaction in compliance with Section 1031.  While plaintiffs' brief opposing summary judgment raises a third theory (misrepresentation) for the first time, caselaw commands that the new theory be disregarded by this court.  *See* Part X(C), *supra*.

The allegation that Baswell-Guthrie's insertion of a "good cause" condition into the tenancy in common agreement is moot, because that agreement did not govern the

221

management of the Quality Circle property.  *See* Part X(C)(3), *supra*.  Finally, the plaintiffs could not qualify their proposed expert witness to establish a standard of care under the ALSLA.  Thus, the allegation that the Baswell-Guthrie Defendants are liable under the ALSLA for not closing the Quality Circle transaction in accordance with Section 1031 cannot succeed.  The Baswell-Guthrie Defendants' motion for summary judgment on claims arising out of the Quality Circle transaction will be GRANTED,[571] and those claims will be DISMISSED with prejudice.

**C**.  **The Baswell-Guthrie Defendants' Counterclaim**s

For the reasons stated in Part XI of this opinion, *supra*, and summarized below, (1) the Baswell-Guthrie Defendants' motion for partial summary judgment on their counterclaims will be DENIED,[572] and (2) the Plaintiffs' motion to dismiss the counterclaims will be GRANTED.[573]   The Baswell-Guthrie Defendants' counterclaims, therefore, will be DISMISSED with prejudice.

**1.    Counterclaim count 1: Fraud**

The Baswell-Guthrie Defendants' motion for partial summary judgment on the fraud counterclaim will be DENIED for two reasons.  First, the defendants adduce no evidence of any material misrepresentation made by plaintiffs or their agents.  Second,

---

[571] Doc. no. 137.

[572] Doc. no. 140.

[573] Doc. no. 84.

even if such evidence existed, it would not be reasonable for Cheryl Baswell-Guthrie, an experienced attorney familiar with "like-kind" exchanges, to have relied on any misrepresentations about the requirements for structuring transactions in accordance with Section 1031. *See* Part XI(A), *supra*.

Even after discovery, the Baswell-Guthrie Defendants were not able to identify any misrepresentation of a material fact and, thus, stood only upon the bare, generalized allegation in the counterclaim that false statements of material fact were made. Thus, as noted in Part XI(C)(2), the fraud counterclaim does not comply with the specificity requirements of Federal Rule of Civil Procedure 9. Amendment would be futile. Plaintiffs' motion to dismiss the fraud counterclaim, therefore, will be GRANTED, and the claim will be DISMISSED with prejudice.

### 2. Counterclaim count 2: Breach of contract

The second counterclaim count is for breach of contract. The alleged contract is the closing affidavit associated with the Old Madison Pike transaction. The Baswell-Guthrie Defendants argue that the plaintiffs breached the release provisions of that agreement by commencing the present action. With regard to the Baswell-Guthrie Defendants' motion for summary judgment on their own counterclaim,[574] the court finds it unnecessary to decide the issues of consideration and privity raised by

---

[574] Doc. no. 140.

223

plaintiffs.  Even if those questions were resolved in favor of the Baswell-Guthrie Defendants, the counterclaim cannot succeed at the summary judgment stage.  A release that purports to excuse wanton or willful conduct is void as against public policy in Alabama.  Plaintiffs have alleged Ms. Baswell-Guthrie inserted a "good cause" condition into the terms of the Old Madison Pike tenancy in common agreement *after* plaintiffs had executed the signature pages of that document.  Because such conduct is wanton or willful, the release could not serve as the basis of a contract.  Hence, the Baswell-Guthrie Defendants' motion for partial summary judgment on their breach of contract counterclaim will be DENIED.  *See* Part XI(B), *supra*.

The same rationale cannot be applied to the plaintiffs' motion to dismiss the breach of contract counterclaim.[575]  Because the Baswell-Guthrie Defendants were the movants for summary judgement on their own counterclaims, the facts were construed against them, and thus the insertion of the "good cause" condition was attributed to Ms. Baswell-Guthrie.  On a motion to dismiss, however, that construction of the facts is impermissible.  Nevertheless, the motion to dismiss the breach of contract counterclaim has merit.  The Baswell-Guthrie Defendants insufficiently pled the elements of a breach of contract claim: namely, that the contract claimed upon binds both plaintiffs and the Baswell-Guthrie Defendants, and that the counterclaim

---

[575] Doc. no. 84.

plaintiffs have performed under the contract.  As a result, the plaintiffs' motion to dismiss the breach of contract counterclaim will be GRANTED and, because amendment would be futile, that counterclaim will be DISMISSED with prejudice. *See* Part XI(C)(2), *supra*.

**D**.    **The Miscellaneous Discovery Motions**

The plaintiffs moved to compel the Baswell-Guthrie Defendants to produce certain documents on the grounds that they have been wrongfully withheld on the basis of the attorney-client privilege.[576]  As noted in Part XII(A), *supra*, Scott McDermott, on behalf of both himself and 7027 Old Madison Pike, L.L.C., waived the attorney-client privilege with regard to communications with Cheryl Baswell-Guthrie. Thus, the motion to compel will be GRANTED, and the Baswell-Guthrie Defendants will be ORDERED to produce the previously withheld documents.  The Baswell-Guthrie Defendants' motion to strike will be DENIED as MOOT.[577]

The Baswell-Guthrie Defendants filed a motion to quash a subpoena of the law firm of Maples & Ray, P.C.[578]  As set out in Part XII(B), *supra*, that motion will be DENIED as MOOT.

---

[576] *See* doc. no. 122.

[577] Doc. no. 184.  The court notes that its analysis of the plaintiffs' motion to compel did not rely on the documents that the Baswell-Guthrie Defendants sought to strike.  *See* Part XII(A), *supra*.

[578] Doc. no. 126.

The Baswell-Guthrie Defendants and the Wilmer & Lee Defendants jointly filed a motion to compel production of communications that the plaintiffs averred were protected by the attorney-client privilege.[579]   The defendants jointly requested leave to re-depose Michael Shiffman and Jeffrey Weiss, as well as the plaintiffs.   The defendants also jointly sought production of documents relevant to the issue of attorneys' fees.

As for the plaintiffs' claim of attorney-client privilege, the court finds that the privilege was waived as to both pre- and post-closing issues arising out of the Old Madison Pike and Quality Circle transactions.   *See* Part XII(C)(1), *supra*.   Thus, the defendants' joint motion to compel will be GRANTED in part, and plaintiffs will be ORDERED to produce within thirty days any correspondence or documents between themselves and California attorneys Michael Shiffman and Jeffrey Weiss that concern the Old Madison Pike and Quality Circle transactions, or the subsequent efforts to correct them.   The Baswell-Guthrie Defendants will further be given leave to re-depose, within sixty days, Messrs. Shiffman and Weiss, and, if necessary, the individual plaintiffs, subject to the same limitations on the scope of questioning.

With regard to the production of documentation concerning attorneys' fees, the plaintiffs will be ordered to produce materials evidencing the fees and expenses

---

[579] Doc. no. 128.

incurred in "correcting" the transactions that form the basis of this action, as those documents go to the issue of damages.   On the other hand, because the issue is premature, plaintiffs need not produce information regarding their attorneys' fees in prosecuting this case.   *See* Part XII(C)(2), *supra*.

The Baswell-Guthrie Defendants moved to strike six exhibits the plaintiffs submitted in opposition to summary judgement.[580]   Finding no merit to the motion, it will be DENIED in full.   *See* Part XII(D), *supra*.

DONE this 13th day of September, 2012.

_____
United States District Judge

---

[580] Doc. no. 164.

227